UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL WABER, derivatively on behalf of Nominal Defendant Motorola, Inc.<br><br>Plaintiff,<br><br>v.<br><br>DAVID W. DORMAN, GREGORY Q. BROWN, DR. SANJAY K. JHA, WILLIAM R. HAMBRECHT, JUDY C. LEWENT, KEITH A. MEISTER, THOMAS J. MEREDITH, SAMUEL C. SCOTT III, JAMES R. STENGEL, ANTHONY J. VINCIQUERRA, DOUGLAS A. WARNER III, DR. JOHN A. WHITE<br><br>Defendants,<br><br>and<br><br>MOTOROLA, INC.<br><br>Nominal Defendant | ) | Case No. |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, through his attorney of record, brings this action on behalf of Nominal Defendant Motorola, Inc. ("Motorola" or the "Company"), and alleges the following based upon personal knowledge and based upon an investigation conducted by his counsel for all other matters. That investigation has included a detailed review and analysis of public documents, United States Securities and Exchange Commission ("SEC") filings, court filings, press releases and

news articles concerning Motorola and other facts as set forth herein.[1]

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right of, and for the benefit of, Nominal Defendant Motorola, against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets that occurred from September 2007 through the present (the "Relevant Period") that have caused substantial loss to Motorola and other damages, such as severe injury to the Company's reputation and goodwill. This action arises out of Defendants' failure to exercise due diligence, which caused Motorola to issue false and misleading statements during the Relevant Period regarding Motorola's purported then-present business fundamentals, sales demand for its phones and financial projections during the Relevant period.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between Plaintiff and each Defendant and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

3. This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the

[1] Additional information is within the custody and control of Defendants. Plaintiff reserves the right to further amend this Petition and add additional Defendants, if needed, as additional information is disseminated. Because Defendants have failed to take action to remedy the breaches of fiduciary duties, the Relevant Period continues through this day instead of ceasing the day before the public became aware of the wrongdoing by Defendants.

exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391 (a) because Nominal Defendant is located within this District. Further, one or more Defendant has received substantial compensation in this District by engaging in numerous activities and conducting business in this district.

## PARTIES

5. Plaintiff Michael Waber, as set forth in the Verification, is and was at relevant times hereto a shareholder of Motorola. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation. Plaintiff is a citizen of the State of Pennsylvania.

6. Nominal Defendant Motorola is a corporation organized under the laws of the State of Delaware. Motorola's principal executive offices are located at 1303 East Algonquin Road, Schaumburg, Illinois 60196. Motorola is the largest U.S. maker of mobile phones and is engaged in providing technologies, products and services for mobile phones. Motorola's portfolio includes wireless handsets, wireless accessories, digital entertainment devices, wireless access systems, voice and data communications systems, and enterprise mobility products. The segments of the Company include Mobile Devices Segment (Mobile Devices), Home and Networks Mobility Segment (Home and Networks Mobility) and Enterprise Mobility Solutions Segment (Enterprise Mobility Solutions).

7. The principal occupation of Defendant David W. Dorman ("Dorman") is Non-Executive Chairman of the Board of Motorola. On March 31, 2008, Motorola's Board of Directors ("the Board" or "Board") elected Defendant Dorman to serve as the non-executive Chairman of the

Board. Dorman acts as the presiding director at meetings of the independent directors. According to the Company's Definitive Form 14A filed with the SEC on 3-13-2009 ("2009 Proxy"), Defendant Dorman is a member of the Governance & Nominating, Executive, and Finance Committees. Upon information and belief, Defendant Dorman is a citizen of the State of Illinois.

8. Defendant Gregory Q. Brown's ("Brown") principal occupation is serving as the Co-Chief Executive Officer of Motorola and Chief Executive Officer, of Motorola's Broadband Mobility Solutions. Brown has been a director of the Company since 2007 and has been an officer of the Company since joining in 2003. Brown has served as Co-Chief Executive Officer of Motorola, Inc. and Chief Executive Officer of Broadband Mobility Solutions since August 2008. Defendant Brown was President and Chief Executive Officer of Motorola, Inc. from January 1, 2008 until August 2008. From March 2007 through December 2007, Brown served as President and Chief Operating Officer. From January 2003 through March 2007, Brown served as Executive Vice President of Motorola, Inc. and President of various Motorola businesses within Broadband Mobility Solutions. Defendant Brown is not an independent director. According to the Company's 2009 Proxy, Brown is counted among those directors who "do not qualify as independent directors since they are, or have been, employees of the Company." Brown was thoroughly knowledgeable about all facets of Motorola's business operations and apparently received reports on a daily basis concerning Company sales. Defendant Brown was also completely involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates. Upon information and belief, Defendant Brown is a citizen of the State of Illinois.

9. The principal occupation of Defendant Dr. Sanjay K. Jha's ("Jha") is Co-Chief

Executive Officer, Motorola Inc. and Chief Executive Officer, Mobile Devices. He has been a Director and an Officer of the Company since 2008. On August 4, 2008, Defendant Jha became Co-Chief Executive Officer of Motorola, Inc., Chief Executive Officer of the Mobile Devices business of Motorola, Inc. and a member of the Board of Directors of Motorola, Inc. According to the Company's 2009 Proxy, Defendant Jha is counted among those directors who "do not qualify as independent directors since they are, or have been, employees of the Company." As a Co-CEO of Motorola in 2008, Sanjay Jha was listed by CNNMoney.com as being #1 on the list of the 10 biggest CEO paychecks for 2008. In 2008, Jha earned a total compensation of $104 million, which included a base salary of $484,615, no cash bonus, stocks granted of $36 million, and options granted of $67.5 million. Jha was also granted perks of $412,096. On February 11, 2010, the Company issued a press release announcing that the Company was targeting the first quarter of 2011 for the completion of its planned separation. Motorola intends to separate into two independent, publicly traded companies. The Company currently expects that, upon separation, one public company will be comprised of the Company's Mobile Devices and Home businesses and the other public company will be comprised of the Company's Enterprise Mobility Solutions and Networks businesses. On February 16, 2010, the Company announced that it had decided to increase the payment co-Chief Executive Officer Sanjay Jha receives in case the separation doesn't occur as planned. Jha will get $38 million if the split doesn't happen by June 30, 2011. The company originally agreed to give Jha $30 million if the separation didn't occur by Oct. 31, 2010. Motorola said last week it will split into two publicly traded companies next year, after delaying a plan first unveiled in 2008. If the plan is successful, Jha will get equity totaling 1.8 percent to 3 percent of the part that will keep making phones, depending on that business's market value. That's a change from his former agreement for fixed 3 percent. Defendant Jha is a citizen of the State of

Illinois.

10. Defendant William R. Hambrecht ("Hambrecht") has served as a Director of Motorola since 2008. According to the Company's 2009 Proxy, Defendant Hambrecht is a member of the Compensation & Leadership Committee. Defendant Hambrecht is a citizen of California.

11. Defendant Judy C. Lewent ("Lewent") has been a Director of the Company since 1995. According to Motorola's 2009 Proxy, Motorola and the Motorola Foundation have had various commercial and charitable relationships with the Massachusetts Institute of Technology ("MIT") and the MIT Media Laboratory. Judy Lewent is a life member of the MIT Corporation. Motorola and the Motorola Foundation made payments to MIT in each of the three years prior to the 2009 Proxy. The 2009 Proxy also states that Defendant Lewent is a member of the Compensation & Leadership and Executive Committees, as well as Chair of the Finance Committee. Upon information and belief, Defendant Lewent is a citizen of the State of Texas.

12. Defendant Keith A. Meister ("Meister") has been a Director of the Company since 2008. According to the Company's 2009 Proxy, Defendant Meister is a member of the Audit & Legal Committee. Defendant Meister is a citizen of the State of New York.

13. Defendant Thomas J. Meredith ("Meredith") has been a Director of the Company since 2005. Meredith served as Acting Chief Financial Officer and Executive Vice President of Motorola from April 1, 2007 until March 1, 2008 and remained an employee of the Company until March 31, 2008. His term as Acting Chief Financial Officer and Executive Vice President of Motorola ended on March 1, 2008 and, under the terms of his agreement, his employment ended on March 31, 2008. According to the Company's 2009 Proxy, in February 2008, the Board determined that after the end of his employment Meredith's independence under the Motorola, Inc. Independence Guidelines and the NYSE independence requirements was "not impaired by his status

as an employee of the Company from April 1, 2007 through March 31, 2008, because he was serving as an interim employee of the Company at the request of the Board while the Company conducted a search for a permanent chief financial officer." Meredith should not be considered an Independent Director due to the fact that he was an employee of the Company during the Relevant Period and is still subject to entanglements as a result of actions taken during that employment. According to the Company's 2009 Proxy, Defendant Meredith is a member of the Finance Committee. Meredith was thoroughly knowledgeable about all facets of Motorola' s business operations as he apparently received reports on a daily basis concerning Company sales. Defendant Meredith was also thoroughly involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates. Upon information and belief, Meredith is a citizen of the State of Texas.

14. Defendant Samuel C. Scott III ("Scott") has been a Director of the Company since 1993. According to the Company's 2009 Proxy, Scott is Chair of the Compensation & Leadership Committee as well as a member of the Executive Committee. Upon information and belief, Scott is a citizen of the State of Illinois.

15. Defendant James R. Stengel ("Stengel") has been a Director of the Company since 2005. According to the Company's 2009 Proxy, Defendant Stengel is a member of the Compensation & Leadership Committee. Defendant Stengel is a citizen of the State of Ohio.

16. Defendant Anthony J. Vinciquerra ("Vinciquerra") has been a Director of the Company since 2007. According to the Company's 2009 Proxy, Defendant Vinciquerra is a member of the Audit & Legal Committee. Upon information and belief, Vinciquerra is a citizen of

the State of California.

17. Defendant Douglas A. Warner III ("Warner") has been a Director of the Company since 2002. According to the Company's 2009 Proxy, Defendant Warner is the Chair of the Governance & Nominating Committee and a member of the Executive Committee as well as the Finance Committee. Upon information and belief, Warner is a citizen of the State of New York.

18. Defendant Dr. John A. White ("White") has been a Director of the Company since 1995. According to the Company's 2009 Proxy, Defendant John A. White is Chair of the Audit & Legal Committee as well as a member of the Executive Committee. Upon information and belief, White is a citizen of the State of Arkansas.

19. Defendants David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White are collectively referred to hereinafter as the "Individual Defendants." Defendant Brown and Defendant Jha are collectively referred to hereinafter as the "Insider Selling Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Motorola's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## STOCK SALES

20. The following table details a compilation of Insider Selling Defendants' stock sales compiled from the Company's Form 4 filings with the SEC.

| Form 4 Filed On Date | Transaction Date | Name of Director | Number of Shares sold | Price Sold At | Proceeds |
|---|---|---|---|---|---|
| 11/6/2007 | 11/3/2007 | non-Defendant Zander | 30,272 | $17.95 | $543,382.40 |
| 11/6/2007 | 11/3/2007 | Defendant Brown | 20,181 | $17.95 | $362,248.95 |
| 1/3/2008 | 1/1/2008 | Defendant Brown | 8,163 | $16.04 | $130,934.52 |
| 1/3/2008 | 1/1/2008 | non-Defendant Zander | 98,167 | $16.04 | $1,574,598.68 |
| 1/7/2008 | 1/5/2008 | non-Defendant Zander | 82,251 | $15.07 | $1,239,522.57 |
| 1/15/2008 | 1/14/2008 | non-Defendant Zander | 651 | $14.64 | $9,530.64 |
| 1/15/2008 | 1/14/2008 | Defendant Brown | 27 | $14.64 | $395.28 |
| 5/6/2008 | 5/4/2008 | non-Defendant Zander | 18,058 | $10.03 | $181,121.74 |
| 8/4/2009 | 7/31/2009 | Defendant Brown | 62,733 | $7.16 | $449,168.28 |
| 8/4/2009 | 7/31/2009 | Defendant Jha | 289,783 | $7.16 | $2,074,846.28 |
| 8/4/2009 | 7/31/2009 | Defendant Jha | 179,204 | $7.16 | $1,283,100.64 |
| 10/6/2009 | 10/5/2009 | Defendant Brown | 69,038 | $8.21 | $566,801.98 |
| 2/16/2010 | 2/11/2010 | Defendant Jha | 52,971 | $6.65 | $352,257.15 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | Total Sales Directors | | $5,219,753.08 |
| | | | Total Sales Including Zander | | $8,767,909.11 |

## CORPORATE GOVERNANCE AND COMMITTEES

21. The Company's 2009 Proxy provides that "the Board has delegated certain authority to several committees. The Board currently has the following committees: (1) Audit and Legal, (2) Compensation and Leadership, (3) Governance and Nominating, (4) Executive, and (5) Finance."

22. According to the Company's 2009 Proxy, the Functions of the Company's Audit and Legal Committee are to:

- Assist the Board in fulfilling its oversight responsibilities as they relate to the Company's accounting policies, internal controls, disclosure controls and procedures, financial reporting practices and legal and regulatory compliance;
- Hire the independent registered public accounting firm;
- Monitor the qualifications, independence and performance of the Company's independent registered public accounting firm and the performance of the Company's internal auditors;
- Maintain, through regularly scheduled meetings, a line of communication between the Board and the Company's financial management, internal auditors and independent registered public accounting firm;
- Oversee compliance with the Company's policies for conducting business, including ethical business standards;
- Prepare the report of the Committee included in the Company's Proxy Statements.

23. According to the Company's 2009 Proxy, the functions of the Company's Compensation and Leadership Committee are to:

- Assist the Board in overseeing the management of the Company's human resources, including:

  - compensation and benefits programs
  - CEO performance and compensation
  - executive development and succession and diversity efforts
- Oversee the evaluation of the Company's senior management
- Review and discuss the Compensation Discussion and Analysis ("CD&A") with management and make a recommendation to the Board on the inclusion of the CD&A in its Proxy Statement
- Prepare the report of the Committee included in the Company's Proxy Statement

24. According to the Company's 2009 Proxy, the functions of the Company's Governance and Nominating Committee are to:

- Identify individuals qualified to become Board members, consistent with the criteria approved by the Board;
- Recommend director nominees and individuals to fill vacant positions;
- Assist the Board in interpreting the Company's Board Governance Guidelines, the Board's Principles of Conduct and any other similar governance documents adopted by the Board;
- Oversee the evaluation of the Board and its committees;
- Generally oversee the governance and compensation of the Board.

25. According to the Company's 2009 Proxy, the functions of the Company's Executive Committee are to:

- Act for the Board between meetings on matters already approved in principle by the Board;
- Exercise the authority of the Board on specific matters assigned by the Board from time to time.

26. According to the Company's 2009 Proxy, the functions of the Company's Finance

Committee are to:

- Review the Company's overall financial posture, asset utilization and capital structure;
- Review the need for equity and/or debt financing and specific outside financing proposals;
- Monitor the performance and investments of employee retirement and related funds;
- Review the Company's dividend payment plans and practices;

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27. By reason of their positions as officers, directors and/or fiduciaries of Motorola and because of their ability to control the business and corporate affairs of Motorola, the Individual Defendants owed Motorola and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Motorola in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Motorola and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28. Each director and officer of the Company owes to Motorola and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Motorola, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Motorola, each of the Individual Defendants had access to adverse non public information about the financial condition, operations and improper representations of Motorola.

30. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Motorola, and was at all times acting within the course and scope of such agency.

31. To discharge their duties, the officers and directors of Motorola were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Motorola were required to, among other things:

a) refrain from acting upon material inside corporate information to benefit themselves;

b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e) remain informed as to how Motorola conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations; and

g) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

32. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Motorola, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Motorola's Board during the Relevant Period.

33. The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions[2] As a result, Motorola has expended, and will continue to expend, significant sums of money.

34. Moreover, these actions have irreparably damaged Motorola's corporate image and goodwill. The Individual Defendants have misled the investing public, such that Motorola's ability

[2] . For example, a class action lawsuit was filed on or about January 21, 2010 n behalf of purchasers of Motorola securities in the United States District Court for the Northern District of Illinois (“Federal Class Action” or “Federal Action”) alleging violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, as well as the control person provisions o the Securities Exchange Act..In addition, two additional class actions were filed on or about February 10, 2010 on behalf of all participants in or beneficiaries of the Motorola 401(k) Plan (the "Plan") between July 1, 2007 and the present and whose accounts included investments in Motorola stock, alleging violations of Sections 404 and 405 of the Employee Retirement Income Security Act of 1974 ("ERISA").

to raise equity capital or debt on favorable terms in the future is now impaired.

## SUBSTANTIVE ALLEGATIONS

35. Motorola is the largest U.S. maker of mobile telephones. The Motorola RAZR (pronounced "razor"), a series of clamshell mobile camera phones, was first developed in July 2003 and introduced in August 2004. The RAZR was the slimmest phone during its release in 2004, and therefore stood out among other phone models. Sales of the RAZR surpassed Motorola's lifetime projections in its first three months. The RAZR was the most popular mobile phone ever released until the iPhone 3G beat out the RAZR for the top spot in November 2008.

36. Motorola sold over 50 million units by June 2006 and more than 110 million units of the RAZR were sold by the time it was replaced by the RAZR2 in July 2007. This advanced Motorola's position to second place in the total hand-held market, and ensured Motorola was surpassed only by Nokia.

37. Because of its striking appearance and thin profile, the RAZR was initially exclusively marketed as a phone for the fashion-forward, but within a year, its price was lowered and it was wildly successful selling over 50 million units by July 2006, making it the most popular clamshell phone. *PC World* would list the RAZR at #12 in *The 50 Greatest Gadgets of the Past 50 Years* released on December 24, 2005.

38. In June 2007, competition increased dramatically when Apple launched its iPhone, which blended the iPod media player with an e-mail-equipped handset. Apple sold out of the iPhone at most of its stores less than a week after the product's debut.

39. In July 2007, Motorola discontinued sales of the original RAZR, replacing it with a release of the new upgraded Motorola RAZR2 series. Marketed as a sleeker and more stable design of the RAZR, the RAZR2 included more features, improved telephone audio quality, and a touch

sensitive external screen. That same month, the struggling cell-phone maker warned investors of a 2Q 07 loss.

40. On September 7, 2007, the Company held a financial analyst meeting. Addressing the market's response to the Company's new product offerings, defendants reported that consumer response was overwhelmingly positive. Specifically as to the Mobile Devices segment, Brown's presentation promised "Mid-to-high single-digit sales growth" and "Solid double-digit OM [operating margins]." Meredith followed up stating "For 2008, expect ... Profitable in all businesses."

41. Despite multiple rereleases of the RAZR and management's repeated promises that the Company was "seamlessly" integrating new technologies to keep up with the advent of so-called "smart phones," Motorola was not. It was a "one hit wonder" and as defendants would later admit, the RAZR line had since grown "long in the tooth."

42. Indeed, cell phones are usually replaced every 12 to 18 months and Motorola was too slow in redesigning its model to keep up with the advances of its competitors. In June 2007, Apple Inc. released its iPhone, a smartphone that effectively integrated internet technology, causing Motorola's market share to begin to plummet from 21 % in FY 2007 down to 13% by the end of 3Q 2007 (the quarter ended September 29,2007).

43. Motorola released yet another disappointing quarter's results on October 25, 2007, missing guidance for the third quarter in a row. 3Q 07 net income declined 94% to $60 million, from $968 million a year earlier. Motorola posted sales of $8.81 billion, also down from 2006 third quarter sales of $10.6 billion. For the first nine months of 2006, Motorola recorded a $149 million loss on sales, down 13% to $30 billion. ***Analysts were then predicting FY 2007 revenues would decline 14%, to $36.7 billion during FY 2007, down from $42.9 billion in FY 2006.***

44. On October 25, 2007, Motorola released its 3Q 07 financial results. The earnings release defendants issued that day reported 3Q 07 sales of $8.8 billion, $4.5 billion of which were in the Mobile Devices segment, down 36% from the 3Q 06. The Mobile Devices segment incurred an operating loss of $138 million in the 3Q 07, compared to an operating profit of $843 million in the 3Q 06. But the Company's October 25, 2007 release affirmatively stated "Motorola's share of the global handset market for the quarter is estimated to be 13 percent." Non-Defendant Zander was quoted in the October 25, 2007 release, stating management was "pleased with the improvement in the financial performance of mobile devices and we look forward to building upon the progress we have made." The quote from Zander also assured that "[w lith our focus on . . . the initiatives we are taking in mobile devices we will further improve our performance and create long-term shareholder value." As to the Company's "Outlook," the October 25, 2007 release stated the "company's outlook for earnings per share from continuing operations in the fourth quarter is $0.12 to $0.14." (Emphasis added.)

45. Non-Defendant Zander and Defendants Brown and Meredith also held an earnings conference that day to discuss the current status of the Company's sales and 3Q 07 financial performance and the ongoing 4Q 07 quarter with the investment community. Concerning the Company's 3Q 07 performance, especially in its Mobile Devices segment, defendants stated:

- [Zander:] ***"Our third quarter can be characterized by one word, progress.*** We improved our earnings and cash flow significantly compared to the second quarter and made ***substantial improvement in all key metrics in Mobile Devices."***

- [Zander:] ***"In Mobile Devices, we began to move in the right direction. We increased unit sales and gross margin percentage while lower operating expenses. These improvements resulted in significantly lower operating loss."***

- [Brown:] "Our estimated market share in the quarter was about 13%."

- [Brown:] "Compared to last quarter, gross margin percentage improved, again as a result of our new product offerings, ***which are collectively running at higher margins than the***

***mature products in the portfolio."***

- [Brown:] "Moving on to the products in the feature phone segment, ***RAZR and KRZR continued to be top sellers globally.*** We sold over 8 million RAZRs, bringing us to a total of now over 110 million RAZRs and in the quarter, nearly 3 million ***KRZRs. RAZR 2s began shipping in all regions and technologies. It's off to a great start, meeting the needs of the demanding feature phone users and accounted for over 900,000 units in the quarter. We .. just recently we announced the RAZR 2 Luxury Edition in time for the holiday selling season."***

- [Brown:] "So to recap, ***the operational changes we have made in Mobile Devices are beginning to yield results and we are making progress.*** We improved gross margin percentage . . . . "

- [Bear Stearns analyst:] " ... you've been losing share in a bunch of regions around the world. And I wonder if you expect to gain a little bit of the share back in the fourth quarter or whether that little bit of drop is going to continue for a while."

- [Zander:] " ... I think you're referring to mobile devices. ***We actually think we gained share."***

- [Brown:] ". . . ***we're pretty pleased with RAZR2 sales out of the gate*** with over 900,000 units in the quarter and now being made available in all technologies and geographies."

- [Zander:] "We are pleased with RAZR2s. I think we did almost 1 million units. I would say that was done in 80 days. I must say that the popular product everybody talks about today also did about 1 million units in 90 days. ***So we're pretty excited about the additional acceptance with the RAZR2 product."***

(Emphasis added.)

46. Defendants also provided a very favorable outlook for the Company's 4Q 07, then well underway:

- [Zander:] "Q3 was about execution, doing what we said we were going to do, but we also recognized there is lot more work to do. ***Our management team is committed to returning the company to our financial targets as outlined during the September Analyst meeting."***

- [Meredith:] "Moving on to our outlook for the fourth quarter, we are encouraged by progress in Mobile Devices as compared to prior quarters. ***We expect continued improvement in the fourth quarter."***

- [Meredith:] ***"We expect fourth quarter earnings per share from continuing operations to be in the range of$0.12 to $0.14."***

- [Brown:] "In closing, as we look overall, third quarter operating performance, we're seeing results from the changes we've implemented***. We will continue the momentum and drive further improvements in the coming quarter.*** With continued execution, our global brand, and healthy market trends across key businesses, we're well positioned for the long term."

- [Zander:] "I think what we need to do in the last six months is to put the operational discipline and execution back into Mobile Devices. ***It's not dependent on a one-hit wonder such as RAZR even though everybody would like to have that. And I think we're doing that."***

- [Meredith:] "In terms of mobile devices, ***we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line."***

- [Brown:] "The overall guidance as we reflected is $0.12 to $0.14. Within the line items, we wouldn't give that breakdown. Just on gross margin percentage, we have sequentially improved it for 1 think three quarters in a row and also for three quarters in a row in Mobile Devices. ***So it's a very regimented and disciplined stair step and we're working hard on all levers: pricing, product efficiencies, new product, higher gross margin, richer experiences and that's the cadence of what we're going to continue to drive from an overall portfolio standpoint over time***."

(Emphasis added.)

47. At the same time, Nokia increased its market share to 38.1 % of unit sales in the 3Q 07 from 35.1 % a year earlier, according to Stamford, Connecticut-based researcher Gartner Inc. ("Gartner"). Additionally, Samsung boosted its market share to 14.5% from 12.2%, while Motorola fell to 13.1 % from 20.7%.

48. In an attempt to mollify the investment community, and to protect their positions of power and prestige at the helm of Motorola, during the Company's October 25, 2007 3Q 07 earnings conference, defendants assured the investment community they had finally turned a corner. Defendants stated that demand for the Company's new RAZR2 released in August 2007, just in time for the Christmas 2007 selling season, was robust, with the Company having already sold 900,000 units between its August 2007 release date and the end of the 3Q 07 on September 30, 2007. Defendants also stated that based on then-current demand and sales, they were projecting earnings

per share of $0.12-$0.14 in 4Q 07, then one-third underway.

49. Yet secretly, defendants knew that in reality the Company had already irreparably lost significant market share to the Apple, Inc. iPhone and other smart phone devices, that consumers were not buying the new RAZR2, that Motorola's share of handset sales was actually declining and that having already slashed prices to maintain market share, there was no way Motorola could report earnings of anywhere near $0.12-$0.14 per share in the 4Q 07.

50. On November 14, 2007, defendant Brown appeared at the UBS Global Technology & Services Conference. Asked about the Company's 4Q 07 forecast, Brown reiterated that "what we said in the ... Q3 earnings call is that we thought units would be growing sequentially along with revenue and bottom line OE [operating earnings] would improve sequentially as well."

51. On November 27, 2007, Motorola announced that Edward J. Zander ("Zander") who served as Chief Executive Officer ("CEO"), Chairman of the Board and Chairman of the Board's Executive Committee since January 2004, was being replaced as CEO effective December 31, 2007 and would not run for re-election to the Motorola Board at the 2008 annual meeting of shareholders. This sudden disclosure spooked the market and the Company's stock price began a downward spiral.

52. Zander would serve as Strategic Advisor to the incoming CEO, a non-officer employee position, beginning January 1, 2008, through January 5, 2009. During this time, Zander would continue to receive his regular base salary and benefits. The Company also announced on November 30, 2007 that Brown, who had served as Motorola's President and Chief Operating Officer since March 21, 2007, would replace Zander as President and CEO of Motorola effective January 1, 2008.

53. Responding to investor unrest, on December 6, 2007, Motorola Chief Financial

Officer Thomas Meredith appeared at a conference in San Francisco to reassure investors that Motorola's 4Q 2007, then more than two-thirds complete, was succeeding financially. This conference was also taking place two-thirds of the way into the 4Q 07, nearly two weeks after so-called "Black Friday," the Friday following Thanksgiving during which retailers finally become profitable and electronics manufacturers conclusively learn what will and what will not sell in the holiday season that year.

54. Defendant Meredith appeared at the Lehman Bros. conference in San Francisco officiated by Jeff Kvaal, analyst with Lehman Bros., and webcast. Meredith opened up his presentation by promising that the recent elevation of Brown to "the CEO position effective January 1st ... was part of a very orderly and disciplined process."Attempting to dispel legitimate concerns the investment community had with the sudden management flip-flop, Meredith emphatically stated that:

> [W]hat we failed to take into account frankly, when we made the announcement just recently, that he was becoming the CEO is that you would have great angst over the fact that we made this announcement and didn't affirm our guidance on the fourth quarter. ***So just to dispel any sort of inadvertent message, let me be real clear. We said on our third quarter earnings call that for the fourth quarter, we would show earnings from continuing operations in the 0.12 to $0.14 range. I am affirming that.***

(Emphasis added.)

55. During the 3Q 07 earnings conference Meredith also confirmed that:

> ***[W]e said that we were going to have sequential improvement in top and bottom-line in mobile devices, a part of our business that seems to have a lot people quite excited regularly, and I will affirm that we will have sequential improvement in our top and bottom-line.***

(Emphasis added.)

56. Later during the conference, in response to a request by Lehman Brothers analyst

Jeff Kvaal ("Kvaal"), Meredith commented on projected 4Q margins, again assuring that the Company had turned a corner. As part of that assurance, Meredith quoted comments made by Motorola's incoming and outgoing CEOs from the 3Q 07 earnings conference call and then stated that:

> As I mentioned ***we expected and still expect an improvement in our top and bottom line over last quarter.*** And this is - Q3 was a start or progress I think is the words that Ed and Greg have used. And I believe that's sort of where we are.

(Emphasis added.)

57. Responding later in the call to Kvaal's questioning about enterprise spending levels, Meredith again confirmed that ***"business for us continues to be very robust business and I mentioned earlier that I was affirming our guidance with sequentially up revenues and continuing strong operating margin performance,"*** adding: ***"I love that business."*** Following up, K vaal asked if that was ***"[b]ecause of the operating margins, or the growth profile?,"*** to which Meredith emphatically responded: ***"Both."*** (Emphasis added.)

58. As predicted, the market responded exuberantly to this news and the Company's stock price partially recovered***. According to Bloomberg, "Motorola, Inc., the largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the Razr and Q handsets."*** According to Bloomberg, on this announcement: "Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock Exchange composite trading." (Emphasis added.)

59. As a result of defendants' misleading statements, January 11, 2009, the Company's $0.12-$0.14 per share earnings guidance previously forecast was inaccurate and remained uncorrected. In fact, Bloomberg reported that as of January 4, 2008, average analyst profit expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14

per share.

60. The above statements made by Defendants in the Relevant Period were false and misleading. The statements were false, misleading and/or incomplete in that:

a) The Company knew it was not experiencing the robust demand for the RAZR2 it claimed it was experiencing;

b) The Company knew that the thinner RAZR2, which went on sale in the U.S. in August 2007, failed to attract buyers in the 2007 holiday buying season because it was not different enough from the original RAZR to warrant the $299 price tag;

c) Motorola knew it was still losing significant market share to Apple, Inc.' s iPhone, Samsung Electronics, Co.'s Sync camera handset and Nokia Oyj's devices;

d) After falling from 21 % at the end of FY 2006 to 13 % at the end of Q3 07, Motorola knew its market share had not stabilized but was still in a freefall during Q4 07;

e) The Company knew it was not on track to bring in anywhere near the $0.12-$0.14 per share in earnings defendants were projecting for Q4 07 ***purportedly based on results available to defendants two weeks after Black Friday;***

f) Motorola knew it was not on track to achieve ***"sequential improvement in top and bottom-line in mobile devices" during its Q4 07;***

g) The Company knew that the secret settlement talks concerning a resolution of ongoing litigation with Freescale arising out of its spinoff and provision of chips to Motorola would require Motorola to take a very material charge to earnings during the 4Q 07;

h) The Company was aggressively buying back its stock on the open market during the 4Q 07 in order to buttress its declining stock price; and

i) Defendants knew Motorola was operating with significantly defective internal controls, rendering its publicly disclosed financial results and projections meaningless.

**<u>THE TRUTH BEGINS TO EMERGE</u>**

61. On January 23, 2008, defendants issued a release reporting Motorola's 4Q 07 financial results, followed by an earnings conference held with the investment community later that day, during which the following admissions were made:

- The Company sold only 1.5 million RAZR2 phones during the 4Q 07;

- "[D]emand for [Motorola's Mobile Device segment] products ha[d] slowed" during the 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- Motorola's market share in the Mobile Devices segment had fallen further in the 4Q 07;

- Motorola earned only $0.04 cents a share in the 4Q 07, 84% less the $0.25 per share earned in the 4Q 06, and nowhere near the $0.12-$0.14 per share defendants had claimed the Company was on track to earn throughout the 4Q 07;

- Motorola booked a FY 07 loss of $0.02 per share on sales of $36.6 billion, down 18.2% from FY 2006's sales;

- Instead of "sequential improvement in top and bottom-line in mobile devices" in the 4Q 07, sales in the Mobile Devices segment fell 38% compared to the 4Q 06 and declined from a 4Q 06 operating profit of $341 million to a 4Q 07 operating loss of $388 million;

- FY 2007 sales in the Mobile Devices segment declined by 33% from FY 2006 and the segment incurred an operating loss of $1.2 billion compared to operating earnings of $2.7 billion in FY 2006;

- Defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge to resolve litigation arising out of the Freescale spin-off and Freescale's chip supplier status with Motorola;

- The Company had buttressed its falling stock price during the 4Q 07 by using Company funds to purchase more than a half-billion dollars worth of stock on the open market;

- For the 1 Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05- $0.07 per share (where defendants' positive statements had led them to expect a $0.10 per share profit); and

- Motorola said it expected to "lose market share in Ql," whereas Apple said its iPhone sales projections were strong, with that company saying it was on track to sell 10 million iPhones In FY2008.

62. In response to an analyst's questions, Meredith finally expressly conceded that the decline in Motorola handset sales dated back to Black Friday - which occurred that year on Friday, November 23, 2007, ***nearly two weeks before*** defendants affirmed 4Q 07 guidance on December 6,

2007:

> [Bear Stearns:] And Thomas, if I could follow up, ***going back to early December, you talked a little bit more bullishly about the handset business overall. Was there really a major drop-of/in December or was this weakening through the quarter?***
>
> [Meredith:] ***I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated.***

(Emphasis added.)

63. The market's reaction was immediate. On this news the Company's stock price plummeted 18.8%, or $2.31 per share, in *a single trading session* to close at $10.01 per share, its lowest level in five years, on unusually high volume of more than 167 million shares trading. According to a January 23, 2008 Bloomberg report, "That's the biggest decline in more than five years and puts the stock at its lowest since September 2003 .... "

64. According to Piper Jaffray & Co's Michael Walkley, "[t] heir phones are just not selling through," adding that ***the "overall health of the market is fine; these problems are Motorola-specific."*** (Emphasis added). As a result of defendants' misleading statements, January 11, 2009, the Company's $0.12-$0.14 per share earnings guidance previously forecast was inaccurate and remained uncorrected. In fact, Bloomberg reported that as of January 4, 2008, average analyst profit expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14 per share.

65. Following defendants' disclosures, the Company's stock and debt ratings were slashed. Fitch cited "[l]imited visibility and expected further delays in returning the mobile devices business to consistent profitability and sustainable market share," the "company's slower than anticipated progress in turning around the mobile devices business," and less than optimal margin improvements in the 4Q 07. Moody's Investors Services cited "the company's recently announced

downward guidance for Q 1 2008 and the continued delays in turning around the handset business." Moody's stated that it had been led to expect improvements in Motorola's business by early 2008. Standard & Poor's slashed Motorola's debt ratings to two levels below investment grade, stating the Company's new handsets failed to catch on with consumers. There are "limited signs of recovery" because the RAZR2 had not met expectations according to Standard & Poor's.

66. The Company's global handset market share continued its rapid decline during FY 2008, falling to just 6% by Q 1 2009.

67. As the truth about Motorola's 4Q 07 sales and financial results were finally disclosed, the Company's stock price plummeted, closing at just $10 per share by January 23, 2008, erasing hundreds of millions of dollars in market capitalization.

**SPLITTING THE COMPANY IN TWO**

68. On March 27, 2008, the New York Times reported that “After a two-month strategic review of its businesses, Motorola said on Wednesday that it would split itself into two separate publicly traded companies, spinning off its unprofitable mobile phone unit to investors.” Gregory Q. Brown, Motorola's chief executive, conceded that the main problem facing the company was its inability to come up with new products to replace the highly successful Razr, which was once a must-have phone but has faded from the scene. The article went on to state:

> Rivals aside, Motorola is also facing pressure from investors -- in particular Mr. Icahn -- who are dissatisfied with Motorola's weak stock performance; the shares have dropped 44 percent in the last year. Cellphone production is the largest division of the company, with $18.99 billion in net sales in 2007, a 33 percent decline from a year earlier.
>
> Last year, the division lost $1.2 billion. Motorola's other two units are smaller but profitable.

> Analysts have questioned what effect a split would have on operations and on attracting solid executives to the troubled company. Already there has been an exodus of executives from Motorola, among them Stu Reed, the former chief of the mobile devices division.
>
> "The danger is they are getting rid of the underperforming part of the business just to get rid of it," Mr. Entner of IAG said. "The fear is in a year or two the operations will cease to exist."
>
> The profitable side of Motorola is decidedly less well known than the mobile devices division. It makes set-top boxes and products used by businesses and law enforcement officials for scanning and fingerprinting, as well as data and video communications systems for public agencies like fire departments.
>
> Motorola expects to have the spinoff, which will be a tax-free distribution to shareholders, completed by 2009.
>
> * * * *
>
> Selling it to a competitor was one option that Motorola pursued, according to a person involved in those discussions, but there were no takers.
>
> Mr. Brown declined to discuss whether the division could be sold. "We've never had a 'For Sale' sign on it," he said. "After our review, we believe this is the appropriate action."

69. On March 27, 2008, USA Today reported that Motorola "which invented cellphone technology more than 20 years ago and sparked a global telecommunications revolution", was planning to split itself into two companies  The article stated:

> Motorola shareholders will get stock in both companies. The tax-free deal is expected to close in 2009 if approved by the IRS.
>
> Once a global leader in wireless handsets, Motorola today is a faraway No.2 to Nokia, which continues to churn out cool new products with dizzying speed.
>
> * * * *
>
> Shortly after Brown was named CEO in January, Motorola said it was considering a range of strategic possibilities, including the sale of the handset division. Motorola got no takers.

> Brown, who had been chief operating officer, says, "We never had a 'for sale' sign on the mobile business."
>
> Analyst John Jackson of Yankee Group says the split is a bitter turn for Motorola's storied handset business: "They can't sell it, and they can't fix it."

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

70. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects, in order to allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Motorola and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Motorola, regarding the Individual Defendants' management of Motorola's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by Defendants throughout the Relevant Period; (iv) sell nearly $5,219,753 worth of personally held Motorola shares while in possession of material, non-public information. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants Collectively and individually took the actions set forth herein.

72. The Individual Defendants engaged in a conspiracy, common enterprise and/or

common course of conduct commencing by at least the start of the Relevant Period and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that Motorola was misrepresenting its business prospects and that the Defendants had breached their fiduciary duties in managing the affairs of the Company. The Defendants also made other specific, improper statements about Motorola's financial performance and future business prospects, as alleged herein. Further, the Defendants took actions that were not the product of valid business judgment, but rather the result of an entrenchment motive.

73. The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, gross mismanagement and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Motorola common stock so they could (i) dispose of approximately $5,219,753 of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

74. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and release improper statements, taking actions that were not the product of valid business judgment and failing to properly manage the affairs of the Company. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

75. Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## MISLEADING STATEMENTS

76. The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Motorola a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

77. This material, non-public information principally included the fact that Motorola would not meet is earnings forecasts. Furthermore, Defendants Meister, Meredith, Vinciquerra and John A. White (Chair), as members of the Audit and Legal Committee[3] had a special duty to know and understand this material information as set out in the Audit and Legal Committee's charter which provides that the Audit and Legal Committee is responsible for reviewing the Company's quarterly earnings releases and financial information and earnings guidance provided to analysts and rating agencies.

78. Defendants Brown and Jha,[4] as officers of Motorola, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal

---

[3] The Company's 2009 Proxy lists Defendants Meister, non-Defendant Sommer, Vinciquerra, and White (Chair) as members of the Company's Audit & Legal Committee. On May 18, 2009, non Defendant Ron Sommer submitted his resignation as a member of the Board of Directors of Motorola, Inc. (the "Company") and its committees, effective July 29, 2009. Defendant Meredith is now listed as a member of the Audit & Legal Committee on the Company's Website, www.motorola.com, presumably serving as non-Defendant Sommer's replacement on the Committee. *last accessed February 16, 2010.*

[4] And for a good portion of the Relevant Period, Meredith.

corporate documents and reports. Moreover, Defendants David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White, as directors of Motorola had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Motorola to the investing public and the Company's shareholders during the Relevant Period.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

79. Plaintiff brings this action derivatively in the right and for the benefit of Motorola to redress injuries suffered, and to be suffered, by Motorola as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Motorola is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

80. Plaintiff will adequately and fairly represent the interests of Motorola in enforcing and prosecuting its rights.

81. Plaintiff is a current owner of the Company's stock and owned shares during times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Currently, the Board consists of the following 12 individuals: David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White.

82. Plaintiff has not made any demand on the present Board of Motorola to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a) The Compensation Committee of the Board determines, in conjunction with the Board, the reasonableness of the compensation paid to the Board members, as well as the CEO and the officers. Specifically, the Committee reviews and approves all forms of compensation for officers and directors of the Company, and produces an annual report on executive compensation to be included in the Company's Proxy Statement. Pursuant to the 2009 Proxy Statement, the Company's Compensation Committee consisted of Defendants Hambrecht, Lewent, Scott (Chair), and Stengel. As the members of the Compensation Committee singularly control the other Individual Defendants' awards, the remaining members of the Board will not institute this action against Defendants Hambrecht, Lewent, Scott, and Stengel, as doing so would jeopardize each Individual Defendant's personal financial compensation;

b) The principal professional occupation of Defendant Dorman is his employment with Motorola, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, Defendant Dorman lacks independence from Defendants Hambrecht, Lewent, Scott, and Stengel who are not disinterested and/or independent and who exert influence over Defendant Dorman’s compensation by virtue of their positions as members of the Compensation Committee. This interest and lack of independence renders Defendant Dorman incapable of impartially considering a demand to commence and vigorously prosecute this action;

c) The principal professional occupation of Defendant Brown is his employment with Motorola, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, Defendant Brown lacks independence from Defendants Hambrecht, Lewent, Scott, and Stengel who are not disinterested and/or independent and who exert influence over Defendant Brown’s compensation by virtue of

their positions as members of the Compensation Committee. This interest and lack of independence renders Defendant Brown incapable of impartially considering a demand to commence and vigorously prosecute this action;

d) The principal professional occupation of Defendant Jha is his employment with Motorola[5], pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, Defendant Jha lacks independence from Defendants Hambrecht, Lewent, Scott, and Stengel who are not disinterested and/or independent and who exert influence over Defendant Jha's compensation by virtue of their positions as members of the Compensation Committee. This interest and lack of independence renders Defendant Jha incapable of impartially considering a demand to commence and vigorously prosecute this action;

83. Pursuant to the Company's 2009 Proxy, the Audit & Legal Committee's members are Defendants Meister, Vinciquerra, and John A. White (Chair).[6] Defendant Meredith is now listed as a member of the Audit & Legal Committee on the Company's website (*last accessed February 16, 2010),* presumably to serve as non-Defendant Sommer's replacement. The Audit & Legal Committee is responsible for overseeing the integrity of Motorola's financial statements, including policies, procedures and practices regarding the preparation of financial statements, the financial

---

[5] As a Co-CEO of Motorola in 2008, Sanjay Jha was listed by CNNMoney.com as having #1 in the list of the 10 biggest CEO paychecks for 2008. In 2008, Jha earned a total compensation of $104 million, which included a base salary of $484,615, no cash bonus, stocks granted of $36 million, and options granted of $67.5 million. Jha was also granted perks of $412,096. On February 11, 2010, the Company issued a press release announcing that the Company was targeting the first quarter of 2011 for the completion of its planned separation. Motorola intends to separate into two independent, publicly traded companies. The Company currently expects that, upon separation, one public company will be comprised of the Company's Mobile Devices and Home businesses and the other public company will be comprised of the Company's Enterprise Mobility Solutions and Networks businesses. On February 16, 2010, the Company announced that it had decided to increase the payment co-Chief Executive Officer Sanjay Jha receives in case the separation doesn't occur as planned. Jha will get $38 million if the split doesn't happen by June 30, 2011. The company originally agreed to give Jha $30 million if the separation didn't occur by Oct. 31, 2010. Motorola said last week it will split into two publicly traded companies next year, after delaying a plan first unveiled in 2008. If the plan is successful, Jha will get equity totaling 1.8 percent to 3 percent of the part that will keep making phones, depending on that business's market value. That's a change from his former agreement for fixed 3 percent.

[6] The Company's 2009 Proxy also lists non-Defendant and former Motorola Director Ron Sommer as a member of the Audit & Legal Committee. On May 18, 2009, non-Defendant Sommer submitted his resignation as a member of the Board of the Company and its committees, effective July 29, 2009.

reporting process, disclosures and the internal control over financial reporting. The Audit & Legal Committee members caused or allowed the Company to issue false and misleading press releases regarding Motorola's business prospects, thus allowing the Company's value to be artificially inflated. By such actions, Defendants Meister, Meredith, Vinciquerra, and John A. White (Chair) breached their duties by causing or allowing the improper projections described above. As a result of these Defendants' breach of their duties, any demand upon them is futile; and

84. The Individual Defendants, because of their interrelated business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the wrongful conduct, as detailed herein, the majority of the Board, including the Defendants listed below, are subject to the following prejudicial entanglements:

a. According to Motorola's 2009 Proxy, Motorola and the Motorola Foundation have had various commercial and charitable relationships with the Massachusetts Institute of Technology ("MIT") and the MIT Media Laboratory. Judy Lewent is a life member of the MIT Corporation. Motorola and the Motorola Foundation made payments to MIT in each of the three years prior to the 2009 Proxy;

b. Meredith served as Acting Chief Financial Officer and Executive Vice President of Motorola from April 1, 2007 until March 1, 2008 and remained an employee of the Company until March 31, 2008. His term as Acting Chief Financial Officer and Executive Vice President of Motorola ended on March 1, 2008 and, under the terms of his agreement, his employment ended on March 31, 2008, and because of his prior employment during the Relevant Period he cannot be considered an independent director;

c. The principal occupation of Defendant David W. Dorman's ("Dorman") is Non-Executive Chairman of the Board of Motorola. Likewise, Defendants Brown and Jha's principal occupation is employment with Motorola. Consequently, Dorman, Brown and Jha cannot be considered independent directors..

85. The Director Defendants of Motorola, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to

conceal or disguise those wrongs from Motorola's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

86. In order to bring this suit, all of the directors of Motorola would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

87. The acts complained of constitute violations of the fiduciary duties owed by Motorola's officers and directors and these acts are incapable of ratification;

88. Each of the Director Defendants of Motorola authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders. They authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

89. Motorola has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Motorola any part of the damages Motorola suffered and will suffer thereby;

90. If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in the federal class action case against Motorola. Their admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in that case. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the shareholder class actions. This they will not do. Thus, demand is futile; and

91. If Motorola's current and past officers and directors are protected against personal

liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Motorola. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Motorola against these Defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Motorola, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Motorola to sue them, since they will face a large uninsured liability.

92. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for Motorola for any of the wrongdoing alleged by Plaintiff herein.

## DEMAND ON SHAREHOLDERS

93. Plaintiff has not made demand on the shareholders of Motorola to institute this action since demand would be a futile and useless act for the following reasons:

a) Motorola is a publicly traded company with thousands of shareholders;
b) Making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of finding out the names and addresses, or telephone numbers

of shareholders; and

c) Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could even be individually identified.

**FIRST CAUSE OF ACTION**

**Against All Individual Defendants for Breach of Fiduciary Duty**

94. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

95. The Individual Defendants owed and owe Motorola fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Motorola the highest obligation of good faith, fair dealing, loyalty and due care.

96. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

97. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

98. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Motorola has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

99. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Against All Individual Defendants for Abuse of Control**

100. Plaintiff incorporates by reference and re-alleges each and every allegation

contained above, as though fully set forth herein.

101. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Motorola, for which they are legally responsible.

102. As a direct and proximate result of the Individual Defendants' abuse of control, Motorola has sustained significant damages.

103. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

104. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**Against All Individual Defendants for Gross Mismanagement**

105. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

106. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Motorola in a manner consistent with the operations of a publicly held corporation.

107. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Motorola has sustained significant damages in excess of hundreds of millions of dollars.

108. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

109. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Against All Individual Defendants for Waste of Corporate Assets**

110. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

111. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Motorola to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend their unlawful actions.

112. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

113. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**

**Against All Individual Defendants for Unjust Enrichment**

114. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Motorola.

116. Plaintiff, as a shareholder and representative of Motorola, seek restitution from these Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

A. Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C. Awarding to Motorola restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: February 25, 2010

Respectfully Submitted,

**___/s/ Thomas M. Ryan, Esq._**
**Law Offices of Thomas M. Ryan, P.C.**
**35 E. Wacker Drive, Suite 650**
**Chicago, IL 60601**
**Telephone: 312-726-3400**
**Fax: 312-782-4519**
**tom@tomryanlaw.com**

**___/s/ Marc S. Henzel, Esq.___**
**LAW OFFICES OF MARC HENZEL**
**273 Montgomery Avenue, Suite 202**
**Bala Cynwyd, PA 19004**
**Telephone: (610) 660-8000**
**Facsimile (610) 660-8080**
**mhenzel@henzellaw.com**

***Attorneys for Plaintiff***