UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL WABER,** derivatively on behalf of Nominal Defendant Motorola, Inc.<br><br>Plaintiff,<br><br>v.<br><br>**DAVID W. DORMAN, GREGORY Q. BROWN, DR. SANJAY K. JHA, WILLIAM R. HAMBRECHT, JUDY C. LEWENT, KEITH A. MEISTER, THOMAS J. MEREDITH, SAMUEL C. SCOTT III, JAMES R. STENGEL, ANTHONY J. VINCIQUERRA, DOUGLAS A. WARNER III, DR. JOHN A. WHITE, EDWARD J. ZANDER,**<br><br>Defendants,<br><br>and<br><br>**MOTOROLA, INC.**<br><br>Nominal Defendant | ) | Case No. 1:10-cv-01289 |

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, through his attorney of record, brings this action on behalf of Nominal Defendant Motorola, Inc. ("Motorola" or the "Company"), and alleges the following based upon personal knowledge and based upon an investigation conducted by his counsel for all other matters. That investigation has included a detailed review and analysis of public documents, United States Securities and Exchange Commission ("SEC") filings, court filings, press releases and

news articles concerning Motorola and other facts as set forth herein.[1] Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right of, and for the benefit of, Nominal Defendant Motorola, against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment and waste of corporate assets that occurred from September 2007 through the present (the "Relevant Period") that have caused substantial loss to Motorola and other damages, such as severe injury to the Company's reputation and goodwill. This action arises out of Defendants' failure to exercise due diligence, which caused Motorola to issue false and misleading statements during the Relevant Period regarding Motorola's purported then-present business fundamentals, prospects, sales demand for its phones, and financial projections during the Relevant Period, including statements regarding: (i) the rapid accumulation of surplus inventory at the Company's mobile device customers (including carriers, retailers and distributors) that Defendants knew was not selling during the 2007 holiday sales period; (ii) that as a result there was a steep drop-off in orders for delivery 1Q 08 being placed during 4Q 07 for Motorola's mobile device products by its customers; (iii) that sky-rocketing 2007 product costs for semi-conductors or "chips" that had resulted from Motorola's declining sales orders had deeply damaged Motorola's profit margin in its Mobile Devices business segment and that those higher product costs undercut the assurances of improving profitability and made the attainment of the Company's publicly announced earnings guidance virtually impossible; (iv) that

[1] Additional information is within the custody and control of Defendants. Plaintiff reserves the right to further amend this Petition and add additional Defendants, if needed, as additional information is disseminated. Because Defendants have failed to take action to remedy the breaches of fiduciary duties, the Relevant Period continues through this day instead of ceasing the day before the public became aware of the wrongdoing by Defendants.

the Company remained on track to achieve $0.12-$0.14 earnings on continuing operations in 4Q 07; (v) that Motorola remained on track to achieve "bottom-line" improvement, or improved operating income, in its Mobile Devices division during the 4Q 07; and (vi) that each of Motorola's business segments, including its Mobile Devices, would be "profitable" in FY 08.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between Plaintiff and each Defendant and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

3. This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391 (a) because Nominal Defendant is located within this District. Further, one or more Defendant has received substantial compensation in this District by engaging in numerous activities and conducting business in this district.

## PARTIES

5. Plaintiff Michael Waber, as set forth in the Verification, is and was at relevant times hereto a shareholder of Motorola. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation. Plaintiff is a citizen of the State of

Pennsylvania.

6. Nominal Defendant Motorola is a corporation organized under the laws of the State of Delaware. Motorola's principal executive offices are located at 1303 East Algonquin Road, Schaumburg, Illinois 60196. Motorola is the largest U.S. maker of mobile phones and is engaged in providing technologies, products and services for mobile phones.. The segments of the Company include Mobile Devices Segment (Mobile Devices), Home and Networks Mobility Segment (Home and Networks Mobility) and Enterprise Mobility Solutions Segment (Enterprise Mobility Solutions).

7. The principal occupation of Defendant David W. Dorman ("Dorman") is Non-Executive Chairman of the Board of Motorola. On March 31, 2008, Motorola's Board of Directors ("the Board" or "Board") elected Defendant Dorman to serve as the non-executive Chairman of the Board. Dorman acts as the presiding director at meetings of the independent directors. According to the Company's Definitive Form 14A filed with the SEC on March 13, 2009 ("2009 Proxy"), Defendant Dorman is a member of the Governance & Nominating, Executive, and Finance Committees. Upon information and belief, Defendant Dorman is a citizen of the State of Illinois.

8. Defendant Gregory Q. Brown's ("Brown") principal occupation is serving as the Co-Chief Executive Officer of Motorola and Chief Executive Officer, of Motorola's Broadband Mobility Solutions. Brown has been a director of the Company since 2007 and has been an officer of the Company since joining in 2003. Brown has served as Co-Chief Executive Officer of Motorola, Inc. and Chief Executive Officer of Broadband Mobility Solutions since August 2008. Defendant Brown was President and Chief Executive Officer of Motorola, Inc. from January 1, 2008 until August 2008. From March 2007 through December 2007, Brown served as President and Chief Operating Officer. From January 2003 through March 2007, Brown served as Executive Vice

President of Motorola, Inc. and President of various Motorola businesses within Broadband Mobility Solutions.[2] Because Brown is an employee of the Company, he is not an independent director, and the Company's 2009 Proxy expressly concedes this. Brown was thoroughly knowledgeable about all facets of Motorola's business operations and apparently received reports on a daily basis concerning Company sales. Defendant Brown was also completely involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. Brown also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates. Upon information and belief, Defendant Brown is a citizen of the State of Illinois.

9. The principal occupation of Defendant Dr. Sanjay K. Jha's ("Jha") is Co-Chief Executive Officer, Motorola Inc. and Chief Executive Officer, Mobile Devices. He has been a Director and an Officer of the Company since 2008. On August 4, 2008, Jha became Co-Chief Executive Officer of Motorola, Chief Executive Officer of the Mobile Devices business of Motorola, and a member of the Board of Directors of Motorola. Because he is an employee of Motorola, Jha is not an independent Director, and the Company's 2009 Proxy expressly concedes this point. As a Co-CEO of Motorola in 2008, Sanjay Jha was listed by *CNNMoney.com* as being #1 on the list of the 10 biggest CEO paychecks for 2008. In fact, Jha earned a total compensation of

[2] On May 28, 2010, Motorola announced in an SEC filing that "Motorola, Inc. (the "Company" or "Motorola") previously has announced that it is targeting the first quarter of 2011 for the completion of its planned separation (the "Separation") into two independent publicly traded companies. Consistent with the foregoing, on May 28, 2010, the Company and its Co-Chief Executive Officer, Greg Brown, entered into a second amendment (the "Second Amendment") to Mr. Brown's employment agreement dated August 27, 2008. The Second Amendment extends from January 1, 2011 to September 1, 2011, the date on which Mr. Brown has the right to terminate his employment with Motorola for "Good Reason" if he is not sole Chief Executive Officer of Motorola. In addition, the Second Amendment increases the value of the Motorola stock options that Mr. Brown will receive upon the occurrence of the Separation from $3,333,333 to $8,333,333 and increases the value of the Motorola restricted stock that Mr. Brown will receive upon the occurrence of the Separation from $1,666,667 to $4,166,667."

$104 million in 2008.[3] Motorola intends to separate into two independent, publicly traded companies. On February 11, 2010, the Company announced that the first quarter of 2011 was being targeted for the completion of its planned separation with one public company comprised of the Company's Mobile Devices and Home businesses and the other public company comprised of the Company's Enterprise Mobility Solutions and Networks businesses. On February 16, 2010, Motorola announced that it had decided to increase the payment Jha receives in case the separation doesn't occur as planned.[4] Defendant Jha is a citizen of the State of Illinois.

10. Defendant William R. Hambrecht ("Hambrecht") has served as a Director of Motorola since 2008. According to the Company's 2009 Proxy, Defendant Hambrecht is a member of the Compensation & Leadership Committee. Defendant Hambrecht is a citizen of California.

11. At the time Plaintiff filed his original Complaint, Defendant Judy C. Lewent ("Lewent") was a Director of the Company, and was a Director from 1995 until she stepped down in May, 2010. According to Motorola's 2009 Proxy, Motorola and the Motorola Foundation have had various commercial and charitable relationships with the Massachusetts Institute of Technology ("MIT") and the MIT Media Laboratory. Judy Lewent is a life member of the MIT Corporation. Motorola and the Motorola Foundation made payments to MIT in each of the three years prior to the 2009 Proxy. The 2009 Proxy also states that Defendant Lewent was a member of the Compensation & Leadership and Executive Committees, as well as Chair of the Finance Committee. Upon information and belief, Defendant Lewent is a citizen of the State of Texas.

12. Defendant Keith A. Meister ("Meister") has been a Director of the Company since

---

[3] This included a base salary of $484,615, no cash bonus, stocks granted of $36 million, and options granted of $67.5 million. Jha was also granted perks of $412,096.

[4] The announcement detailed that Jha would get $38 million if the split doesn't happen by June 30, 2011. The company had originally agreed to give Jha $30 million if the separation didn't occur by Oct. 31, 2010. If the plan to split the Company is successful, Jha would now get equity totaling 1.8 percent to 3 percent of the part that will keep making phones, depending on that business's market value. That's a change from his former agreement for fixed 3 percent.

2008. According to the Company's 2009 Proxy, Defendant Meister is a member of the Audit & Legal Committee. Defendant Meister is a citizen of the State of New York.

13. Defendant Thomas J. Meredith ("Meredith") has been a Director of the Company since 2005. Meredith served as Acting Chief Financial Officer and Executive Vice President of Motorola from April 1, 2007 until March 1, 2008 and remained an employee of the Company until March 31, 2008. His term as Acting Chief Financial Officer and Executive Vice President of Motorola ended on March 1, 2008 and, under the terms of his agreement, his employment ended on March 31, 2008. Meredith should not be considered an Independent Director due to the fact that he was an employee of the Company during the Relevant Period and is still subject to entanglements and potential liability as a result of actions taken during his tenure. According to the Company's 2009 Proxy, Defendant Meredith is a member of the Finance Committee. Meredith was thoroughly knowledgeable about all facets of Motorola' s business operations as he apparently received reports on a daily basis concerning Company sales. Meredith was also thoroughly involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates. Upon information and belief, Meredith is a citizen of the State of Texas.

14. Defendant Samuel C. Scott III ("Scott") has been a Director of the Company since 1993. According to the Company's 2009 Proxy, Scott is Chair of the Compensation & Leadership Committee as well as a member of the Executive Committee. Upon information and belief, Scott is a citizen of the State of Illinois.

15. Defendant James R. Stengel ("Stengel") has been a Director of the Company since 2005. According to the Company's 2009 Proxy, Defendant Stengel is a member of the

Compensation & Leadership Committee. Defendant Stengel is a citizen of the State of Ohio.

16. Defendant Anthony J. Vinciquerra ("Vinciquerra") has been a Director of the Company since 2007. According to the Company's 2009 Proxy, Defendant Vinciquerra is a member of the Audit & Legal Committee. Upon information and belief, Vinciquerra is a citizen of the State of California.

17. Defendant Douglas A. Warner III ("Warner") has been a Director of the Company since 2002. According to the Company's 2009 Proxy, Defendant Warner is the Chair of the Governance & Nominating Committee and a member of the Executive Committee as well as the Finance Committee. Upon information and belief, Warner is a citizen of the State of New York.

18. Defendant Dr. John A. White ("White") has been a Director of the Company since 1995. According to the Company's 2009 Proxy, Defendant John A. White is Chair of the Audit & Legal Committee as well as a member of the Executive Committee. Upon information and belief, White is a citizen of the State of Arkansas.

19. Defendant Edward J. Zander ("Zander") served as CEO, Chairman of the Board and Chairman of the Board's Executive Committee from January 2004 until January 2008. Throughout the Relevant Period, Zander regularly participated in "Operations Review" meetings with Defendants Meredith and Brown, during which the business, operations and finances of the Company's Mobile Devices business was discussed. Though having entered into a separation agreement on November 27, 2007 terminating his position as CEO effective January 1, 2008, Zander would continue serving as a management consultant through 2009 (at full salary) and as Chairman until the Company's annual meeting of shareholders in May 2008. Zander was intimately knowledgeable about all aspects of Motorola's business operations as he received daily reports regarding Company sales, and as described by several former Motorola executives and employees,

had access to even more detailed information on Motorola's and its customers' upcoming sales demand and purchases from suppliers. Zander was also intimately involved in the preparation of Motorola's financial statements and guidance and what disclosures would be made, and the functioning of Motorola's internal financial, accounting and disclosure controls. He also reviewed and approved Motorola's SEC filings and its Sarbanes-Oxley certificates. Indeed, as part of his duties as Chairman and CEO, Zander was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the Company's Mobile Devices business. As Chairman and one of the only senior executives on Motorola's Board of Directors, Zander was required not only to keep himself informed of the Company's day-to-day business and finances, but also to keep Motorola's non-management directors apprised of the status of the Company's business and finances. As "senior management" of the Company, each quarter, Defendant Zander was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements." Accordingly, Zander was required to discuss the accounting and disclosure of the 4Q 07 Freescale charge with the Company's Audit Committee prior to any such charges being considered or taken.

20. Zander, along with Brown and Meredith, presented at the Company's September 7, 2007 Analyst Day Conference and the Company's October 25, 2007 3Q 07 earnings conference. While Zander did not present at the December 6, 2007 Lehman Bros. conference, Zander, along with Meredith and Brown, had provided the $0.12-$0.14 4Q 07 earnings guidance during the Company's October 25, 2007 3Q 07 earnings call, along with the relevant factors which would

purportedly make that guidance possible, and Meredith at the December 6th Lehman Bros. conference expressly reaffirmed that guidance specifically attributing it back to Zander. On December 6, 2007, Zander was still CEO of Motorola and had the power to control whether Meredith appeared at the Lehman Bros. conference and the message he delivered. Meredith's false and misleading comments were extensively reported by analysts and Zander did nothing to correct them. Zander, in the ordinary course, would also likely have received an immediate update from Meredith that his message had been delivered at the Lehman Bros. conference and, as Meredith's superior, could have directed him and/or others at Motorola to withdraw and/or correct the statements, but did not.

21. Defendants David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White and Edward J. Zander are collectively referred to hereinafter as the "Individual Defendants." Defendants David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White are collectively referred to hereinafter as the "Director Defendants." Defendant Brown, Jha and Zander are collectively referred to hereinafter as the "Insider Selling Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Motorola's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of

their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22. By reason of their positions as officers, directors and/or fiduciaries of Motorola and because of their ability to control the business and corporate affairs of Motorola, the Individual Defendants owed Motorola and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Motorola in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Motorola and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

23. Each director and officer of the Company owes to Motorola and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

24. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Motorola, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial

positions with Motorola, each of the Individual Defendants had access to adverse non public information about the financial condition, operations and improper representations of Motorola.

25. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Motorola, and was at all times acting within the course and scope of such agency.

26. To discharge their duties, the officers and directors of Motorola were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Motorola were required to, among other things:

a) refrain from acting upon material inside corporate information to benefit themselves;

b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e) remain informed as to how Motorola conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations; and

g) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

27. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Motorola, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Motorola's Board during the Relevant Period.

28. The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. As a result, Motorola has expended, and will continue to expend, significant sums of money. [5]

29. Moreover, these actions have irreparably damaged Motorola's corporate image and goodwill. The Individual Defendants have misled the investing public, such that Motorola's ability to raise equity capital or debt on favorable terms in the future is now impaired.

[5] For example, a class action lawsuit was filed on or about January 21, 2010 on behalf of purchasers of Motorola securities in the United States District Court for the Northern District of Illinois (“Federal Class Action” or “Federal Action”) alleging violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, as well as the control person provisions of the Securities Exchange Act. In addition, two additional class actions were filed on or about February 10, 2010 on behalf of all participants in or beneficiaries of the Motorola 401(k) Plan (the "Plan") between July 1, 2007 and the present and whose accounts included investments in Motorola stock, alleging violations of Sections 404 and 405 of the Employee Retirement Income Security Act of 1974 ("ERISA").

**STOCK SALES**

30. The following table details a compilation of Insider Selling Defendants' stock sales compiled from the Company's Form 4 filings with the SEC.

| Form 4 Filed On Date | Transaction Date | Name of Defendant | Number of Shares sold | Price Sold At | Proceeds |
|---|---|---|---|---|---|
| 11/6/2007 | 11/3/2007 | Zander | 30,272 | $17.95 | $543,382.40 |
| 11/6/2007 | 11/3/2007 | Brown | 20,181 | $17.95 | $362,248.95 |
| 1/3/2008 | 1/1/2008 | Brown | 8,163 | $16.04 | $130,934.52 |
| 1/3/2008 | 1/1/2008 | Zander | 98,167 | $16.04 | $1,574,598.68 |
| 1/7/2008 | 1/5/2008 | Zander | 82,251 | $15.07 | $1,239,522.57 |
| 1/15/2008 | 1/14/2008 | Zander | 651 | $14.64 | $9,530.64 |
| 1/15/2008 | 1/14/2008 | Brown | 27 | $14.64 | $395.28 |
| 5/6/2008 | 5/4/2008 | Zander | 18,058 | $10.03 | $181,121.74 |
| 8/4/2009 | 7/31/2009 | Brown | 62,733 | $7.16 | $449,168.28 |
| 8/4/2009 | 7/31/2009 | Jha | 289,783 | $7.16 | $2,074,846.28 |
| 8/4/2009 | 7/31/2009 | Jha | 179,204 | $7.16 | $1,283,100.64 |
| 10/6/2009 | 10/5/2009 | Brown | 69,038 | $8.21 | $566,801.98 |
| 2/16/2010 | 2/11/2010 | Jha | 52,971 | $6.65 | $352,257.15 |
| | | | | | |
| | | | | | |
| | | | Total Sales of those who were Directors at the time Plaintiff filed his original Complaint | | $5,219,753.08 |
| | | | **Total Sales Including Zander** | | **$8,767,909.11** |

## INTRODUCTION

31. Defendants' false and misleading public statements during the Relevant Period concerning Motorola's purported, then-present business fundamentals, and prospects included misleading statements concerning: (i) the rapid accumulation of surplus inventory at the Company's mobile device customers (including carriers, retailers and distributors) that Defendants knew was not selling during the 2007 holiday sales period; (ii) that as a result there was a steep drop-off in orders being placed during the fourth quarter of 2007 slated for delivery in the first quarter of 2008 for Motorola's mobile device products by its customers; (iii) that sky-rocketing 2007 product costs for semi-conductors or "chips" that had resulted from Motorola's declining sales orders had deeply damaged Motorola's margin in its Mobile Devices business segment and that those higher product costs undercut the assurances of improving profitability and made the attainment of the Company's publicly announced earnings guidance virtually impossible; (iv) that the Company remained on track to achieve $0.12-$0.14 earnings on continuing operations in 4Q 07; (v) that Motorola remained on track to achieve "bottom-line" improvement, or improved operating income, in its Mobile Devices division during the 4Q 07; and (vi) that each of Motorola's business segments, including its Mobile Devices, would be "profitable" in FY 08.

32. Because Motorola's Mobile Devices division accounted for 66% of FY 06 sales, it was crucial to the Company's financial condition. In the Mobile Devices division, Defendants reported disappointing earnings in 4Q 06 and quarterly losses in 1Q 07 and 2Q 07 and also suffered severe deterioration in its handset market share. Thereafter, on September 7, 2007, Defendants convened Motorola's annual financial analyst conference to publicly outline their plan for returning Motorola to financial health by the end of 2007, with supposed vast improvements which would be manifest in Motorola's Mobile Device business by 2008.

33. Sometime later, on October 25, 2007, Defendants opened the Company's 3Q 07 earnings conference by proudly announcing that their plan was succeeding: ***"[o]ur third quarter can be characterized by one word, progress.*** We improved our earnings and cash flow significantly compared to the second quarter and made substantial improvement in all key metrics in Mobile Devices." Notwithstanding continued losses in the Company's Mobile Devices division, Defendants continued to insist that ***"[i]n Mobile Devices, we began to move in the right direction.*** We increased unit sales and gross margin percentage while lower[ing] operating expenses," that "estimated market share in the quarter was about 13%" and that "[e]xcluding highlighted items, the operating loss in the quarter was 138 million," noting that was ***"a significant improvement over both Q1 and Q2 results."*** Defendants also explained that Motorola's newly released "RAZR 2s began shipping" and were ***"off to a great start,*** meeting the needs of the demanding feature phone users and account[ing] for over 900,000 units in the quarter." Explaining Motorola's "outlook for the fourth quarter," Defendants stated they were "encouraged by progress in Mobile Devices as compared to prior quarters," "expect[ed] continued improvement in the fourth quarter," and based on their knowledge of the Company's then-present business metrics ***"expect[ed] fourth quarter earnings per share from continuing operations to be in the range of $0.12 to $0.14."*** (Emphasis added.)

34. The market reacted to this news with relief -- evidenced by a significant surge in the Company's stock price. According to *Bloomberg,* Motorola's stock "climbed the most since Jan. 30 [that day], gaining 75 cents, or 4 percent, to $19.30" when the "largest U.S. maker of mobile phones ***posted its first profit in three quarters and gave a forecast that surpassed analysts' estimates. . . ."***

35. Motorola sold $1.4 billion in bonds four days later, on October 29, 2007. These bonds had been priced on the basis of ratings sustained by Motorola's turnaround story. The bond

offering was Motorola's first in three years, timed to pay down $1.2 billion in bond obligations that would come due November 17, 2007. As reported on October 30, 2007 by the *Chicago Tribune*, "Moody's Investors Service rated the securities Baa1, its third-lowest level of investment grade, while Standard & Poor's ranked them a step higher at A- "***after "Motorola last week posted its first profit in three quarters and gave a forecast that surpassed analysts' estimates."*** (Emphasis added.)

36. The market's relief at the Company's so-called "turnaround" would quickly wither and die on the vine. On November 30, 2007, the Company made an abrupt announcement that its CEO and Chairman of four years, Edward J. Zander ("Zander"), would step down effective December 31, 2007. The Company also announced that although Chief Operating Officer ("COO") Gregory Q. Brown ("Brown") had only *recently been appointed COO* (and had virtually *no experience* running the Company's all-important Mobile Devices division), he would nevertheless take over in Zander's place as CEO. On this alarming news, by December 5, 2007, the Company's stock closed down at $15.75 per share.

37. The investment community had deep reservations as a result of the Company's abrupt, off-putting announcement that Zander was stepping down without ***"affirm[ing] guidance on the fourth quarter"*** or without reassuring the investing public that, despite speculation to the contrary, the Company was then still on track with its plan to return Motorola's Mobile Device business to financial health. When Motorola Chief Executive Officer ("CFO") Thomas Meredith ("Meredith") took the podium on December 6, 2007 at an investment conference hosted by Lehman Bros., Meredith stated that his objective was to disarm what he described as "great angst" that had suddenly developed in the investment community. This "great angst" was the unfortunate product of the abrupt nature of Motorola's high-level departures and the fact that key reassurances were not forthcoming from the Company. (Emphasis added.)

38. At this point,[6] there were a mere ***three and a half weeks remaining*** to reach the quarter's financial results that had earlier been included in the Company's 4Q 07 guidance. Meredith vigorously stated: ***"let me be real clear,"*** Motorola remained on track to achieve both ***"earnings from continuing operations in the 0.12 to $0.14 range"*** and ***"sequential improvement in top and bottom-line in mobile devices."*** Asked about "the timeframe . . . for the handset business to be approaching breakeven," Meredith responded "[a]s I mentioned ***we expected and still expect an improvement in our top and bottom line over last quarter . . . Q3 was a start of progress."*** (Emphasis added.)

39. From the time of the Company's 3Q 07 call on October 25, 2007, Motorola's stock value had fallen off drastically, losing more than $3 per share. However, Meredith's calculated statements had their intended effect of shoring up the Company's stock price. In response, Motorola stock closed up over 3.6% on December 6, 2007 at $16.31 on uncommonly heavy volume.

40. Furthermore, the Individual Defendants' own financial interests made it essential that the market accept the Motorola Mobile Devices "turnaround" story. Zander, who would be stepping down on January 1, 2008, had millions of dollars of unvested stock options and restricted stock units ("RSUs"), some of which would not vest until January 5, 2008 and others whose value was dependent on increasing Motorola's stock price to the $20-$25 price range. Meredith's employment contract had been amended on October 4, 2007 to provide that he would step down no later than April 1, 2008, and his equity grants would vest on an accelerating basis once Motorola's stock price exceeded $20 per share for at least ten trading days.

41. The Individual Defendants were positioning Motorola for a restructuring or outright sale that would significantly increase its stock price. However, everything depended upon the market's continued perception that Motorola was resolving its Mobile Devices problems. A *Wall*

[6] December 6, 2007.

*Street Journal* report (which was based on statements made during the December 6th conference that Motorola's senior management was then considering selling the Mobile Devices division -- something the investment community had been pushing for) as well as the general consensus held then that the Company could be sold "for the value of one year's revenue, or about $20 billion."

42. If such a sale could be concluded before the *true* 4Q 07 results leaked out, the value of Motorola's stock price could conceivably be increased by $8 per share, causing it to trade in the $20-$25 per share range. Significantly, if the stock were to trade in the $20-$25 per share range, ***all of the soon-departing CEO's and CFO's stock options and RSUs would vest.***

43. Accordingly, this situation created tremendous motive for Zander and Meredith to conceal the truth at the December 6th conference. As reported in the *WSJ,* market speculation of an impending transaction ***alone*** could drive up Motorola's stock price. On the other hand, things would not go as well if the market perceived that the problems were not corrected. For example, the *WSJ* quoted an industry banker who stated the "cellphone piece could sell for less than one times sales if its problems aren't fixed."

44. As a result, Individual Defendants had enormous motive and personal financial incentive to prop up Motorola's façade for the weeks following the December 6th conference in order to facilitate their ability to cash in on millions of dollars of unvested equity interests for their own personal economic benefit .

45. Defendants' reassurances to investors that the Company was on track to achieve the 4Q 07 earnings results were extraordinarily positive. The strong, overwhelmingly positive nature of these statements was combined with the fact that the statements were ostensibly based on internal knowledge available only to Defendants. This situation operated to mislead investors, and continued until January 23, 2008. On January 23, 2008, Defendants finally revealed the truth about the

Company's dismaying 4Q 07 results and the effects of the long-known deterioration in Mobile Devices in Motorola's following quarter.

46. On the morning of January 22, 2008, *Bloomberg* reminded the market that Motorola was "set to report Q4 earnings before the market opens tomorrow," reporting that "[c]urrent [analyst] consensus [was] for EPS of $0.13[']" and emphasizing that "[o]n 12/6, the company reaffirmed guidance for Q4 EPS of $0.12-$0.14."

47. Motorola released its actual financial results for 4Q 07 (quarter ending December 31, 2007) before trading opened on January 23, 2008. The market was ***stunned*** to learn that Motorola ***badly missed*** its 4Q 07 earnings targets – coming in at only ***$0.04 cents a share,*** nowhere near the $0.12-$0.14 per share Defendants had led the market to believe the Company was on track to earn throughout the 4Q 07. Additionally, the market was shocked to realize that the purported "sequential improvement in top and bottom-line in mobile devices," was an apparent fiction. In fact, ***rather than achieving bottom-line "improvement" in Mobile Devices, Motorola reported its worst quarter of all in the prior two fiscal years. The loss in Motorola's Mobile Devices unit had actually ballooned exponentially from $138 million in the 3Q 07 to $388 million in 4Q 07 – an increase of more than 275%.*** To add insult to injury, these bleak results were reported for the historically best performing quarter.[7]

48. At the Company's earnings call on January 23, 2007, Defendants disclosed the Company was taking a ***whopping $276 million charge*** to earnings as part of a confidential legal settlement with its primary chip supplier Freescale Semiconductor Inc. ("Freescale") that had been in the works throughout 4Q 07.

49. Motorola's senior executives refused to discuss the basis of why such a charge was

[7] This quarter historically is the best performing quarter due to a usual increase in sales during the Christmas season. In addition, global growth in sales of mobile devices had soared by 18% for the quarter.

so extraordinary. What is more, they also refused to discuss what it was about the charge's extraordinary nature that somehow freed them of their obligation to reach the promised published earnings guidance. More clarification would later surface through statements by Freescale and disclosures in Motorola's 2007 Form 10-K filed with the SEC on February 28, 2008 ("2007 10-K"). Apparently, the "settlement" was a reference to payments by Motorola in order to satisfy the minimum purchase requirements for chips under its purchase agreement with Freescale.

50. Defendants' insistence on keeping these matters "confidential" operated to conceal several crucial facts from investors about the genuine state of the Company's affairs. First of all, this "confidentiality" operated to obscure the deterioration in the Mobile Devices margins for the increased costs of goods sold ("COGS"). It hid also that ***Motorola's own sales in 2007 had actually declined and that this decline had led the Company to place lower orders with its chip supplier.*** As Freescale noted, "[i]n 2007, Motorola's wireless handset sales decreased significantly compared to 2006 and it lost considerable market share during 2007" and "[a]s a result, [Freescale] experienced a significant reduction in sales of [its] Cellular Products to Motorola" during 2007.

51. Later Freescale disclosures would make it clear that: "during the fourth quarter of 2007," senior executives at the two companies had begun negotiating a compromise agreement resulting in Freescale offering Motorola "certain pricing modifications and reliev[ing] Motorola of certain obligations" in exchange for payments from Motorola to Freescale in 1Q 08.

52. In fact, Meredith had touched upon the issue of the Company's participation in contract renegotiations with its chip suppliers (purportedly for diversification purposes) in Motorola's December 6, 2007 earnings call. Thus, the following were a calculated effort to mislead investors about the Company's grim predicament: (a) Meredith's republishing of the $0.12 - $0.14 in 4Q 07 guidance at the December 6th call; (b) Meredith's claim of "sequential improvements" in

Mobile Devices' sales and margins; (c) Meredith's concealment of the increases in Motorola's 2007 product costs attributable to the Company's minimum purchase requirements; and (d) Meredith's concealment of the imminent $277 million "settlement" with Freescale for Motorola's inability to use the chips due to its own reduced sale orders.

53. ***Significantly, at the January 23, 2008 earnings conference, Meredith now admitted that "demand for [Motorola's Mobile Device segment] products ha[d] slowed" since Thanksgiving, two weeks prior to his having republished the $0.12-$0.14 earnings guidance and confirmed that the Company was still on track to achieve top and bottom-line improvement in Mobile Devices.*** At the January 23, 2008 call, when he finally described their effects on the following quarter, Defendant Meredith also revealed the devastating breadth of problems with the Mobile Devices segment which were misrepresented at the December 6th earnings call. Now, according to Meredith, 1Q 08 ***"Mobile Devices unit sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (where Defendants' positive statements had led the market to expect a $0.10 per share profit in the 1Q 08), and that Motorola again expected to "lose [even more] market share in Q1" [08]."*** (Emphasis added.)

54. On or before January 4, 2008, only days after he took over the reins as the Company's CEO, Defendant Gregory Brown secretly made some comments at a private meeting with one of Motorola's outside accountants. ***Brown's comments make it very clear that the Individual Defendants were well aware that by December 2007 Motorola's Mobile Devices division had suffered a very serious and significant decline***. As revealed by a judge's findings in an action based on breach of fiduciary duty for insider-trading by that accounting firm against one of its own partners, on or before January 4, 2008 "Motorola's CEO had stated in a private meeting that the company's [4Q 07] performance 'will be significantly worse than anybody's imagined'. . .

." That same day, the outside accountant, knowing that the Company's stock would predictably plummet when Motorola's 4Q 07 financial results were finally disclosed on January 23, 2008, purchased put options[8] on Motorola's stock. ***The outside accounting partner garnered a 1,400% return on his "investment" in Motorola when the truth was revealed to outsiders and the Company's stock price crashed.***

55. The *Associated Press* ran a story on January 23, 2008 after the close of trading. This story demonstrated that the Defendants' statements had successfully misled analysts and that the truth, once revealed, caused Motorola's stock to plummet:

> Income from continuing operations was 5 cents per share, including charges of 9 cents per share for asset write-downs, layoffs and a legal settlement. ***That was 8 cents less than the consensus estimate of analysts polled by Thomson Financial.***
>
> Motorola executives had told analysts that a series of innovative new cell phones would help break the company out of a slump that began when sales of the iconic RAZR phone leveled off and the company had no other hit product to maintain momentum and market share. The Schaumburg, Ill.-based company showed tentative progress toward a turnaround in the third quarter during a disastrous year which saw its handset sales tumble 33 percent overall from 2006. ***But sales from the mobile devices division, dominated by cell phones, sank to $4.8 billion in the fourth quarter as the company failed to connect with consumers over the holidays.*** The handset unit, its biggest, had an operating loss of $388 million and shipped 40.9 million devices during the quarter, in line with analyst expectations but down sharply from past quarters.

Dave Carpenter, *AP*, "Bleak outlook sends Motorola plummeting," Jan. 23, 2008. (Emphasis added.)

56. The market's negative reaction to the abysmal results announced on January 23, 2008 was immediate. As one analyst explained, the "overall health of the market is fine; ***these problems are Motorola-specific."*** Other analysts were now openly valuing the Company's Mobile

[8] A "put option" is an option which gives the holder the right, but not the obligation, to sell a fixed amount of a certain stock at a specified price within a specified time. Puts are purchased by those who think a stock may go down in price.

Devices division at ***zero***. The Company's stock and debt ratings were heavily downgraded. Motorola's stock price took a tremendous hit of 18.8% (or $2.31 per share), in a *single trading session*, closing at $10.01 on January 23, 2008. On that day, the Company's stock reached its ***lowest level in five years***, on unusually high volume of over 7.5x the average daily trading volume of the 30 days prior – 167 million shares traded that day. As a matter of fact, between the close of trading on January 3, 2008 (the night before the outside accountant placed his personal guaranteed "bet" on Motorola's stock sinking when its actual 4Q 07 results became common knowledge), and the close of trading on January 23, 2008, (after the full extent of the deterioration in Motorola's Mobile Devices business during 4Q 07 was revealed), ***the Company's stock price fell sharply by over $6 per share – more than one-third. This obliterated over $13.5 billion in market capitalization for the Company's shares and caused damage to Motorola Corporation.***

## SUBSTANTIVE ALLEGATIONS

## OVERVIEW AND SUMMARY

57. Defendant Motorola builds, markets, and sells products, services and applications that make connections to people, information and entertainment through broadband, embedded systems and wireless networks. During the Relevant Period, the Company operated in three primary business segments: Mobile Devices, Networks and Enterprise and Connected Home Solutions. Mobile Devices (which accounted for 58% of Motorola's sales in FY 05 and had grown to 66% of sales by the end of FY 06) was the most substantial by far.

### Motorola Mobile Devices

58. By 2007, almost half of all Motorola's Mobile Devices sales were made in North America. In the North American market, the purchase of mobile devices was dominated by the major phone operators or carriers, who purchased phones from Motorola and marketed them to their

retail consumers as part of a package to enter into multi-year phone operator contracts. In keeping with this, Motorola's 2007 10-K reports the Mobile Devices segment had "several large customers worldwide, the loss of one or more of which could have a material adverse effect on the segment's business," including Sprint Nextel, AT&T, Verizon, China Mobile and America Movil. These large customers collectively accounted for 42% of the Mobile Devices segment's 2007 net sales.

59. Having 42% of the segment's sales concentrated in just five customers gave Motorola's management visibility into its sales orders for "sell in" to the carriers and the carriers' "sell through" numbers which were useful for forecasting follow-on purchases. The high customer concentration also gave Motorola's management considerable leeway to manipulate the segment's reported revenues through the timing of shipments, which is what occurred in both 4Q 06 and then again in 4Q 07, with significant consequences for the sales results in the following quarters.

60. While global cell phone sales grew dramatically in FY 07 and in 4Q 07, Motorola was unable to capture any of that growth. ***In fact, Motorola actually gave back billions of dollars worth of market share.*** For instance, at the same time the global handset market grew 16% from 980 million units in FY 06 to 1.137 billion units in FY 07, Motorola's shipments fell 27% from 217.4 million units in FY 06 to just 159.1 million units in 2007 – meaning Motorola lost 10% of its global market share in FY 07. More specifically, at the same time the global handset market grew 18% in 4Q 07, from 285.7 million units sold in 3Q 07 to 336 million units in 4Q 07, Motorola only sold 3.7 million additional units in 4Q 07 (including all holiday sales), meaning Motorola actually lost .8% of its market share in the 4Q 07. But even this poor performance was only accomplished by raiding sales that would otherwise have been made in 1Q 08.

61. Motorola's terrible sales performance in 1Q 08 versus the rest of its peers was even more marked. During that quarter, Motorola lost a full 3% share of the 295 million units sold

industry-wide, or more than 8.8 million devices. At Motorola's $120 average selling price, that was a loss of more than $1 billion in sales in a single quarter.

62. Tellingly, the Company's April 24, 2008 1Q 08 earnings release would reveal that after having reported substantial gains in North American handset sales, which increased from 35% of Motorola's total handset sales in FY 06 to 46% in its FY 07 sales, the enormous 1Q 08 decline in Motorola's global handset market share was "due primarily to a decline in North America." Motorola's 1Q 08 Form 10Q, would confirm just how detrimental that market share loss was to Mobile Devices, stating that "[i]n the first quarter of 2008, the segment's net sales . . . decrease[d] 39%," and that the "39% decrease in net sales was primarily driven by a 40% decrease in unit shipments and a 2% decrease in average selling price ("ASP")." As a result, "[t]he segment incurred an operating loss of $418 million in the first quarter of 2008." According to the 1Q 08 10Q, the "operating loss was primarily due to the decrease in gross margin, driven by the 39% decrease in net sales. . . ." Indeed, that the massive 1Q 08 market share loss was in North America further demonstrated that Defendants stuffed the channels in North America in 4Q 07 in order to meet their 4Q 07 revenue guidance, but did so at the cost of 1Q 08 sales.

**<u>Performance Deterioration, Motorola's Cell Phones</u>**

63. Until being surpassed by the Apple iPhone 3G in November 2008, Motorola's RAZR clamshell-type cell phone was the most popular line of mobile phones ever released. After its 2004 release, RAZR sales surpassed the Company's total lifetime projections in its first three months. By June 2006, the Company had sold over 50 million units. By the time the RAZR2 was released in July 2007, Motorola had sold 100 million units, boosting its position to second place in the global hand-held market, only behind Nokia. At the end of FY 05, Motorola was the largest U.S. and second largest global supplier of wireless handsets, with an estimated 17% global market share.

By the close of FY 06, Motorola maintained its #2 position only behind Nokia and had grown its global market share to 22%.

64. However, despite multiple re-releases of the RAZR and management's repeated promises that the Company was "seamlessly" integrating new technologies to keep up with the advent of so-called "smart phones," Motorola was not in fact doing so. In fact, cell phones are typically replaced every 12 to 18 months and Motorola was too slow in redesigning its model to keep up with the advances of its competitors. In June 2007, Apple Inc. released its wildly successful iPhone, a smartphone that effectively integrated internet technology, causing Motorola's market share to begin a freefall from 22% at the end of FY 06 down to 13% by the end of 3Q 07 (the quarter ended September 29, 2007).

65. Profits in Mobile Devices had grown 23% in FY 06 to $2.7 billion on sales that had grown 32% in FY 06 to $28.4 billion.[9] As the third quarter of 2007 was drawing to a close, Defendants made repeated unsuccessful attempts to remedy a tremendous decline in handset sales and profits in Motorola's Mobile Devices division. Performance plummeted. Motorola recognized hundreds of millions of dollars in losses in each of the first three quarters of FY 07. To make matters worse, Connecticut-based researcher Gartner Inc. ("Gartner") reported the embarrassing news that on November 26, 2007, Motorola had been overtaken by Samsung in 3Q 07. Reduced to only *13% of market share,* Motorola was now swiftly relegated to *third place*, holding the ***#3 spot behind Nokia and Samsung.***

66. At its annual analyst conference on September 7, 2007, Motorola unveiled its turnaround plan which purportedly would restore the health of its Mobile Devices business and reduce the Company's cost structure. Again, Defendants made fervent assurances to investors on

[9] Motorola had increased its cell phone handset shipments 49% in FY 06 to 217.4 million, gaining more than four percentage points to an estimated 22% of global handset sales by December 31, 2006.

October 25, 2007 and December 6, 2007 that the turnaround was successfully accomplished with Motorola strongly returned to the path to profitability. However, despite Defendants' strong statements to the contrary, Motorola's Mobile Devices division had not made "progress" on its recovery plan. Nor, as Defendants had announced on October 25, 2007, had they turned a corner in 3Q 07. Motorola was also not on a recovery path for 4Q 07. This continuing failure became increasingly apparent to management as the quarter progressed.

**Motorola's Senior Executives Stood to Reap**
***Huge* Personal Profits**
**As A Result of The Deception**

67. In January 2004, Defendant Zander joined Motorola as CEO, Chairman of the Board and Chairman of the Board's Executive Committee. Zander was Motorola's CEO until December 31, 2007. Until May 5, 2008, Zander had been the Company's Chairman of the Board and Chairman of its Executive Committee.

68. The highly successful 2004 launch of Motorola's RAZR phone was the factor behind the positive sales surge in Mobile Devices. This gain was largely credited to Defendant Zander. In fact, the RAZR was ranked as the most popular consumer U.S. cell phone for several years, and Zander enjoyed enormous compensation as a result. Based largely on increasing RAZR sales, ***Motorola paid Zander over $18+ million in FY 04, over $15+ million in FY 05, over $14+ million in FY 06 and over $17+ million in FY 07. However, according to Zander's employment agreement, only $1.5 million of his annual compensation was paid in the form of cash salary.*** By the agreement's terms, the remainder of Zander's compensation would be paid largely in restricted stock units ("RSUs"), stock options and other long-term incentive payments, the value of which were inextricably linked to Motorola's deteriorating stock price.

69. When Apple's iPhone wowed the market (and in 2007 pushed Motorola to a dismal

third in global sales behind Apple and Samsung), investors began to cast a disparaging eye upon Zander's performance and the fortunes Motorola had paid him. The Company's stock price plummeted as the perceived value of the Mobile Devices unit drastically deteriorated. There was now intense pressure from investors to remove Motorola's management, disgorge unearned 2006 executive bonuses, and break up Motorola and sell off its Mobile Devices division (including a well-funded proxy contest at the 2007 annual shareholder meeting that was only defeated with considerable fight).

70. Submitting to this pressure, on November 30, 2007, Defendants announced Zander would step down as CEO in January 2008 and that he would not stand for re-election to the Motorola Board of Directors at the Company's May 2008 annual meeting of shareholders. At that time, Zander was holding:

- 377,190 stock options that would not vest until January 5, 2008 (and which had an exercise price of $12.97, meaning the Company's stock price had to be at or above that price for the options to have any value),
- 200,000 RSUs that would not vest until January 5, 2008 and an additional 800,000 stock options granted to Zander in May 2007 that would only vest if Defendants could cause the closing price of Motorola's stock to exceed $22-$25 for at least ten trading days within a thirty-day consecutive trading session.
- Zander was also entitled to a multi-million dollar payment under Motorola's Long Range Incentive Plan ("LRIP") for FY 07 that could be significantly enhanced or diminished based on the closing price of Motorola's stock price on December 31, 2007.

71. Defendant Meredith has been a director of Motorola since 2005. Between April 1,

2007 and March 1, 2008, Meredith served as Motorola's Acting Chief Financial Officer and Executive Vice President. Meredith is also a general partner of Meritage Capital, L.P., an investment management firm specializing in multi-manager hedge funds that he co-founded, and chief executive officer of MFI Capital. The executive pay Meredith (like Zander) received from Motorola for serving as its CFO during most of chaotic FY 07 mostly consisted of RSUs and stock options. To underscore this point, Meredith served as Motorola's CFO for six months (between April 1, 2007 and September 30, 2007) under an employment agreement which paid him only ***$1 per year in salary, plus 500,000 RSUs and 250,000 stock options.*** Like those of Defendant Zander, Meredith's RSUs would only vest if he was able to increase Motorola's stock price above $20-$24 per share for ten thirty-day durations. The Company's 2007 annual report specifically acknowledged that the Compensation Committee had intended Meredith's pay to provide him with "added incentive" to "stimulate stock price growth."

72. By autumn 2007, Motorola had decided to replace Meredith as CFO. On October 4, 2007, Meredith signed a new employment agreement providing that he would be replaced as Motorola's CFO effective April 1, 2008 at the very latest. While the new October 2007 agreement now provided Meredith a salary of $75,000 per month ($900,000 per year), like Zander, the RSUs and stock options Meredith had received for serving as Motorola's CFO during the six topsy-turvy months of 2007 would be worth ***nothing*** if Defendants were unable to increase Motorola's stock price above $20. The Company's stock price had hovered precariously *below $20* since January 4, 2007 when Motorola reported the miserable 4Q 06 financial results which Meredith was brought in to correct.

73. From March 2007 through December 2007, Defendant Brown served as President and COO of Motorola. In 2007, Brown joined the Board. On January 1, 2008, Brown stepped into

the role of President and CEO of Motorola. Brown had previously served in executive capacities in the Company's Networks and Enterprise Mobility Solutions and the Commercial Government and Industrial Solutions sectors, ***but had never led Motorola's all important Mobile Devices division.*** According to a November 30, 2007 *Associated Press* story entitled "Zander's Turbulent Ride at Motorola Ends," Zander's resignation "left some observers wary about what it might signal about the turnaround effort in the cell-phone unit . . . ." "While Mr. Zander's departure has been the source of speculation for some time, we had thought that an improvement in mobile devices could possibly grant him a stay," said Citigroup's Jim Suva in a research note. "We now wonder if today's announcement signals yet another disappointment for the handset segment and more meaningful changes that have to occur." The November 30, 2007 *AP* story quoted Brown as refusing to discuss a potential restructuring – or breakup – of Motorola until early 2008. But Defendants were positioning Motorola for sale to drive up the Company's stock price. (Emphasis added.)

74. The *Wall Street Journal* ran a story on December 13, 2007 entitled "Is Motorola Worth More If It Gets Busted Up? By Icahn's Math, Selling Phone Unit Would Bump Shareholder Value 50%." This article noted that while "Motorola Chief Executive Ed Zander [had] rejected Mr. Icahn's proposal [to split up Motorola], . . . he is stepping down" now and "Brown is taking over," adding that "Brown is seen as a deal maker and open to restructuring." The *WSJ* reiterated the new willingness to sell off Mobile Devices: "[l]ast week, Mr. Meredith said that while he believed 'there's every opportunity for us to create significant economic value as a whole,' that doesn't mean other options aren't viable,'" and emphasized Meredith's statement at the December 6, 2007 Lehman Bros. conference that "[a] change in circumstance sometimes requires a change in action." Additionally, the *WSJ* reemphasized Icahn's recent statements that "carving up Motorola could produce almost $20 billion of additional shareholder value," "translate[ing] to nearly $8 more a

share and would make the stock worth roughly 50% more than its current price." The *WSJ* story concluded, stating that "[a]nalysts agree in principle with Mr. Icahn's math, although many caution that Motorola needs to fix underlying problems in the handset division to maximize the value of a breakup." Defendants were consequently well aware that it was vital to successfully promote the Mobile Devices recovery story to keep the Company's perceived sale value (and stock price) high,

75. Citing "industry sources", the *Financial Times* had reported on December 5, 2007, (one day prior to Meredith's appearance at the Lehman Bros. conference), that Dell was potentially interested in acquiring Motorola's Mobile Devices division. Later that day it was reported that Dell's volatility had increased substantially on the rumor. It was also reported that on the speculation Motorola's stock price increased $0.25 to $15.92 per share. According to the *Financial Times*, "[i]ndustry bankers said that Dell might want to compete with listed Apple's iPod and iPhones" and that "Motorola's handset business might be a fast entry into the mkt said one veteran technology banker, especially because Dell's consumer products head, Ron Garrigues headed it until a year ago." The *Financial Times* also highlighted that Dell's former CFO, Tom Meredith, now holds the same position at Motorola." On December 10, 2007, *Bloomberg* reported that "Motorola . . . may be an acquisition candidate for Dell Inc., Hewlett-Packard Co. or Research in Motion Ltd. in 2008," quoting research analyst David Garrity as stating ***"Motorola may fetch between $22 and $23 a share in a buyout."*** *Bloomberg.com* added that an "[a]nalyst on CNBC" had confirmed the same speculation, emphasizing that Dell's "former CFO Tom Meredith [was] now CFO" at Motorola. Though *Bloomberg* reported Motorola would neither confirm nor deny the speculation, according to *Bloomberg,* Motorola's stock price "rose 18 cents, or 1.1 percent, to $16.48 at 4 p.m." again that day. (Emphasis added.)

76. Thus, beyond needing to maintain – if not increase – Motorola's stock price during

Zander's and Meredith's final days at Motorola's helm, Motorola's three most-senior executives had another overwhelmingly important reason to overstate the Company's 4Q 07 sales and financial performance in the Mobile Devices unit. ***Motorola's larger investors and investment bankers were insisting the sum of the Company's parts were more valuable than the whole and that the Company's true value could only be realized if Motorola's divisions were split up and its Mobile Devices segment sold off – but only if the Mobile Devices business appeared healthy.*** Though the Mobile Devices unit's sales were collapsing and the costs of production sky-rocketing because of supply contracts that tied the component costs to sales volume and imposed purchase minimums, so that Mobile Devices' profits were plummeting throughout 4Q 07, Defendants knew that if the market became aware of this, the price they could secure upon a break-up and sale of the business unit would diminish, as would any hopes Zander and Meredith had of increasing the Company's stock price above the $20-$25 range required to vest the rest of their stock options and RSUs.

**<u>Defendants Invent a "Turnaround" Story and Intentionally Mislead the Market</u>**

77. During the Company's October 25, 2007 3Q 07 earnings conference, Defendants made attempts to soothe and pacify the investment community by assuring investors that Motorola had finally turned the corner. According to Defendant Meredith, management was "encouraged by progress in Mobile Devices as compared to prior quarters." Ostensibly based on improvement that had already occurred, Meredith stated Motorola then "expect[ed] continued improvement in the fourth quarter." Defendants stated that demand for the RAZR2 was robust, with the Company having already sold 900,000 units between its release date in August 2007 and September 30, 2007, the end of the 3Q 07.[10] Defendants also stated that based on then-current demand and sales they were then experiencing, Defendants "expect[ed] fourth quarter earnings per share from continuing

[10] The Company's new RAZR2 was released in August 2007, just in time for the 2007 holiday selling season,

operations to be in the range of $0.12- $0.14." Notably, the fourth quarter of 2007 was by then one-third underway.

78. Zander told the Arlington *Daily Herald* "[w]e've made some progress toward stability," and that "[w]e did what we said we were going to do and actually (made) the numbers in some areas." The *Daily Herald* also reported on October 26th that "Zander said his top lieutenants are carrying out a turn-around strategy put in place earlier this year," including "cost-cutting and streamlining globally and the elimination of 7,500 jobs."

79. Despite their positive assertions to the contrary, Defendants knew that in actual fact the Company had already irreparably lost its technology edge to the Apple iPhone and other smart phone devices, that consumers were not buying the new RAZR2, that Motorola's share of handset sales was actually declining, and that the unit costs of its devices were adversely tied (i.e., increasing) as the volumes purchased from their suppliers fell***. Thus, by the time they were one-third of the way through 4Q 07, Defendants knew there was no way Motorola could report earnings of anywhere near $0.12-$0.14 per share in 4Q 07.***

**Abrupt Departure by Zander;**
**"Turnaround Story" is Drawn into Question As A Result;**
**Market Reacts With Alarm**

80. Motorola announced on November 30, 2007 that effective December 31, 2007, Zander would no longer serve as Motorola's CEO. The announcement provided that Zander would not run for reelection to the Motorola Board and Brown would replace Zander. The abrupt and surprising nature of this announcement, combined with the importance of such a high level departure, together with the obvious negative larger implications of the content of the announcement functioned to unnerve the market. Immediately, the Company experienced a drastic deterioration in its stock price. *AP* reported on November 30, 2007 that: "While Mr. Zander's

departure has been the source of speculation for some time, we had thought that an improvement in mobile devices could possibly grant him a stay. . . . ***We now wonder if today's announcement signals yet another disappointment for the handset segment and more meaningful changes that have to occur."*** *24/7 Wall St.* coverage gave more insight into the subtext of what Zander's sudden and ill-timed departure might mean for the Company, reminding in a forthright statement that you ***"[n]ever throw out a CEO when he is in the middle of a solid turnaround," stating "Zander's departure … is a sign that the quarter must be going very poorly."*** (Emphasis added.)

81. On December 1, 2007, the *Daily Herald* quoted Carl Icahn, (the activist investor who had orchestrated the May 2007 proxy contest) as making a statement that showed that Icahn believed that the sum of Motorola's parts were now worth more than their whole:

> "I believe that the steps announced today do not even begin to address the major problems at Motorola. In my opinion, Motorola should be split into separate companies: a mobile devices company; an enterprise mobility company; a connected home company; and a company focused on mobile networks infrastructure."

82. On December 3, 2007, *Crain's Chicago Business* ran an article entitled "Brown on Razr's edge; No honeymoon for insider named to top job at Motorola." According to the article, Zander's resignation would not "address the broader problem that has bedeviled Mr. Brown's predecessors: how to squeeze synergies out of a disparate collection of businesses ranging from cell phones to wireless network equipment to cable television set-top boxes," adding that "Zander tried to tie it all together under a strategy he called 'seamless mobility' that never produced concrete results."

**Meredith Attempts to Maintain the Crumbling Façade**

83. Responding to investor unrest, and determined to keep the Company's stock price up, on December 6, 2007, Meredith appeared at the Lehman Bros. conference in San Francisco with

the expressly stated purpose of reassuring investors that the recovery effort in Motorola's 4Q 07, then more than two-thirds complete, was succeeding as previously promised. This conference was taking place ***nearly two weeks after so-called "Black Friday,"*** the Friday following Thanksgiving when retailers finally become profitable and electronics manufacturers are confronted with the indisputable facts of what is and what is not selling to consumers in the holiday season that year.

84. Meredith opened the session stating: "I suspect that there is probably lots of questions in the audience around our leadership change recently, our guidance or the lack of affirmation of that when we announced our leadership and just sort of the status of where we are, in terms of our cost reduction efforts and head count actions." Attempting to dismiss investor's legitimate fears about the Company's then present business condition and management's abrupt and unexplained about face, Meredith categorically noted:

> [W]hat we failed to take into account frankly, when we made the announcement just recently, that he was becoming the CEO is that you would have great angst over the fact that we made this announcement and didn't affirm our guidance on the fourth quarter. ***So just to dispel any sort of inadvertent message, let me be real clear. We said on our third quarter earnings call that for the fourth quarter, we would show earnings from continuing operations in the 0.12 to $0.14 range. I am affirming that.***

(Emphasis added.)

85. Additionally, during Motorola's 3Q 07 earnings conference, Meredith made the following extremely positive statement :

> ***[W]e said that we were going to have sequential improvement in top and bottom-line in mobile devices, a part of our business that seems to have a lot people quite excited regularly, and I will affirm that we will have sequential improvement in our top and bottom-line.***

(Emphasis added.)

86. Later in the call, Meredith added to his positive statements supporting the Company's purported "turnaround" when he affirmatively responded to a question posed by

Lehman Bros. analyst Jeff Kvaal: "what is the timeframe you think for the handset business to be approaching breakeven?" Meredith underscored and reaffirmed the comments Zander and Brown made previously at the 3Q 07 earnings conference held October 25, 2007, that ***"[a]s I mentioned we expected and still expect an improvement in our top and bottom line over last quarter. And this is – Q3 was a start or progress I think is the words that Ed [Zander] and Greg [Brown] have used. And I believe that's sort of where we are."*** (Emphasis added.)

87. The Defendants' calculated and misleading representations were effective, and the market reacted immediately and positively to them. In point of fact, the Company's stock price closed ***up 3.6% that day.*** *CNET News'* December 6, 2007 headline noted that: ***"Mobile phone maker Motorola backed its forecast for fourth-quarter earnings and revenue growth on Thursday, sending its shares up as much as 3.5 percent."*** *Bloomberg* reported that: ***"Motorola, Inc., the largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the Razr and Q handsets."*** On this announcement, *Bloomberg* also noted that: "Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock Exchange composite trading."

88. At the December 6, 2007 Lehman Bros. conference, Defendant Meredith hinted that Motorola now might be agreeable to selling off the Mobile Devices unit if the price was right. At the same conference, Meredith also made a misleadingly vague reference to the negotiations then well under way with Freescale.[11] Meredith had vigorously republished and endorsed the $0.12-$0.14 guidance and assertions of "bottom-line improvement" in the Mobile Devices business. Once Meredith made the decision to speak about the Freescale negotiations (which were then well under

[11] As noted *supra,* these negotiations would culminate in Motorola taking a $277 million 4Q 07 charge that comprised about $0.07 of the earnings miss in the 4Q 07. That $0.07 charge, (along with about $0.02 attributable to the Company's employee restructuring and similar charges), would reduce Motorola's reportable earnings on continuing operations in 4Q 07 to $0.04, significantly missing the Company's now oft-repeated and oft-emphasized 4Q 07 guidance of $0.12-$0.14.

way) he was required to disclose the adverse facts and dispel the misleading impressions he was affirmatively creating. Instead, Meredith muddied the waters further by waffling about the Company's chip supplier arrangements that had driven up its costs and undermined its margins:

> <Q>: Tom, historically – recently you folks have talked a little bit more about diversifying your chip supplier base. Just wanted to see if you have any additional color there in terms of the strategies and the vendors that you folks have been talking to?
>
> <A - Thomas Meredith>: We are continuing down the path of trying to present to our ultimate users a broader swath of devices and ***that may entail some shift in that set of relationships over the course of the next 12 months. And we're and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements in coming weeks and months.*** And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space.
>
> <Q - Jeff Kvaal>: Would we expect an announcement in coming weeks and months?
>
> <A - Thomas Meredith>: Can't say.
>
> <Q - Jeff Kvaal>: I'll take that as a maybe.

(Emphasis added.)

89. The effectiveness of "turnaround" plans as well as the direction of sales and earnings forecasts and trends made in earlier presentations were being contradicted by steadily increasing hard evidence as 4Q 07 progressed. By vigorously reiterating, endorsing and confirming these, Motorola Defendants misled investors about both the Company's current performance and its prospects:

a) When providing their 4Q 07 guidance, at the 3Q 07 earnings conference Defendants claimed that the Company was experiencing robust demand for the RAZR2, but demand for the RAZR2 was not in fact robust;

b) The thinner RAZR2, which went on sale in the U.S. in August 2007, did not appeal to consumers in the 2007 holiday buying season because it was not different enough from the original RAZR to justify the $299 price tag;

c) Motorola was still losing substantial market share to Apple, Inc.'s iPhone, Samsung Electronics, Co.'s Sync camera handset and Nokia Oyj's devices;

d) Since declining from 21% at the end of FY 06 to 13% at the end of 3Q 07, Motorola's market share had not stabilized but was still experiencing a dramatic decline during 4Q 07;

e) The Company was not on track to report anywhere near $0.12-$0.14 per share in earnings in 4Q 07 as it had claimed; and

f) Motorola was not on target to achieve "sequential improvement in top and bottom-line in mobile devices" during its 4Q 07, in large part because its per unit average mobile chip costs rose as a result of the minimum purchase requirements of its Freescale contract and Motorola's declining sales orders.

## The Truth Is Revealed

90. Defendants issued a release reporting Motorola's 4Q 07 financial results on January 23, 2008. This was followed by an earnings conference held with the investment community. At this conference, Defense made the following admissions which destroyed the façade Defendants had previously created about supposedly improving performance and prospects for the Company's Mobile Devices business:

- During 4Q 07 the Company sold only 1.5 million RAZR2 phones;
- "[D]emand for [Motorola's Mobile Device segment] products ha[d] slowed" during 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- That, contrary to Zander's statement on the October 25, 2007 earnings call that Defendants "actually [thought Motorola's Mobile Devices division] gained share" in 3Q 07, Motorola's market share in the Mobile Devices segment was still rapidly deteriorating. By the end of 4Q 07, market share would end up well below 13%;

- Motorola could report only $0.04 cents a share GAAP earnings in 4Q 07, 84% less the $0.25 per share earned in 4Q 06, and nowhere near the $0.12-$0.14 per share Defendants had claimed the Company was on target to achieve throughout 4Q 07;

- Instead of "sequential improvement in top and bottom-line in mobile devices," in 4Q 07, its operating loss increased by 56% in 4Q 07 to $388 million;

- Contrary to their previous statements of "progress" and assurances of having "turned the corner" in Mobile Devices, Defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge to fourth quarter 2007 earnings in connection with its contract with Freescale; and

- For 1Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05- $0.07 per share (a devastating reversal of the expectations which Defendants' positive statements had led the market to believe about the Company's improving prospects).

91. Additionally, in response to an analyst's inquiry, Meredith finally admitted that the decline in Motorola handset sales dated back to Black Friday – which occurred that year on Friday, November 23, 2007, nearly two weeks before Defendants republished their 4Q 07 guidance on December 6, 2007:

> [Bear Stearns:] And Thomas, if I could follow up, ***going back to early December, you talked a little bit more bullishly about the handset business overall. Was there really a major drop-off in December or was this weakening through the quarter?***
>
> [Meredith:] ***I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated.***

(Emphasis added.)

**Factual Background**

92. The Motorola RAZR[12], a series of clamshell mobile camera phones, was first developed in July 2003 and introduced in August 2004. The RAZR was the slimmest phone during its release in 2004, and therefore stood out among other phone models. Sales of the RAZR surpassed Motorola's lifetime projections in its first three months. The RAZR was the most popular mobile phone ever released until the iPhone 3G beat out the RAZR for the top spot in November 2008.

93. Motorola sold over 50 million units by June 2006 and more than 110 million units of the RAZR were sold by the time it was replaced by the RAZR2 in July 2007. This advanced Motorola's position to second place in the total hand-held market, and ensured Motorola was surpassed only by Nokia.

94. Because of its striking appearance and thin profile, the RAZR was initially exclusively marketed as a phone for the fashion-forward, but within a year, its price was lowered and it was wildly successful selling over 50 million units by July 2006, making it the most popular clamshell phone. *PC World* would list the RAZR at #12 in *The 50 Greatest Gadgets of the Past 50 Years* released on December 24, 2005.

95. While, in 2007, Motorola continued to heavily rely on the RAZR, Motorola's competitors (such as Nokia, Apple and Samsung) developed phones with more functionality and new features. As a result, Motorola's market share and profit margins started to disintegrate. After reporting significant losses in its Mobile Devices business in the first two quarters of 2007, in September 2007 Motorola announced a plan to turn around the business. This plan relied upon expected sales from new higher priced versions of the RAZRs and limited new product releases, and

[12] Pronounced "razor".

largely focused on improved cost efficiencies to protect the Company's margins. Defendants, however, misled the market about being "on track" with their turnaround plan, and their reported healthy earnings guidance concealed the depth of the revenue losses and the increases in expense attributable to its volume-based supplier agreements, particularly with its key chip provider, Freescale.

## **MOTOROLA'S DRAMATIC REVENUE AND EARNINGS DECLINE PRIOR TO THE START OF THE RELEVANT PERIOD**

96. By January 2007, Motorola would report that it had garnered 23.3% of the global market share in handsets by the end of FY 06. Importantly, Motorola also stated it "[c]ontinued as the clear No. 2.player in the world's wireless handset industry." The Company's annual report on Form 10-K also stated that "[d]ue to the segment's increase in unit shipments outpacing overall growth in the worldwide handset market, which grew approximately 20% in 2006, the segment believes that it expanded its global handset market share to an estimated 22% in 2006."

97. However, Motorola also then disclosed in its January 19, 2007 earnings release that its "ASP ["average selling price"] decreased approximately 11% compared to 2005," stating the "overall decrease in ASP was driven primarily by an unfavorable geographic and product-tier mix." Essentially, the Company had significantly increased total unit sales during 4Q 06 by selling a higher volume of cheaper phones (and also upon information and belief, purportedly accomplished additionally, by stuffing the channel through shipments to carriers and distributors of devices that could not yet be "sold through" to their retail clients). As a result, the Mobile Device segment's operating earnings were only $341 million, compared with the $663 million in operating earnings reported in 4Q 05.

98. Investors sought immediate improvement. On January 26, 2007, activist investor Carl C. Icahn notified the Motorola Board that he would nominate himself and would seek to have

himself elected to the Motorola Board of Directors at the annual shareholder meeting in May 2007.

99. On February 16, 2007, Motorola announced that Ronald G. Garriques, Executive Vice President and President of the Company's Mobile Devices business, was being terminated "effective immediately." Ray Roman, Senior Vice President, Global Sales, and Terry Vega, Senior Vice President, Global Devices, would assume responsibility as interim co-heads of the Mobile Devices business.

100. On March 12, 2007, Motorola distributed its preliminary proxy statement to shareholders for the May 2007 annual meeting. Icahn distributed a proxy challenge that same day, requesting that shareholders elect him to the Motorola Board. On March 21, 2007, Motorola announced that Brown had been elevated to the position of President and Chief Operating Officer of the Company, effective immediately. Motorola also disclosed on March 21, 2007 that Meredith, a member of Motorola's Board of Directors since January 2005, would become the Company's Acting CFO effective April 1, 2007. During the Company's conference call to discuss the management shift that day, Zander disclosed that for the full year of FY 07, the Company "expect[ed] overall sales profitability and operating cash flow to be substantially below . . . prior guidance." However, Zander also stated Motorola "expects to be profitable for the full year and have positive operating cash flow for the year," including "expect[ing] the Mobile Device business to experience a gradual recovery in the second half of 2007 and have an operating profit for the full year." Zander also explained that Motorola "anticipate[d] lowering [its] annualized cost structure by $400 million, which include[d] a previously-announced work force reduction of 3,500 and acceleration of site rationalizations," and that the Company would "continue to make further adjustments to our cost structure in line with the revised revenue expectations, as necessary."

101. On March 27, 2007, the Company disclosed the financial terms of Meredith's

employment arrangement with Motorola, disclosing that:

> In connection with becoming acting Chief Financial Officer of the Company, Mr. Meredith on March 27, 2007 entered into an employment agreement with a term of one year that provides him: (1) a base salary of $1 per year; (2) 250,000 stock options with an exercise price equal to closing price for a share of Motorola common stock on April 2, 2007, a one year vesting period and a ten year duration; (3) 500,000 performance-based restricted stock units to be granted on April 2, 2007 that vest only if and to the extent the closing price of the Company's Common Stock meets or exceeds the dollar amount set forth below for at least ten trading days during any thirty consecutive trading days all of which fall within the two years following the date of grant of such award:

| Dollar Amount | Percent Vested |
|---|---|
| $20.00 per share | 33% |
| $22.00 per share | An additional 33% |
| $24.00 per share | The final 34% |

102. According to Motorola, the RSUs Meredith received were valued at over $5.4 million. The exercise price on the 250,000 stock options Meredith received was $17.56 per share, with an estimated value of over $1.5 million.

103. On April 18, 2007, the Company issued disappointing 1Q 07 financial results. The release quoted Zander as stating, "[a]s I said a few weeks ago, the performance in our Mobile Devices business in the first quarter is unacceptable and we are committed to restoring it to an appropriate level of profitability." Brown added that in Mobile Devices, the Company was "very focused on improving operating cash flow and profitability," and that "[a]cross the company, the previously announced cost reduction actions are on schedule." 1Q 07 Mobile Devices segment sales were $5.4 billion, down 15% from 1Q 06. The segment incurred an operating loss of $231 million in 1Q 07, compared with operating profits of $701 million in 1Q 06. The Company's April 18th release stated Mobile Devices' "[l]ower sales and earnings [were] attributable to lower overall unit volumes, particularly in the emerging markets and Europe," stating that Motorola's share of the global handset market had fallen to 17.5%.

104. During the Company's conference call that day, Meredith outlined his plan to improve the profitability of the mobile device business:

> Now let's talk about our plans to make significant enhancements to our cash flow and profitability. It starts with our cost savings initiative. In January w announced a $400 million savings program, which included a 3,500 person headcount reduction, realization of cost synergies from our acquisitions and site rationalizations. The charges for the reduction in force will be completed by the end of the second quarter. We expect to have 18% fewer sites by the end of the year versus what we have today, and lastly, we are starting to realize cost savings from our acquisitions. It is important to note that Ed, Greg and I are determined to reduce costs. We know what we have announced is not enough. We plan to give you an update by June 1 regarding these additional actions. ***I want to be very clear — these actions will be all about improving our cash flow from operations and profitability. At the same time, rest assured we will prioritize investments for sustainable growth. So stay tuned.***

(Emphasis added.)

105. Meredith also reiterated during the 1Q 07 earnings call that Motorola would become profitable company-wide – and specifically in Mobile Devices – by the end of FY 2007:

> For the full year, we expect to see gradual quarterly improvements in both sales and operating margin in the second half. ***We expect to be profitable and to generate positive operating cash flow. In Mobile Devices we expect a gradual recovery in the second half and to be profitable for the full year.***

(Emphasis added.)

106. That same day, April 25, 2007, Icahn issued a release suggesting that Institutional Shareholder Services was recommending that shareholders elect Icahn to the Board. Later that day, Motorola disclosed Glass Lewis recommended shareholders vote against Icahn. On April 26, 2007, Icahn announced that Proxy Service, Inc. was recommending that shareholders elect Icahn.

107. On May 7, 2007, Motorola's shareholders rejected Icahn's proxy contest, and reelected management's slate to the Board of Directors. However, a "say on pay" shareholder proposal on executive compensation was approved as was another shareholder proposal regarding

recouping previously unearned management bonuses.

108. On May 14, 2007, Motorola disclosed in a current report filed with the SEC that "[o]n May 8, 2007, the Compensation and Leadership Committee ("Committee") of the Board of Directors of Motorola, Inc. ("Motorola" or the "Company"), with the concurrence of the independent directors of the Company's Board of Directors ("Board"), granted to Edward J. Zander, the Company's Chairman and Chief Executive Officer, performance-based stock options to purchase 800,000 shares of the Company's common stock under the Company's Omnibus Incentive Plan of 2006." According to the Company's release, the "options ha[d] an option exercise price of $17.70 per share" and would "vest only if and to the extent the closing price of a share of the Company's common stock [met] or exceed[ed] [that price] on at least ten trading days within any thirty consecutive trading days all of which fall within the two years following the date of grant of such award:

| Dollar Amount | Options Vested |
|---|---|
| $22.00 per share | 300,000 |
| $25.00 per share | 500,000 |

109. However, competition in the wireless handset segment increased dramatically in June 2007 when Apple introduced its iPhone. The Apple iPhone blended the iPod media player with an e-mail-equipped handset. Apple sold out of the iPhone at most of its stores less than a week after the product's debut.

110. On July 11, 2007, the Company issued a release announcing "preliminary estimates of second quarter 2007 financial results," stating it "expect[ed] second quarter sales to be in the range of $8.6 billion to $8.7 billion" and "a second quarter GAAP loss per share from continuing operations in the range of $(0.02) to $(0.04)." According to Motorola's July 11, 2007 release, the "company's shortfall in sales and earnings for the second quarter [was] primarily attributable to

lower overall unit volumes in the Mobile Devices business in Asia and Europe." "The company expect[ed] second quarter Mobile Devices shipments to be approximately 35 to 36 million handsets," and its "Mobile Devices business [was] expected to have a larger operating loss in the second quarter as compared to the first quarter." Most detrimentally, "[f]or the full year 2007, ***the company no longer expect[ed] the Mobile Device business to be profitable."*** (Emphasis added.)

111. Separately, Motorola announced that "Stu Reed, executive vice president of Motorola's Integrated Supply Chain organization, ha[d] been named president of Motorola's Mobile Devices business," promising that "Motorola [would] provide an update on the company's strategy and progress at the company's financial analyst meeting which, as a result of the management changes and other recent business realignments, ha[d] been rescheduled to September 2007."

112. On July 19, 2007, the Company issued its final 2Q 07 earnings release, disclosing that "Mobile Devices segment sales were $4.3 billion, down 40 percent compared with the year-ago quarter," and that "the segment incurred an operating loss of $264 million, compared with operating earnings of $804 million" in the 2Q 06. "Lower sales and earnings [were] attributable to lower overall unit volumes, particularly in Asia, and the Europe, Middle East and Africa region" and "Motorola's share of the global handset market for the quarter [was then] estimated to be 13.5%."

113. In July 2007, Motorola released the new upgraded Motorola RAZR2 series. Marketed as a sleeker and more stable design of the RAZR, the RAZR2 included more features, improved telephone audio quality, and a touch-sensitive external screen. Indeed, describing the purported turnaround then taking place in Mobile Devices, Motorola's July 19, 2007 earnings release explained that the Company had begun "shipping several new products, including the EV-DO RAZR2, the Q9, the MOTO Z8 and the Linux/Java platform-based GSM RAZR2 and ROKR

Z6". Defendant Brown (then president and chief operating officer of the Company), was quoted in the earnings release as stating: ***"We are committed to improving the performance of the Mobile Devices business. We announced strong new leadership, began shipping a number of new products, and are implementing aggressive cost controls. . . "*** (Emphasis added.)

**THE MOBILE DEVICES "TURNAROUND" STORY**

114. On September 7, 2007, the Company held its annual financial analyst meeting. Addressing the market's response to the Company's new product offerings, Defendants reported that consumer response was overwhelmingly positive. Specifically as to the Mobile Devices segment, Brown's presentation promised "Mid-to-high single-digit sales growth" and "Solid double-digit OM [operating margins]." ***Meredith followed up stating "For 2008, expect . . . Profitable in all businesses."*** (Emphasis added.)

115. During his presentation, Meredith blamed a combination of declining sales growth and diminishing operating margins for what had gone awry at Motorola during the 1Q 07. Meredith was most critical of Motorola's growing lengthy delays in the devices' business or "cash conversion" cycle ("CCC"). According to Meredith, CCC was "simply a formula about a company's operational efficiency. It's about how fast we take a dollar of investment and convert it hopefully into more than a dollar of income, how fast we convert our receivables plus our inventories into--minus our payables--net cash." Meredith also emphasized that there was a "high correlation between a stock price and one cash conversion cycle."

116. Importantly, what this initiative entailed was reducing the lead times for Motorola's suppliers, and avoiding the purchase of obsolete components and manufactured items that would sit in Motorola's inventory and ultimately be scrapped, by increasing the "transparency" between Motorola and its customers, the carriers, operators and distributors in the "sell through" of Motorola

devices to the ultimate retail consumers, or in the words of Motorola's chief procurement officer, "to collaborate" on sales forecasting, planning and replenishment.

117. The consequence of this signature project that Meredith repeatedly invoked to analysts was that he personally had greater and earlier knowledge of carriers' sell-through sales, and therefore more reliable Motorola future sales forecasts based on the need to replenish carriers' phone inventories for their future sales to consumers.

118. Thus, e.g., on December 6, 2007, one week after the announcement of Zander's termination as CEO and to reassure investors that the management change did not suggest reversals in the Company's mobile phone business (since Motorola's stock price had declined), Meredith appeared at the Lehman Bros. conference and touted the progress on the CCC project and its implications. Meredith, with the stated purpose of dispelling analysts' apparent "great angst" over Zander's termination, reiterated 4Q 07 guidances of $0.12 - $0.14 per share and asserted that, ***"we are going to have sequential improvement in top and bottom-line in mobile devices."*** (Emphasis added.)

119. Meredith also pointed to improvements in the CCC to convince the assembled analysts that he had personally confirmed that the supposed improvement in the Mobile Devices business would continue into later periods:

> Well, as I think many people that have followed what we've been saying for the last eight or so months. We are very focused on our cash conversion cycle and frankly our value chain more broadly. I'm pleased with the progress we've made, not satisfied. As I mentioned, the job of a CFO is never to be satisfied. We have gone from 56-day cash conversion cycle to now 43 at last quarter. ***And we feel to be in a position to say, that we effectively just went through our planning process for 2008, 2009. And each of the business unit heads, the business unit heads not the finance leaders spoke at some length around the drive and the activity they have ongoing around improving their own cash conversion cycle as well as value chain.***

(Emphasis added.)

120. As would be revealed just six weeks later, on January 23, 2008, Motorola, in fact, did not earn $0.12 - $0.14 in 4Q 07 (because of its $277 million in component costs attributed to a "confidential settlement" with Freescale, which also contributed to Motorola's Mobile Devices segment loss of $330 million in the quarter. This poor performance was particularly telling because the fourth quarter was generally the strongest because of the Christmas holiday. But what really shocked analysts was Defendants' report that Motorola's Mobile Devices sales projection for 1Q 07 was devastating, a report that ultimately proved to be all too true. For 1Q 08, Motorola's industry market share of worldwide mobile devices dropped by an astounding 3% – which translated into a loss in sales versus its peers' of more than 8.8 million devices, or at Motorola's average sales prices, more than $1 billion in sales lost in a single quarter.

## MOTOROLA'S VOLUME-BASED PURCHASE ARRANGEMENT WITH FREESCALE

121. Freescale is an American semiconductor manufacturer. It was one of the first semiconductor companies in the world, having started as a division of Motorola in 1949. On October 6, 2003, Motorola announced it was spinning off Freescale. On July 21, 2004, Freescale was taken public through an initial public stock offering. As part of the spinoff transaction, Freescale and Motorola entered into a supply agreement which obligated Motorola to continue purchasing semiconductors, or "chips," from Freescale.

122. In fact, following completion of the spin-off, Freescale's new "Cellular Products" division would continue producing semiconductor components and platform-level products for use in the design and manufacturing of mobile devices. The division's offerings were designed for and sold almost exclusively for Motorola for use in its cellular handsets.

123. As would later be revealed by Freescale and through new "risk" disclosures in

Motorola's 2007 Form 10-K filed after the Class Period, Motorola was obligated to make minimum purchases from Freescale under agreement, which Motorola failed to do because of its own declining sales.

124. Freescale was taken private again on December 1, 2006 when it was acquired by a consortium of private equity funds. According to the proxy statement disseminated to Freescale's shareholders seeking their approval of this $17+ billion "going private" transaction, ***"[n]early 90% of [Freescale's] revenues were derived from the cellular handset market in 2005 and 2006, with Motorola representing [its] largest customer."*** (Emphasis added.)

125. Because Motorola's minimum purchase commitments were so material to Freescale's enterprise value, as part of this going private transaction, Freescale's private equity purchasers required that Freescale's executives obtain at least an additional two year commitment from Motorola to continue its semiconductor purchases from Freescale. On February 8, 2007, Motorola and Freescale announced that their "strategic relationship" had been continued through 2009. In 2007, Motorola, even with its handset business declining, accounted for 94% of Freescale's 2007 Cellular Product division sales. And Motorola's obligations to purchase semi-conductors from Freescale remained a major component of Motorola's cost of sales, and hence a key factor in determining the gross margins for Motorola's Mobile Devices business segment, a major focus of analysts during the Relevant Period.

126. While, during the Relevant Period, Defendants assured the market of its turnaround in its Mobile Devices sales and the improving profitability of its Mobile Devices business, and as late as December 6, 2007 reiterated that the Company would be making its $0.12 - $0.14 earnings guidance for 4Q 07, Defendants concealed that Motorola's product costs per unit had increased as a result of its failure to meet the minimum purchase obligations in its agreement with Freescale, and

that those higher product costs undercut the assurances of improving profitability and made the attainment of the earnings guidances virtually impossible. Ultimately, Defendants revealed that the Company's Mobile Devices segment had incurred $388 million in losses for 4Q 07 up 56% from the $138 million loss in 3Q 07 – hardly the turnaround that had been promised – largely as a result of the $277 million owed to Freescale.

127. In announcing Motorola's 4Q 07 results, Defendants attributed the 4Q 07 $277 million charge to a confidential "legal settlement" with Freescale. Because, however, the business terms of the confidential "legal settlement" drove major aspects of both companies' 2007 financial statements, and were critical to an understanding of their 2008 prospects that were discussed throughout the Relevant Period and thereafter, Motorola's and Freescale's agreement to keep their "settlement" terms under wraps was neither permitted under the relevant federal securities laws, nor indeed even possible if Motorola was to publicly file with the SEC annual financial statements that were audited and approved by its independent auditor.

128. Thus, in its 2007 Form 10-K, Motorola was forced to disclose that the $277 million due Freescale was part of its cost of goods sold that had resulted in the lower reported 2007 margins for its Mobile Devices business. The Form 10-K, through its purported "risk" disclosures, also revealed that these costs were likely attributable to Motorola's failure to satisfy the minimum purchase requirements in its contract with Freescale:

> ***We have negotiated favorable pricing terms with many of our suppliers, some of which have volume-based prices. In the case of volume-based pricing arrangements, we may experience higher than anticipated costs if current volume based purchase projections are not met. Some contracts have minimum purchase commitments and we may incur large financial penalties if these commitments are not met.***

(Emphasis added.)

129. The fact that, in late 2007, Motorola had failed to place minimum purchase orders

worth hundreds of millions of dollars with Freescale was a key fact that, had it been revealed during the Relevant Period, would have disclosed to investors that not only were the 2007 product costs of Motorola's Mobile Devices division being misrepresented, but that Motorola's depressed component orders to Freescale (which necessarily preceded Motorola's shipments of finished goods to its customers) signaled that Motorola's own sales orders for deliveries in 1Q 08 were plummeting to disastrous levels. All these facts were known to Meredith (and the other Defendants), but were concealed from investors, when on December 6, 2007, he appeared at the Lehman Bros. conference to calm investors' "angst" and reiterate Motorola's pre-existing earnings guidance and purportedly improving Mobile Devices financial performance. Indeed, at that conference, Meredith expressly stated that he was then finalizing the Company's deal arrangements with its chip suppliers, purportedly to diversify Motorola's supply of chips – so there is no question that Meredith then knew of the sky-rocketing 2007 product costs that had resulted from Motorola's declining sales orders.

130. In January 2008, at its own earnings conference, Freescale, too, found it difficult to fully keep "confidential" the terms of its "settlement" with Motorola, because it affected the valuation of billions of dollars of intangible assets on its balance sheet, and, indeed, the very viability of its Cellular Division going forward – since Motorola was responsible for 94% of its sales in that business.

131. Thus, Freescale, on January 30, 2008, reported a $449 million impairment charge on its 2007 income, in principal part, for amendments to its supply agreement with Motorola, "to reflect the new business conditions." When pressed by analysts at its earnings conference about the new terms, and what had led Motorola to agree to pay Freescale hundreds of millions of dollars, Michael Meyer, Freescale's CEO, stated:

> Guy, so first of all I am somewhat limited in what we can disclose to you because of the confidentiality agreement that we have with Motorola, which is normal. I mean because this is part of an ongoing commercial relationship between two large companies with give and take constantly, if you want. And so the change – so I am going to dance a little bit around and I apologize for that because I am trying to remain within the frame of what I can talk about. ***The agreement amended*** and extended, as I said, ***a supply agreement that was a large agreement*** between two companies, ***which*** was – ***had been built at a time where the Motorola business outlook was different than what it is now. So one can imagine that there were commitments made on a number of things that were more difficult to meet with new conditions,*** that's one. ***The second thing, part of the discussions were linked to hidden fees and movement of cash, if you want, between two companies when certain payments are made and things like that. And so that the balance of those discussions resulted into some cash changing hands,*** I mean – and going forward, let me talk about the Motorola relationship for a second here since we have on the line a lot of people. I have repeatedly said if you listen to me and will get tired after a few years here, I have repeatedly said that as more and more of the Motorola portfolio becomes 3G, they will diversify their supply because they – in 2 and 2.5G they were not 100% Freescale. And they should not as they switch to 3G be 100% Freescale.
>
> Now the thing that is a little bit I don't want to say an issue, ***but the thing that makes that natural diversification a little bit more of a problem moving forward is the fact that their revenue has been going down and so it's a smaller pie to share.*** But other than that, we don't see anything happening here that is not something we thought was going to happen naturally. They do need to diversify their 3G as they move their entire portfolio to be 3G and going beyond. So going forward we are competing for their new product designs in the future. We have advantages and we have things to overcome. We have the advantage of being able to run their existing software and other things and we have to fight on cost and so we intend to be competitive and as we win more and more business outside, we tend to remain competitive. So that's a long answer to the question of what's behind, but ***the main thing that's behind the changes, the significant reduction in Motorola's business outlook.***

(Emphasis added.)

132. Freescale was somewhat clearer in its 1Q 08 earnings call when its CFO explained, "we entered into an amended and extended agreement with Motorola whereby we received cash proceeds, provided certain pricing concessions ***and relieved Motorola of certain obligations."*** These purchase "obligations," and the fact that Motorola had failed to satisfy them because of its own declining sales orders, were material concealed facts that belied Meredith's statements at

Motorola's December 6, 2007 conference about the current state of Motorola's Mobile Devices business, and its prospects. (Emphasis added.)

**SPLITTING THE COMPANY IN TWO**

133. On March 27, 2008, the *New York Times* reported that "After a two-month strategic review of its businesses, Motorola said on Wednesday that it would split itself into two separate publicly traded companies, spinning off its unprofitable mobile phone unit to investors." Gregory Q. Brown, Motorola's chief executive, conceded that the main problem facing the company was its inability to come up with new products to replace the highly successful Razr, which was once a must-have phone but has faded from the scene. The article went on to state:

> Rivals aside, Motorola is also facing pressure from investors -- in particular Mr. Icahn -- who are dissatisfied with Motorola's weak stock performance; the shares have dropped 44 percent in the last year. Cellphone production is the largest division of the company, with $18.99 billion in net sales in 2007, a 33 percent decline from a year earlier.
>
> Last year, the division lost $1.2 billion. Motorola's other two units are smaller but profitable.
>
> Analysts have questioned what effect a split would have on operations and on attracting solid executives to the troubled company. Already there has been an exodus of executives from Motorola, among them Stu Reed, the former chief of the mobile devices division.
>
> "The danger is they are getting rid of the underperforming part of the business just to get rid of it," Mr. Entner of IAG said. "The fear is in a year or two the operations will cease to exist."
>
> The profitable side of Motorola is decidedly less well known than the mobile devices division. It makes set-top boxes and products used by businesses and law enforcement officials for scanning and fingerprinting, as well as data and video communications systems for public agencies like fire departments.
>
> Motorola expects to have the spinoff, which will be a tax-free distribution to shareholders, completed by 2009.
>
> * * * *

> Selling it to a competitor was one option that Motorola pursued, according to a person involved in those discussions, but there were no takers.
>
> Mr. Brown declined to discuss whether the division could be sold. "We've never had a 'For Sale' sign on it," he said. "After our review, we believe this is the appropriate action."

134. On March 27, 2008, USA Today reported that Motorola "which invented cellphone technology more than 20 years ago and sparked a global telecommunications revolution", was planning to split itself into two companies The article stated:

> Motorola shareholders will get stock in both companies. The tax-free deal is expected to close in 2009 if approved by the IRS.
>
> Once a global leader in wireless handsets, Motorola today is a faraway No.2 to Nokia, which continues to churn out cool new products with dizzying speed.
>
> * * * *
>
> Shortly after Brown was named CEO in January, Motorola said it was considering a range of strategic possibilities, including the sale of the handset division. Motorola got no takers.
>
> Brown, who had been chief operating officer, says, "We never had a 'for sale' sign on the mobile business."
>
> Analyst John Jackson of Yankee Group says the split is a bitter turn for Motorola's storied handset business: "They can't sell it, and they can't fix it."

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

135. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

136. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects, in order to allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Motorola and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Motorola, regarding the Individual Defendants' management of Motorola's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by Defendants throughout the Relevant Period; (iv) sell nearly $5,219,753 worth of personally held Motorola shares (this figure rises to $8,767,909.11 when including the sales of Defendant Zander) while in possession of material, non-public information. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants Collectively and individually took the actions set forth herein.

137. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least the start of the Relevant Period and continuing thereafter. During this time, the Individual Defendants caused the Company to conceal the true fact that Motorola was misrepresenting its business prospects and that the Defendants had breached their fiduciary duties in managing the affairs of the Company. The Defendants also made other specific, improper statements about Motorola's financial performance and future business prospects, as alleged herein. Further, the Defendants took actions that were not the product of valid business judgment, but rather the result of an entrenchment motive.

138. The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, gross mismanagement and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Motorola common stock so they could (i) dispose of approximately $5,219,753 of their personally held stock (this figure rises to $8,767,909.11 when including the sales of Defendant Zander); and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

139. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and release improper statements, taking actions that were not the product of valid business judgment and failing to properly manage the affairs of the Company. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

140. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

141. On October 25, 2007, Motorola released its 3Q 07 financial results. The earnings release Defendants issued that day reported 3Q 07 sales of $8.8 billion, $4.5 billion of which were in the Mobile Devices segment, down 36% from the 3Q 06. The Mobile Devices segment incurred

an operating loss of $138 million in the 3Q 07, compared to a 2Q 07 operating loss of $264 million, a sequential quarter improvement of 47%. The Company's October 25, 2007 release affirmatively stated "Motorola's share of the global handset market for the quarter is estimated to be 13 percent." Zander was quoted in the October 25, 2007 release, stating management was ***"pleased with the improvement in the financial performance of mobile devices and we look forward to building upon the progress we have made."*** The quote from Zander also assured that ***"[w]ith our focus on . . .the initiatives we are taking in mobile devices we will further improve our performance and create long-term shareholder value."*** As to the Company's "Outlook," the October 25, 2007 release stated the ***"company's outlook for earnings per share from continuing operations in the fourth quarter is $0.12 to $0.14."*** (Emphasis added.)

142. Defendants Zander, Brown and Meredith also held an earnings conference that day to discuss the Company's 3Q 07 financial performance and the ongoing 4Q 07 quarter with the investment community. Concerning the Company's 3Q 07 performance, especially in its Mobile Devices segment, Defendants touted its turnaround and the success of its new RAZR2 product:

- (Zander:) ***"Our third quarter can be characterized by one word, progress.*** We improved our earnings and cash flow significantly compared to the second quarter ***and made substantial improvement in all key metrics in Mobile Devices."***

- (Zander:) ***"In Mobile Devices, we began to move in the right direction. We increased unit sales and gross margin percentage while lower operating expenses. These improvements resulted in significantly lower operating loss."***

- (Brown:) "Our estimated market share in the quarter was about 13%."

- (Brown:) "Compared to last quarter, ***gross margin percentage improved,*** again as a result of ***our new product offerings, which are collectively running at higher margins than the mature products in the portfolio."***

- (Brown:) "Moving on to the products in the feature phone segment, ***RAZR and KRZR continued to be top sellers globally.*** We sold over 8 million RAZRs, bringing us to a total of now over 110 million RAZRs and in the quarter, nearly 3 million KRZRs. ***RAZR 2s began shipping in all regions and technologies. It's off***

***to a great start, meeting the needs of the demanding feature phone users and accounted for over 900,000 units in the quarter.*** We . . . just recently we announced the RAZR 2 Luxury Edition in time for the holiday selling season."

- (Brown:) "So to recap, ***the operational changes we have made in Mobile Devices are beginning to yield results and we are making progress.*** We improved gross margin percentage . . . ."

- • (Bear Stearns analyst:) ". . . you've been losing share in a bunch of regions around the world. And I wonder if you expect to gain a little bit of the share back in the fourth quarter or whether that little bit of drop is going to continue for a while." (Zander:) ". . . I think you're referring to mobile devices. ***We actually think we gained share."***

- (Brown:) ". . . ***we're pretty pleased with RAZR2 sales out of the gate*** with over 900,000 units in the quarter and now being made available in all technologies and geographies."

- (Zander:) "We are pleased with RAZR2s. I think we did almost 1 million units. I would say that was done in 80 days. I must say that the popular product everybody talks about today also did about 1 million units in 90 days. ***So we're pretty excited about the additional acceptance with the RAZR2 product.***"

(Emphasis added.)

143. Defendants also provided a very favorable outlook for the Company's 4Q 07, then well under way and reiterated the financial targets announced in the September 7th analyst meeting (*i.e.*, that by 2008 the Company would be profitable in all its businesses):

- (Zander:) "Q3 was about execution, doing what we said we were going to do, but we also recognized there is lot more work to do. ***Our management team is committed to returning the company to our financial targets as outlined during the September Analyst meeting."***

- (Meredith:) "Moving on to our outlook for the fourth quarter, we are encouraged by progress in Mobile Devices as compared to prior quarters. ***We expect continued improvement in the fourth quarter."***

- (Meredith:) ***"We expect fourth quarter earnings per share from continuing operations to be in the range of $0.12 to $0.14."***

- (Brown:) "In closing, as we look overall, third quarter operating performance, we're seeing results from the changes we've implemented. ***We will continue the***

***momentum and drive further improvements in the coming quarter.*** With continued execution, our global brand, and healthy market trends across key businesses, we're well positioned for the long term."

- (Zander:) "I think what we need to do in the last six months is to ***put the operational discipline and execution back into Mobile Devices.*** It's not dependent on a one-hit wonder such as RAZR even though everybody would like to have that. And I think we're doing that."

- (Meredith:) "In terms of mobile devices, ***we do see, sequentially seeing our top line go up, revenue units up, and improvement in our bottom line."***

- (Brown:) "The overall guidance as we reflected is $0.12 to $0.14. Within the line items, we wouldn't give that breakdown. Just on gross margin percentage, we have sequentially improved it for I think three quarters in a row and also for three quarters in a row in Mobile Devices. ***So it's a very regimented and disciplined stair step and we're working hard on all levels: pricing, product efficiencies, new product, higher gross margin, richer experiences and that's the cadence of what we're going to continue to drive from an overall portfolio standpoint over time."***

(Emphasis added.)

144. After the earnings release, Zander told the Arlington *Daily Herald* "[w]e've made some progress toward stability," and that "[w]e did what we said we were going to do and actually (made) the numbers in some areas." The *Daily Herald* also reported on October 26th that ***"Zander said his top lieutenants are carrying out a turn-around strategy put in place earlier this year."*** (Emphasis added.)

145. On this news, the Company's stock price increased $0.75 to a close of $19.30 per share on unusually high trading volume of over 40 million shares, more than twice the average daily trading volume over the preceding 30 trading days.

146. Yet consumers were not buying the new RAZR2 and Motorola's share of handset sales was actually declining. In addition, the guidance for 4Q 07 and the statements about the September 2007 targets were false and misleading, because, upon information and belief, they conflicted with sales information already on hand and which Defendants knew, or recklessly failed to check at the time of their statements.

147. On November 14, 2007, Defendant Brown appeared at the UBS Global Technology & Services Conference. Asked about the Company's 4Q 07 forecast, Brown reiterated that "***what we said in the . . . Q3 earnings call is that we thought units would be growing sequentially along with revenue and bottom line OE [operating earnings] would improve sequentially as well.***" (Emphasis added.)

148. On November 30, 2007, Motorola suddenly announced that Zander, its Chairman and CEO, had resigned as CEO effective December 31, 2007. Zander would continue to serve as Motorola's Chairman until the 2008 annual meeting of stockholders in May 2008. But Zander would not be nominated, or stand for re-election, to the Board of Directors at the 2008 annual meeting of stockholders. Beginning January 1, 2008, Zander would serve as Strategic Advisor to the incoming CEO, a non-officer employee position, through January 5, 2009. During this time, Zander would continue to receive his regular base salary and benefits. The Company also announced on November 30, 2007 that Brown, who had served as Motorola's President and Chief Operating Officer since March 21, 2007, would replace Zander as President and CEO of Motorola effective January 1, 2008.

149. Later on November 30, 2007, Icahn issued a press released "comment[ing] on the announcement by Motorola . . . that it was replacing Edward J. Zander as Motorola's CEO." Icahn's November 30, 2007 release was also filed with the SEC on a Form 14A Definitive Proxy Statement, indicating Icahn was once again launching a proxy fight for control of Motorola. Icahn's November 30, 2007 release quoted him stating that:

> [T]he steps announced today do not even begin to address the major problems at Motorola. In my opinion, Motorola should be split into separate companies: a mobile devices company; an enterprise mobility company; a connected home company; and a company focused on mobile networks infrastructure. In particular, I believe that the best opportunity for the mobile devices' business to

> attract top flight management and to prosper and grow is to establish it as a standalone business.

150. On December 3, 2007, shortly after it became public that Defendant Zander would be stepping down, Chief Technology Officer Padmasree Warrior's employment with Motorola was also suddenly terminated. On December 3, 2007, *CNET News* suggested that "Motorola was unable to come up with a second act that would have kept the business rolling . . . . [t]hat would have been Warrior's responsibility, as head of Motorola Labs and the company's 'early-stage accelerators,' which were responsible for coming up with new ideas."

151. By the close of trading on the evening of December 5, 2007, Motorola's stock price had declined to $15.75 on investor concern about Motorola's continuing decline in market share and Zander's and Warrior's sudden departures. The exercise price on 377,190 stock options Zander was holding that would not vest until January 5, 2008 was $12.97, meaning if the stock price continued declining, these options would have no value upon vesting. Moreover, any chance of reaching the $20-$25 price range required to vest the rest of Zander's and Meredith's stock options and RSU grants was vanishing as the stock price continued declining. More importantly, the growing market perception that Mobile Devices was not making "progress" and had not "turned the corner" would make it difficult, if not impossible, to sell the Mobile Devices unit at a price that would generate the $8 per share bump that was then being predicted Motorola could garner if the Mobile Devices business was split into separate companies as Icahn was publicly advocating, potentially increasing Motorola's stock price into the $20-$25 range required to vest the rest of Zander's and Meredith's stock options and RSUs.

152. At 7:30 a.m. PST on December 6, 2007, Defendant Meredith appeared at the Lehman Bros. conference in San Francisco officiated by Jeff Kvaal, analyst with Lehman Bros., and webcast with the stated purpose of deflecting the message implied by the recent and abrupt

personnel changes – i.e., that Motorola, and particularly its Mobile Devices business, was floundering. Thus, Meredith opened up his presentation by falsely representing that the recent elevation of Brown to "the CEO position effective January 1st . . . was part of a very orderly and disciplined process." Meredith then acknowledged that Zander's leaving could be interpreted as suggesting that there were undisclosed problems at the Company, but emphatically insisted that nothing had gone awry:

> ***[W]hat we failed to take into account frankly, when we made the announcement just recently, that he was becoming the CEO is that you would have great angst over the fact that we made this announcement and didn't affirm our guidance on the fourth quarter. So just to dispel any sort of inadvertent message, let me be real clear. We said on our third quarter earnings call that for the fourth quarter, we would show earnings from continuing operations in the 0.12 to $0.14 range. I am affirming that.***

(Emphasis added.)

153. Meredith also emphatically represented that the turnaround in the Mobile Devices business was continuing:

> [W]e said that we were going to have sequential improvement in top and bottom-line in mobile devices, a part of our business that seems to have a lot [of] people quite excited regularly, ***and I will affirm that we will have sequential improvement in our top and bottom-line.***

(Emphasis added.)

154. Later during the call, in response to Kvaal's request that Meredith comment on 4Q margins, Meredith again confirmed, quoting Defendants Brown and Zander from the 3Q 07 earnings conference call, that:

> As I mentioned ***we expected and still expect an improvement in our top and bottom line over last quarter. And this is – Q3 was a start or progress I think is the word that Ed and Greg have used.*** And I believe that's sort of where we are.

(Emphasis added.)

155. To persuade analysts that there was a concrete factual basis for his assurances about the improved financial and business performance and prospects for Motorola's Mobile Devices, Meredith pointed to the changes in the cash conversion cycle (changes which should have given him greater visibility into customer inventories and therefore future sales orders), and his recent meetings with the heads of the relevant business units about their 2008 and 2009 business plans:

> Well, as I think many people that have followed what we've been saying for the last eight or so months [sic]. We are very focused on our cash conversion cycle and frankly our value chain more broadly. I'm pleased with the progress we've made, not satisfied. As I mentioned, the job of a CFO is never to be satisfied. We have gone from 56-day cash conversion cycle to now 43 at last quarter. And we feel to be in a position to say, that ***we effectively just went through our planning process for 2008, 2009. And each of the business unit heads, the business unit heads, not the finance leaders spoke at some length around the drive and the activity they have ongoing around improving their own cash conversion cycle as well as value chain.*** So in a relatively short period of time we've changed the lexicon and frankly raised the level of importance inside our own company around all about the cash. And I meant what I said at the September financial analyst meeting, our goal is to be at 20 to 30 days next year, by year end, this time next year and frankly I'd be sorely disappointed if we can't get there.
>
> <Q - Jeff Kvaal>: ***How tightly timed to, is your margin structure and your cash conversion cycle?***
>
> <A - Thomas Meredith>: ***I'd say it's not one-to-one, but it's pretty tightly correlated. And in fact, ROIC is driven largely by the investment, obviously in capital but also the 'R' part. And let's just say you can't, I don't think physically compress your time around your value chain including cash, cash-to-cash without actually also improving your 'R', the return. So I'd say pretty tight.***

(Emphasis added.)

156. At the end of the December 6, 2007 question and answer session, Meredith was questioned about the Company's efforts to diversify its chip supplier base, i.e., to extend its purchases of semi-conductors beyond Freescale. Meredith admitted that he had been involved in

discussions and that new arrangements were in the process of being finalized. Meredith, however, was noticeably silent about the fact that he was in the process of negotiating payments by Motorola of hundreds of millions of dollars, for amendment of its agreement with Freescale and that, for 2007, Motorola owed Freescale $277 million for Motorola's failure to satisfy its minimum purchase commitments. Thus, Meredith was asked the following question and gave the following response:

> <Q>: Tom, historically – recently you folks have talked a little bit more about diversifying your chip supplier base. Just wanted to see if you have any additional color there in terms of the strategies and the vendors that you folks have been talking to?
>
> <A - Thomas Meredith>: We are continuing down the path of trying to present to our ultimate users a broader swath of devices and that may entail some shift in tha set of relationships over the course of the next 12 months. ***And we're and have been in discussions with all of the named players and they will play out in terms of finalizing those arrangements in coming weeks and months. And so that's a space that continues to be one of extraordinary focus, lots of activity and watch that space.***

(Emphasis added.)

157. These statements were false and misleading, and indeed were calculated to be so. Meredith also concealed known material facts, the disclosure of which was necessary to correct the false and misleading impression that he was creating. It has been asserted that the sales information on the poor 4Q 07 results was readily available on several of the Company's systems by December 6, 2007. As Meredith himself later admitted, he knew about the poor fourth quarter sales by November 23, 2007, at the latest.

158. In 4Q 07, mobile phone sales had improved only marginally in 4Q 07 over 3Q 07 (up 7%) given the holiday season, and the sharp increase in industry sales in those sequential quarters (18% growth in industry-wide units). Moreover, upon information and belief, even this anemic growth had been accomplished only by stuffing the channel and offering price concessions

particularly among the major U.S. carriers. The sequential 3Q 07 to 4Q 07 mobile phone operating earnings sharply deteriorated from $138 million in 3Q 07 to $388 million in 4Q 07. And the true deterioration of this business over 4Q 07 was to be reflected in the 1Q 08 results, since the 4Q 07 shipments that remained unsold to the ultimate users would depress 1Q 08 results – the very point of Meredith's CCC project that he repeatedly touted. Indeed, this phenomenon – that excessive and unwanted shipments in one quarter led to increased CCCs in the next – was borne out when, in 1Q 08, Motorola's CCC increased to 45 days from the 26 days in 4Q 07. Moreover, Brown explained in the 1Q 08 earnings call that the decline in U.S. mobile device sales (where the major carriers were concentrated) was principally responsible for the Company's 3% loss in market share during that quarter. Thus, all facts point to the conclusion that the devastating drop-off in customer demand for Motorola's phones occurred during 4Q 07 and was well known by Defendants at that time.

159. The false and misleading statements Defendants made on October 25, 2007 and that Meredith implied remained alive by his December 6, 2007 comments adopting the earlier statements about the segment's continuing improvement, were false, misleading and/or incomplete because:

a) The Company was not experiencing the robust demand for the RAZR2 Defendants claimed at the 3Q 07 earnings conference when providing their 4Q 07 guidance;

b) The thinner RAZR2, which went on sale in the U.S. in August 2007, failed to attract buyers in the 2007 holiday buying season because it was not different enough from the original RAZR to warrant the $299 price tag;

c) Motorola was still losing significant market share to Apple, Inc.'s iPhone, Samsung Electronics, Co.'s Sync camera handset and Nokia Oyj's devices; and

d) After falling from 21% at the end of FY 06 to 13% at the end of 3Q 07, Motorola's

market share had not stabilized but was still in a freefall during 4Q 07.

160. As expected, the market responded positively to Meredith's false and misleading statements at the December 6, 2007 conference. According to *Bloomberg*, "Motorola, Inc., the largest U.S. maker of mobile phones, expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the RAZR and Q handsets." According to *Bloomberg,* on this announcement, "Motorola rose 56 cents, or 3.6 percent, to $16.31 at 4:01 p.m. in New York Stock Exchange composite trading." *CNET News* reported that day that "[t]he news was a relief for some investors who had worried that last week's announcement that Chief Executive Ed Zander was stepping down was a sign that Motorola would miss its targets," emphasizing that Meredith had "backed Motorola's forecast for earnings from continuing operations of 12 cents to 14 cents per share, and said its mobile device unit would see sequential revenue and bottom-line improvements." The *AP* too reported that "Motorola shares up after CFO reaffirms fourth-quarter guidance," stating:

> Schaumburg-based Motorola's shares are up today after a senior official with the cell-phone maker affirmed the company's fourth-quarter outlook.
>
> The remarks by Chief Financial Officer Tom Meredith came at an investor conference in San Francisco with Motorola in the process of changing chief executives.
>
> ***Ed Zander's resignation last Friday had prompted concerns among investors that the company could be in the midst of another disappointing quarter.***
>
> ***Meredith says he expects improvement in both sales and profits from the company's handset business, continuing the progress made in the third quarter.***
>
> ***Motorola shares are up 39 cents, or 2.5 percent, to $16.14 in afternoon trading.***

(Emphasis added.)

161. *Reuters* also reported that day that "[m]obile phone maker Motorola Inc. backed its forecast for fourth-quarter earnings and revenue growth on Thursday, sending its shares up 3.6 percent," quoting Oppenheimer analyst Lawrence Harris stating "[i]t was very helpful for the

company to make this statement today," and describing "***Motorola's share rise as a relief rally.*"** *Reuter's* December 6, 2007 story also emphasized Meredith's alluding to a possible spin off – or sale – of Mobile Devices:

> ***BREAK-UP?***
>
> Asked about a recent call by activist investor Carl Icahn for Motorola to break into several units, Meredith would not rule out structural changes.
>
> "I believe there's every opportunity for us to create significant economic value as a whole. ***Does that mean other options aren't viable? Not at all. A change in circumstance sometimes requires a change in action,*"** he said.
>
> While Icahn advocated a split of the company into several different parts, ***other investors have called for just a sale or spin-off of the network equipment unit*** while some have suggested a divestiture of the set-top box division.

(Emphasis added.)

162. The *Chicago Tribune* highlighted on December 7, 2007 that Motorola's stock had risen $0.56, or 3.6%, to $16.31 and that "Chief Financial Officer Thomas Meredith said the firm expects to meet profit targets this quarter after cutting jobs and introducing updated versions of the Razr and Q handsets."

163. To be sure, Defendants' false statements about the Company's 4Q 07 earnings and the purported improvements in the Mobile Devices business continued to dupe analysts even after the close of the year. On January 7, 2008, Ehud Gelblum at JP Morgan issued a report stating: **"*We believe Q4 results for all segments are relatively on track with guidance – including Mobile Devices – as reiterated by CFO Tom Meredith on Dec. 6.*"** On January 11, 2008, *Bloomberg* reported that as of January 4, 2008, average analyst profit expectations for Motorola were $0.13 per share for the 4Q 07, with the range being $0.11 - $0.14 per share. On January 15, 2008, Citigroup Global Markets issued a report stating Motorola was scheduled to report 4Q 07 earnings on January

23, 2008 and stating that analyst consensus was still that ***Motorola would report 4Q 07 EPS of $0.13 and Mobile Devices sales of $5.074 billion and handset unit sales of 42 million.*** And Bloomberg confirmed after the close of trading on January 22, 2008 that market consensus on Motorola's 4Q 07 earnings was still $0.13 per share.

(Emphasis added.)

## <u>THE TRUTH BEGINS TO EMERGE</u>

164. On January 22, 2008, research analyst Tai Liani at Merrill Lynch's Telecom Equipment-Wireless Cellular division issued an estimate change report, the day before Motorola released its 4Q 07 earnings report. According to Liani, Merrill Lynch's "supply chain checks suggest steeper than normal order declines in December, leading [Merrill Lynch] to lower [its] 1Q 2008 EPS estimate from 12c to 9c" and to "lower[ its] 2008/2009 estimates from $0.75/$1.15 to $0.65/$1.06." Merrill Lynch's report (based on its own direct "channel checks" with Motorola's suppliers and other research) also detailed the rapid decline in orders Motorola was placing with its suppliers for delivery in the 1Q 08. Upon information and belief, future sales were largely known long in advance because significant lead time was required to order the parts and manufacture the devices before they were shipped to Motorola's customers.

165. Defendants' decision to dramatically reduce orders to suppliers during the 4Q 07 demonstrates they knew by early December 2007, at the very latest, that the Company's Mobile Devices division had not "turned a corner" and that instead it was rapidly deteriorating, which would lead to the massive 1Q 08 earnings guidance reduction announced January 23, 2008.

166. On January 23, 2008, Defendants issued a release reporting Motorola's 4Q 07 financial results, followed by an earnings conference held with the investment community later that day, during which the following admissions were finally made:

- The Company sold only 1.5 million RAZR2 phones during 4Q 07;

- "[D]emand for [Motorola's Mobile Device segment] products ha[d] slowed" during the 4Q 07, as would-be customers fled to Apple's iPhone, Samsung's Sync camera handset and Nokia's devices;

- That contrary to Zander's statement on the October 25, 2007 earnings call that Defendants "actually [thought Motorola's Mobile Devices division] gained share" in 3Q 07, Motorola's market share in the Mobile Devices segment was still on a downward spiral and would come to rest well below 13% by the end of 4Q 07;

- Motorola could report only $0.04 cents a share GAAP earnings in 4Q 07, ***84% less the $0.25 per share earned in 4Q 06,*** and nowhere near the $0.12-$0.14 per share Defendants had claimed the Company was on track to achieve throughout 4Q 07. The previously undisclosed costs owed Freescale accounted for $0.07 per share of this earnings miss;

- Instead of "sequential improvement in top and bottom-line in mobile devices" in 4Q 07, given sales increases attributable to normal seasonability as between the 3rd and 4th quarters, Motorola's true sequential sales performance had deteriorated. This was particularly apparent by reference to the sales performance of Motorola's peers – industry data showed that global mobile device sales units had grown by 18% between 3Q 07 and 4Q 07;

- Contrary to their previous statements of "progress" and assurances of having "turned the corner" in Mobile Devices, Defendants disclosed the "recovery in Mobile Devices [would] take longer than expected and [that] there [was] a lot more work to be done";

- The Company had taken a $276 million charge associated with Freescale "during the fourth quarter of 2007." As would later be revealed, this charge reduced the margins of the mobile phone segment and was attributable to Motorola's failure to meet its minimum purchase commitments during FY 07;

- ***For 1Q 08, the Company was projecting that "Mobile Devices units and sales [would] be down significantly compared to the fourth quarter, resulting in an operating loss" of $0.05-$0.07 per share (where Defendants' positive statements had led the market to expect a $0.10 per share profit in the 1Q 08);*** and

- Motorola said it expected to "lose market share in Q1."

(Emphasis added.)

167. The deterioration in Motorola's Mobile Devices business and prospects revealed by

these disclosures was particularly stunning in light of the strong industry-wide growth in unit sales during this period. In response to an analyst's questioning at the January 23, 2008 conference call, DefendantMeredith revealed that, when speaking on December 6th, he fully understood the deteriorated state of Motorola's sales performance: Meredith admitted that Motorola's decline in handset sales dated back to November 23, 2007 (the day after Thanksgiving), and nearly two weeks before he had adamantly affirmed the Company's 4Q 07 guidance and the continuing improvement in the sales and profits of the Mobile Devices business:

> [Bear Stearns:] And Thomas, if I could follow up, ***going back to early December, you talked a little bit more bullishly about the handset business overall. Was there really a major drop-off in December or was this weakening through the quarter?***
>
> [Meredith:] ***I would say Thanksgiving through the Christmas selling season was where we experienced slower demand than we otherwise anticipated.***

(Emphasis added.)

168. The market's reaction was swift and furious. On this news, the Company's stock price plummeted 18.8%, or $2.31 per share, to close at $10.01 per share on January 23, 2008, its lowest level in five years, on unusually high volume over 7.5x the average daily trading volume over the preceding 30 days. According to a January 23, 2008 *Bloomberg* report, "That's the biggest decline in more than five years and puts the stock at its lowest since September 2003 . . . ."

169. According to Piper Jaffray & Co.'s Michael Walkley, "[t]heir phones are just not selling through," adding that the "overall health of the market is fine; ***these problems are Motorola-specific."*** (Emphasis added.)

170. JP Morgan's Ehud Gelblum's report issued January 23, 2008 stated Motorola's 4Q 07 Mobile Devices revenues of $4.81 billion missed JP Morgan's estimate of $4.98 billion, blaming lower ASPs (or "average selling price") of $118 on handset units Motorola sold during the 4Q 07,

$3 below Motorola's ASPs in 3Q 07 and $2 below JP Morgan's estimate for the 4Q 07 of $120. Gelblum also blamed handset shipments of 40.9 million being below his 41.5 million estimate, down 38% from 4Q 06, and 600,000 below what JP Morgan had been led to expect. JP Morgan also stated that Motorola's "Q1 EPS guidance of $(0.05-0.07) [was] well below [its] $0.09 est," and reduced its estimates for Motorola's APS in the 1Q 08 from $113 to $110. ***JP Morgan's report concluded that its "conservative" sum-of-the-parts valuation of Motorola's three operating divisions now "implie[d] zero value for Mobile Devices."*** (Emphasis added.)

171. As the *Associated Press* emphasized on January 23, 2008 after the close of trading:

> Income from continuing operations was 5 cents per share, including charges of 9 cents per share for asset write-downs, layoffs and a legal settlement. ***That was 8 cents less than the consensus estimate of analysts polled by Thomson Financial.***
>
> Motorola executives had told analysts that a series of innovative new cell phones would help break the company out of a slump that began when sales of the iconic Razr phone leveled off and the company had no other hit product to maintain momentum and market share. The Schaumburg, Ill.-based company showed tentative progress toward a turnaround in the third quarter during a disastrous year which saw its handset sales tumble 33 percent overall from 2006.
>
> ***But sales from the mobile devices division, dominated by cell phones, sank to $4.8 billion in the fourth quarter as the company failed to connect with consumers over the holidays. The handset unit, its biggest, had an operating loss of $388 million and shipped 40.9 million devices during the quarter, in line with analyst expectations but down sharply from past quarters.***

172. Following Defendants' disclosures, the Company's stock and debt ratings were slashed. Fitch cited "[l]imited visibility and expected further delays in returning the mobile devices business to consistent profitability and sustainable market share," the "company's slower than anticipated progress in turning around the mobile devices business," and less than optimal margin improvements in the 4Q 07. Moody's Investors Services cited "the company's recently announced downward guidance for Q1 2008 and the continued delays in turning around the handset business." Moody's stated that it had been led to expect improvements in Motorola's business by early 2008.

Standard & Poor's slashed Motorola's debt ratings to two levels below investment grade, stating the Company's new handsets failed to catch on with consumers. There are "limited signs of recovery" because the RAZR2 had not met expectations according to Standard & Poor's.

173. As would be revealed in a lawsuit brought in Delaware Chancery Court by Deloitte & Touche LLP against Thomas P. Flanagan, one of Deloitte's own audit partners, Brown was not only aware long before January 23, 2008, that Motorola was not about to achieve $0.12 - $0.14 earnings from continuing operations in the 4Q 07, nor see bottom-line improvement in Mobile Devices, but he was also secretly telling others about the devastating decline in Motorola's business:

> Flanagan is also alleged to have improperly traded in options of Motorola Corporation ("Motorola"), another of Deloitte's clients. On January 4, 2008, Flanagan received an email from a Deloitte partner in Boston informing him that ***Motorola's CEO had stated in a private meeting that the company's performance "will be significantly worse than anybody's imagined" and that a huge, across the-board, cost reduction was in the works.*** On January 14, Flanagan purchased Motorola put options through the Flanagan BOA account. The following week, Motorola issued its earnings release, causing shares to plummet. Flanagan sold his put options on the day of the announcement for a 1,400% return.

*Deloitte LLP v. Flanagan,* Memorandum Opinion, No.: C.A. No. 4125-VCN (Del. Chan. Dec. 29, 2009).

(Emphasis added.)

174. In one of the securities fraud class actions against Motorola and certain of its officers, Judge Moran in *Silverman v. Motorola,* No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008), analyzed scienter allegations charging Zander and Brown with fraudulent misstatements in connection with their knowledge of the Mobile Devices division's failing financial performance: ***"it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company. Zander himself stated that he had a staff meeting or call 'every week' to***

***monitor the status of the 3G phones."***

(Emphasis added.)

175. According to ¶65 of the operative *Silverman* complaint (which was filed after significant discovery was had in that case, including scores of depositions), "[b]y virtue of the Individual Defendants' positions at Motorola, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. ***Specifically, each Individual Defendant had direct access to a wealth of reports and documents on the Company's Compass document database that showed the Company's 3G handsets were not on track for timely delivery in 2006*** and would result in the 4Q 06 earnings miss. Based on access to these same sources of information, Plaintiffs in this case as well as in a securities fraud class action now pending similarly allege that Motorola's Compass document database would have alerted Defendants in ***4Q 07*** to the fact that Motorola was achieving nowhere near the sales performance required to meet its $0.12 - $0.14 4Q 07 earnings guidance, particularly once the $277 million of Freescale costs were included in the calculation of earnings.

176. Performance in Motorola's Mobile Devices division has never recovered, and its devastating decline has thwarted the success of efforts to profitably split the Company and sell off the business. On February 1, 2008, Icahn appeared on *CNBC*, again demanding that Mobile Devices be spun off. Icahn emphasized that Motorola's handset sales had declined 38% in the 4Q 07, calling the division's handset offerings "arcane."

177. On February 22, 2008, Motorola announced Meredith's replacement as CFO. Paul Liska, a former private equity firm partner who was a restructuring expert, had been appointed CFO of Motorola to replace Meredith at some point between October 2007 and February 22, 2008. That day, the *New York Times Dealbook* reported there was "[s]ome doubt that Motorola will find a buyer for its handset business," and that "[i]nvestors certainly seem doubtful: After an initial pop, Motorola's stock has fallen back below the level where it was before the company said it was exploring a strategic transaction." The *New York Times* also cited Mark Sue, an analyst at RBC Capital Markets "offer[ing] this skeptical take on a potential sale: 'A strong stomach and some Rolaids will be required for whomever is interested in buying Motorola's handset division. If it's an existing handset vendor, order some Tums too.'"

178. On March 3, 2008, Brown appeared at a Morgan Stanley conference stating Motorola was still "focused on fixing" the Mobile Devices unit and still evaluating strategic options for the money-losing division. Stu Reed, who had been appointed to lead Mobile Devices in 2007 was fired. Days later, Mike Walkley, a stock analyst at Piper Jaffray, who reported Motorola's announcement that it was spinning off Mobile Devices confirmed that the Company "couldn't sell it at the price it wanted."

179. On March 27, 2008, the *New York Times* reported that "[a]fter a two-month strategic review of its businesses, Motorola said on Wednesday that it would split itself into two separate publicly traded companies, spinning off its unprofitable mobile phone unit to investors." According to the *New York Times* ***"[s]elling [Mobile Devices] to a competitor was one option that Motorola pursued, according to a person involved in those discussions, but there were no takers."*** (Emphasis added.)

180. On April 24, 2008, Motorola released its 1Q 08 financial results, reporting that ***the***

***Company's market share had fallen by 3%, equating to approximately $1 billion in lost sales.*** At the earnings conference call discussing this stunning decline, Brown revealed that it was attributable to the loss of sales in North America – where the large carriers are dominant customers, and confirming the lack of sell-through of Motorola's devices shipped in 4Q 07. This quarter, the Company's CCC increased 13 days over the CCC in 4Q 07, another indicator that the channels had been stuffed in 4Q 07. Motorola disclosed a 1Q 08 loss of $0.09 per share, on $7.45 million in sales. Mobile Devices segment sales were $3.3 billion, down 39% compared to the 1Q 07, and the segment's operating loss was a staggering $418 million.

181. A May 24, 2008 *New York Times* exposé entitled "Cellphone Pioneer Struggles to Stay Relevant" disclosed "Motorola's reversal of fortune has been striking. The Schaumburg, Ill., company shipped about 27 million handsets during the first quarter of 2008, ***putting its share of the global market below 10 percent — a plunge from its 22 percent market share in 2006, when its Razr flip phone was a top seller."*** (Emphasis added.)

182. The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Motorola a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

183. This material, non-public information principally included the fact that Motorola would not meet is earnings forecasts. Furthermore, Defendants Meister, Meredith, Vinciquerra and John A. White (Chair), as members of the Audit and Legal Committee[13] had a special duty to know

[13] The Company's 2009 Proxy lists Defendants Meister, non-Defendant Sommer, Vinciquerra, and White (Chair) as members of the Company's Audit & Legal Committee. On May 18, 2009, non Defendant Ron Sommer submitted

and understand this material information as set out in the Audit and Legal Committee's charter which provides that the Audit and Legal Committee is responsible for reviewing the Company's quarterly earnings releases and financial information and earnings guidance provided to analysts and rating agencies.

184. Defendants Brown and Jha,[14] as officers of Motorola, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, Defendants David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White, as directors of Motorola had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Motorola to the investing public and the Company's shareholders during the Relevant Period.

## <u>CORPORATE GOVERNANCE AND COMMITTEES</u>

185. The Company's 2009 Proxy provides that "the Board has delegated certain authority to several committees. The Board currently has the following committees: (1) Audit and Legal, (2) Compensation and Leadership, (3) Governance and Nominating, (4) Executive, and (5) Finance."

186. According to the Company's 2009 Proxy, the Functions of the Company's Audit

---

his resignation as a member of the Board of Directors of Motorola, Inc. (the "Company") and its committees, effective July 29, 2009. Defendant Meredith is now listed as a member of the Audit & Legal Committee on the Company's Website, www.motorola.com, presumably serving as non-Defendant Sommer's replacement on the Committee. *last accessed February 16, 2010.*

[14] And for a good portion of the Relevant Period, Meredith.

and Legal Committee are to:

- Assist the Board in fulfilling its oversight responsibilities as they relate to the Company's accounting policies, internal controls, disclosure controls and procedures, financial reporting practices and legal and regulatory compliance;
- Hire the independent registered public accounting firm;
- Monitor the qualifications, independence and performance of the Company's independent registered public accounting firm and the performance of the Company's internal auditors;
- Maintain, through regularly scheduled meetings, a line of communication between the Board and the Company's financial management, internal auditors and independent registered public accounting firm;
- Oversee compliance with the Company's policies for conducting business, including ethical business standards;
- Prepare the report of the Committee included in the Company's Proxy Statements.

187. According to the Company's 2009 Proxy, the functions of the Company's Compensation and Leadership Committee are to:

- Assist the Board in overseeing the management of the Company's human resources, including:
  - compensation and benefits programs
  - CEO performance and compensation
  - executive development and succession and diversity efforts
- Oversee the evaluation of the Company's senior management
- Review and discuss the Compensation Discussion and Analysis ("CD&A") with management and make a recommendation to the Board on the inclusion of the CD&A in its Proxy Statement

- Prepare the report of the Committee included in the Company's Proxy Statement

188. According to the Company's 2009 Proxy, the functions of the Company's Governance and Nominating Committee are to:

- Identify individuals qualified to become Board members, consistent with the criteria approved by the Board;
- Recommend director nominees and individuals to fill vacant positions;
- Assist the Board in interpreting the Company's Board Governance Guidelines, the Board's Principles of Conduct and any other similar governance documents adopted by the Board;
- Oversee the evaluation of the Board and its committees;
- Generally oversee the governance and compensation of the Board.

189. According to the Company's 2009 Proxy, the functions of the Company's Executive Committee are to:

- Act for the Board between meetings on matters already approved in principle by the Board;
- Exercise the authority of the Board on specific matters assigned by the Board from time to time.

190. According to the Company's 2009 Proxy, the functions of the Company's Finance Committee are to:

- Review the Company's overall financial posture, asset utilization and capital structure;
- Review the need for equity and/or debt financing and specific outside financing proposals;
- Monitor the performance and investments of employee retirement and related funds;
- Review the Company's dividend payment plans and practices;

## ADDITIONAL DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

191. Plaintiff brings this action derivatively in the right and for the benefit of Motorola to redress injuries suffered, and to be suffered, by Motorola as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Motorola is named as a nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

192. Plaintiff will adequately and fairly represent the interests of Motorola in enforcing and prosecuting its rights.

193. Plaintiff is a current owner of the Company's stock and owned shares during times relevant to the Individual Defendants' wrongful course of conduct alleged herein. At the time Plaintiff filed his original derivative complaint, the Board consisted of the following 12 individuals: David W. Dorman, Gregory Q. Brown, Dr. Sanjay K. Jha, William R. Hambrecht, Judy C. Lewent, Keith A. Meister, Thomas J. Meredith, Samuel C. Scott III, James R. Stengel, Anthony J. Vinciquerra, Douglas A. Warner III, Dr. John A. White.

194. Plaintiff has not made any demand on the present Board of Motorola to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a) The Compensation Committee of the Board determines, in conjunction with the Board, the reasonableness of the compensation paid to the Board members, as well as the CEO and the officers. Specifically, the Committee reviews and approves all forms of compensation for officers and directors of the Company, and produces an annual report on executive compensation to be included in the Company's Proxy Statement. Pursuant to

the 2009 Proxy Statement, the Company's Compensation Committee consisted of Defendants Hambrecht, Lewent, Scott (Chair), and Stengel. As the members of the Compensation Committee singularly control the other Individual Defendants' awards, the remaining members of the Board will not institute this action against Defendants Hambrecht, Lewent, Scott, and Stengel, as doing so would jeopardize each Individual Defendant's personal financial compensation;

b) The principal professional occupation of Defendant Dorman is his employment with Motorola, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, Defendant Dorman lacks independence from Defendants Hambrecht, Lewent, Scott, and Stengel who are not disinterested and/or independent and who exert influence over Defendant Dorman's compensation by virtue of their positions as members of the Compensation Committee. This interest and lack of independence renders Defendant Dorman incapable of impartially considering a demand to commence and vigorously prosecute this action;

c) The principal professional occupation of Defendant Brown is his employment with Motorola, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, Defendant Brown lacks independence from Defendants Hambrecht, Lewent, Scott, and Stengel who are not disinterested and/or independent and who exert influence over Defendant Brown's compensation by virtue of their positions as members of the Compensation Committee. This interest and lack of independence renders Defendant Brown incapable of impartially considering a demand to commence and vigorously prosecute this action;

d) The principal professional occupation of Defendant Jha is his employment with Motorola[15], pursuant to which he received and continues to receive substantial monetary

[15] As a Co-CEO of Motorola in 2008, Sanjay Jha was listed by CNNMoney.com as being#1 in the list of the 10 biggest CEO paychecks for 2008. In 2008, Jha earned a total compensation of $104 million, which included a base salary of $484,615, no cash bonus, stocks granted of $36 million, and options granted of $67.5 million. Jha was also granted perks of $412,096. On February 11, 2010, the Company issued a press release announcing that the Company was targeting the first quarter of 2011 for the completion of its planned separation. Motorola intends to separate into two independent, publicly traded companies. The Company currently expects that, upon separation,

compensation and other benefits. Accordingly, Defendant Jha lacks independence from Defendants Hambrecht, Lewent, Scott, and Stengel who are not disinterested and/or independent and who exert influence over Defendant Jha's compensation by virtue of their positions as members of the Compensation Committee. This interest and lack of independence renders Defendant Jha incapable of impartially considering a demand to commence and vigorously prosecute this action;

195. Pursuant to the Company's 2009 Proxy, the Audit & Legal Committee's members were Defendants Meister, Vinciquerra, and John A. White (Chair).[16] Defendant Meredith is now listed as a member of the Audit & Legal Committee on the Company's website (*last accessed July 23, 2010),* presumably to serve as non-Defendant Sommer's replacement. The Audit & Legal Committee is responsible for overseeing the integrity of Motorola's financial statements, including policies, procedures and practices regarding the preparation of financial statements, the financial reporting process, disclosures and the internal control over financial reporting. The Audit & Legal Committee members caused or allowed the Company to issue false and misleading press releases regarding Motorola's business prospects, thus allowing the Company's value to be artificially inflated. By such actions, Defendants Meister, Meredith, Vinciquerra, and John A. White (Chair) breached their duties by causing or allowing the improper projections described above. As a result of these Defendants' breach of their duties, any demand upon them is futile; and

196. The Individual Defendants, because of their interrelated business, professional and

---

one public company will be comprised of the Company's Mobile Devices and Home businesses and the other public company will be comprised of the Company's Enterprise Mobility Solutions and Networks businesses. On February 16, 2010, the Company announced that it had decided to increase the payment co-Chief Executive Officer Sanjay Jha receives in case the separation doesn't occur as planned. Jha will get $38 million if the split doesn't happen by June 30, 2011. The company originally agreed to give Jha $30 million if the separation didn't occur by Oct. 31, 2010. Motorola said last week it will split into two publicly traded companies next year, after delaying a plan first unveiled in 2008. If the plan is successful, Jha will get equity totaling 1.8 percent to 3 percent of the part that will keep making phones, depending on that business's market value. That's a change from his former agreement for fixed 3 percent.

[16] The Company's 2009 Proxy also lists non-Defendant and former Motorola Director Ron Sommer as a member of the Audit & Legal Committee. On May 18, 2009, non-Defendant Sommer submitted his resignation as a member of the Board of the Company and its committees, effective July 29, 2009.

personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the wrongful conduct, as detailed herein, the majority of the Board, including the Defendants listed below, are subject to the following prejudicial entanglements:

a. According to Motorola's 2009 Proxy, Motorola and the Motorola Foundation have had various commercial and charitable relationships with the Massachusetts Institute of Technology ("MIT") and the MIT Media Laboratory. Judy Lewent is a life member of the MIT Corporation. Motorola and the Motorola Foundation made payments to MIT in each of the three years prior to the 2009 Proxy;

b. Meredith served as Acting Chief Financial Officer and Executive Vice President of Motorola from April 1, 2007 until March 1, 2008 and remained an employee of the Company until March 31, 2008. His term as Acting Chief Financial Officer and Executive Vice President of Motorola ended on March 1, 2008 and, under the terms of his agreement, his employment ended on March 31, 2008, and because of his prior employment during the Relevant Period he cannot be considered an independent director;

c. The principal occupation of Defendant David W. Dorman's ("Dorman") is Non-Executive Chairman of the Board of Motorola. Likewise, Defendants Brown and Jha's principal occupation is employment with Motorola. Consequently, Dorman, Brown and Jha cannot be considered independent directors.

d. During 2009, Motorola paid $200,000 to the United Football League (the "UFL") in sponsorship fees in connection with the UFL's 2009 premiere season. The Company received marketing opportunities with the UFL. Defendant Hambrecht is a director of Motorola and is a founder of, and has a controlling interest in, the UFL.

**PERSONALLY BASED FINANCIAL MOTIVE AND OPPORTUNITY**

197. In addition to the direct and circumstantial evidence that Defendants knew their material statements and omissions were false or misleading when made, or that they acted recklessly in making these statements and omissions, as alleged throughout this Complaint, Individual Defendants were highly motivated by the terms of their compensation agreements with Motorola to inflate the Company's stock price during the Relevant Period. Indeed, the

overwhelming majority of Zander and Meredith's compensation was tied directly to the Company's stock price.

**Zander**[17]

198. On January 5, 2004, pursuant to his employment agreement, Motorola granted Zander an option to purchase 1,508,760 shares of Common Stock with an exercise price of $12.97 per share. The stock option had a term of 10 years and vested in four equal annual installments commencing on January 5, 2005, with the final installment vesting on January 5, 2008. In addition, on January 5, 2004, Motorola granted Zander 400,000 restricted stock units, 50% of which vested on January 5, 2006 and the remainder of which vested on January 5, 2008 ("RSUs convert to shares of our Common Stock when they vest, so they have a gross value at the time of vesting equal to the then current market value of our Common Stock."). Additionally, Motorola granted Zander 800,000 market-based options on May 8, 2007. These options would only vest and become exercisable as follows: (1) 300,000 options would vest if the closing price for a share of the Company's Common Stock met or exceeded $22.00 for 10 trading days out of any 30 consecutive trading days from May 8, 2007 until May 8, 2009, and (2) an additional 500,000 options would vest if the closing price for a share of the Company's Common Stock met or exceeded $25.00 for 10 trading days out of any 30 consecutive trading days from May 8, 2007 until May 8, 2009.

199. These grants alone provided Zander with significant financial motive to artificially inflate Motorola's stock price during the Relevant Period. Specifically, Zander had 377,190 stock options vesting on January 5, 2008 with an exercise price of $12.97. As a result of Defendants' fraud, following vesting of Zander's stock options on Saturday, January 5, 2008, the Company's

[17] Defendant Zander was not a Director at the time Plaintiff filed his original action, and so he does not enter *directly* into the demand futility analysis. However, the factual basis of Zander's personal motivations for financial gain have bearing on the demand futility analysis. Zander's actions and motivations relate to actions and motivations shared with various Defendant Directors in this action and have bearing on the analysis of their legal disability to impartially consider demand.

stock price traded over $15 on the following Monday, transferring over $5.66M in fraud-inflated value to Zander on the stock options alone. Once the truth about Motorola's actual 4Q 07 results and reduced 1Q 08 projections were revealed on January 22, 2008, Motorola's stock price dropped to $10.01, demonstrating the stock options would have been worth nothing had the truth been disclosed prior to their vesting. The 200,000 RSUs that vested to Zander on January 5, 2008 were worth another $3M based on the fraud-inflated price Motorola's stock was then trading at. As additional motive, Zander had been granted the 800,000 market-based options on May 8, 2007 (following Icahn's proxy challenge and just months before Zander's resignation would be announced) that only vested to Zander if the Company's stock price exceeded $22-$25 per share for limited durations during the Relevant Period. Though Zander was ultimately *unsuccessful* in inflating Motorola's stock price high enough to vest the RSUs, this definitely provided him with motive to do so during the Relevant Period.

200. Zander was also paid a Long Range Incentive Plan ("LRIP") bonus for three-year periods, the last of which Zander knew would be calculated based on the closing price of Motorola's stock on December 31, 2007. The financial component of the LRIP was based on Motorola's actual reported sales revenues, but it also included a multiplier based on the closing price of the Company's share price as of December 31, 2007. The LRIP multiplier calculation required that Motorola's December 31, 2004 closing share price be deducted from its December 31, 2007 closing share price, resulting in a total shareholder return ("TSR"). If the TSR was within the top 50 percentile in Motorola's peer group, Zander would receive the entire LRIP bonus. Had this been the case, Zander would have received a LRIP bonus of $3.75M for FY 07. Had Motorola's TSR been in the 35%- 50% percentile, Zander would have received 75% of his target bonus. Zander's LRIP bonus was reduced to 33% of target based on the closing price of Motorola's stock

price on December 31, 2007, but Zander still received a $1.25M LRIP bonus.

**Meredith**

201. Meredith, a director since 2005, began serving as Motorola's CFO on April 1, 2007 pursuant to an employment agreement that ran through October 2007. Pursuant to that agreement, Meredith was paid $1 per year salary plus 250,000 stock options and 500,000 RSUs ***that would only vest*** to the extent Defendants were able to successfully inflate Motorola's stock above $20, $22, $24 per share for 10-30 day trading durations. According to the Company's 2007 annual proxy statement, "[t]he Committee granted the market-based RSUs to provide Mr. Meredith ***added incentive*** to make the performance improvements necessary ***to stimulate stock price growth."*** On October 4, 2007, shortly before Zander's termination was announced, Meredith's employment contract was amended to provide for a $75,000 monthly salary ($900,000 per year) plus stock options. However, the October 2007 agreement ***terminated Meredith's employment effective April 1, 2008.*** (Emphasis added.)

202. Meredith's knowledge throughout much of the Relevant Period was that the only compensation he would receive for serving as Motorola's CFO for the tumultuous six-month period running from April 1, 2007 to October 4, 2007, the 250,000 stock options and 500,000 RSUs Meredith knew would only vest with value if he could increase Motorola's stock price above $20/$22/$24 provided Meredith with ample motive to artificially inflate Motorola's stock price during the Relevant Period.

203. Individual Defendants were additionally motivated to misstate Motorola's ongoing business metrics and financial condition on October 25, 2007 in order to permit Motorola to complete a $1.4 billion bond offering on October 29, 2007. The $1.4 billion was desperately needed to repay $1.2 billion in notes coming due November 17, 2007, less than three weeks later. Had

Defendants disclosed Motorola’s true financial condition, the Company’s corporate debt ratings would have been slashed to “junk” as they were after the truth emerged later in the Relevant Period, significantly increasing Motorola’s cost of capital.

204. The Director Defendants of Motorola, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Motorola's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

205. In order to bring this suit, all of the directors of Motorola would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

206. The acts complained of constitute violations of the fiduciary duties owed by Motorola's officers and directors and these acts are incapable of ratification;

207. Each of the Director Defendants of Motorola authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders. They authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

208. Motorola has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Motorola any part of the damages Motorola suffered and will suffer thereby;

209. If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in

the federal class action case against Motorola. Their admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in that case. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the shareholder class actions. This they will not do. Thus, demand is futile; and

210. If Motorola's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Motorola. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Motorola against these Defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Motorola, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Motorola to sue them, since they will face a large uninsured liability.

211. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for Motorola for any of the wrongdoing alleged by Plaintiff herein.

**DEMAND ON SHAREHOLDERS**

212. Plaintiff has not made demand on the shareholders of Motorola to institute this action since demand would be a futile and useless act for the following reasons:

a) Motorola is a publicly traded company with thousands of shareholders;
b) Making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of finding out the names and addresses, or telephone numbers of shareholders; and
c) Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION
## Against All Individual Defendants for Breach of Fiduciary Duty

213. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

214. The Individual Defendants owed and owe Motorola fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Motorola the highest obligation of good faith, fair dealing, loyalty and due care.

215. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

216. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

217. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Motorola has sustained significant damages. As a result of the

misconduct alleged herein, the Individual Defendants are liable to the Company.

218. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**Against All Individual Defendants for Abuse of Control**

219. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

220. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Motorola, for which they are legally responsible.

221. As a direct and proximate result of the Individual Defendants' abuse of control, Motorola has sustained significant damages.

222. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Against All Individual Defendants for Gross Mismanagement**

224. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

225. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Motorola in a manner consistent with the operations of a publicly held corporation.

226. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Motorola has sustained significant damages in excess of hundreds of millions of dollars.

227. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

228. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Against All Individual Defendants for Waste of Corporate Assets**

229. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

230. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Motorola to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend their unlawful actions.

231. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

232. Plaintiff, on behalf of Motorola, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Against All Individual Defendants for Unjust Enrichment**

233. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Motorola.

235. Plaintiff, as a shareholder and representative of Motorola, seek restitution from these Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their

wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

A. Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C. Awarding to Motorola restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: July 23, 2010

Respectfully Submitted,

**___/s/ Thomas M. Ryan, Esq._**
**Law Offices of Thomas M. Ryan, P.C.**
**35 E. Wacker Drive, Suite 650**
**Chicago, IL 60601**
**Telephone: 312-726-3400**
**Fax: 312-782-4519**
**tom@tomryanlaw.com**

**___/s/ Marc S. Henzel, Esq.___**
**LAW OFFICES OF MARC HENZEL**
**273 Montgomery Avenue, Suite 202**
**Bala Cynwyd, PA 19004**
**Telephone: (610) 660-8000**
**Facsimile (610) 660-8080**
**mhenzel@henzellaw.com**

***Attorneys for Plaintiff***

## VERIFICATION

I, Michael Waber, declare that I have reviewed the First Amended Verified Shareholder Derivative Complaint ("Complaint") and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of common stock during relevant times in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Dated: July 22, 2010