

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL WABER, derivatively on behalf of Nominal Defendant Motorola, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> DAVID W. DORMAN, GREGORY Q. BROWN, DR. SANJAY K. JHA, WILLIAM R. HAMBRECHT, JUDY C. LEWENT, KEITH A. MEISTER, THOMAS J. MEREDITH, SAMUEL C. SCOTT III, JAMES R. STENGEL, ANTHONY J. VINCIQUERRA, DOUGLAS A. WARNER III, DR. JOHN A. WHITE, EDWARD J. ZANDER, <br><br> Defendants, <br><br> and <br><br> MOTOROLA, INC., <br><br> Nominal Defendant. | No. 10 C 1289 <br><br> The Honorable William J. Hibbler |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Waber brings this shareholder derivative action on behalf of Nominal Defendant Motorola, Inc., charging the remaining defendants ("Individual Defendants"), all of whom are current or former directors and/or officers of Motorola, with breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. Defendants now move to dismiss this action for failure to make a demand on Motorola's Board of Directors or, alternatively, meet the pleading requirements of Federal Rule of Civil Procedure 23.1. For the following reasons, the Court grants Defendants' motion to dismiss.

1

## I. Factual background

Waber alleges the following facts, which the Court must accept as true for purposes of a Rule 23.1 motion. *In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 804 & 807 (7th Cir. 2003).

Motorola is the largest U.S. manufacturer of mobile phones and is engaged in providing technologies, products, and services for mobile phones. (Amend. Compl. ¶ 6.) Defendants Brown, Lewent, Meredith, Scott, Stengel, Vinciquerra, Warner, White, and Zander were directors of Motorola since at least 2007. (Amend. Compl. ¶¶ 8, 11, 13-19.) Lewent and Zander are no longer directors, but Lewent was as of the filing of this lawsuit. (Amend. Compl. ¶¶ 11 & 19.) Defendants Dorman, Jha, Hambrecht, and Meister have been directors since 2008. (Amend. Compl. ¶¶ 7, 9, 10, 12.) According to the Motorola's 2009 Proxy, Meister, Vinciquerra, and White were members of the company's Audit and Legal Committee. (Amend. Compl. ¶¶ 12, 16, 18.) According to the same statement, Hambrecht, Lewent, Scott, and Stengel were members of the Compensation and Leadership Committee. (Amend. Compl. ¶¶ 10, 11, 14, 15.) According to the company's website, Defendant Meredith is now a member of the Audit and Legal Committee. (Amend. Compl. ¶ 195.)

Defendants Brown, Meredith, and Zander were officers of Motorola since at least 2007. (Amend. Compl. ¶¶ 8, 13, 19.) Meredith served as Acting Chief Financial Officer and Executive Vice President from April 1, 2007 until March 1, 2008 and remained an employee until March 31, 2008. (Amend. Compl. ¶ 13.) Zander served as CEO from January 2004 until January 1, 2008, and served as a management consultant (at full salary) through 2009. (Amend. Compl. ¶ 19.) Thus, Meredith and Zander were no longer officers as of the filing of this lawsuit. (Amend. Compl. ¶¶ 13 & 19.) Defendant Brown has been the Co-CEO of Motorola and CEO of its

2

Broadband Mobility Solutions division since August 2008. He was President and CEO of the company from January 1, 2008 until August 2008. From March 2007 through December 2007 he was President and Chief Operating Officer. He has been an officer since 2003. (Amend. Compl. ¶ 8.) Defendant Jha has been an officer of the company since August 2008, serving as Co-CEO of the company and CEO of Mobile Devices. (Amend. Compl. ¶ 9.) Plaintiff also argues that Defendant Dorman is currently employed by Motorola, though the allegations regarding Dorman in the complaint are rather vague on this point and might even be read to belie such an assertion. While Plaintiff describes Dorman's work for Motorola as his "principal occupation," he also describes it as "non-executive" and alleges that Dorman presides over meetings of the *independent* directors. (Amend. Compl. ¶ 7.) Defendants dispute any suggestion that Dorman is employed by Motorola, but the Court is not in a position to resolve disputed facts or consider materials outside the pleadings at this stage of the proceedings. Ultimately, however, this factual detail has no great bearing on the Court's analysis of Defendants' motion. Thus, the Court will assume for the time being that Dorman is in fact a Motorola employee.

On September 7, 2007, at Motorola's Analyst Day Conference, Zander, Brown, and Meredith presented their plan for returning Motorola to financial health by the end of 2007 after the company had experienced a decline in its share of the mobile phone market when its RAZR phone models were unable to compete with a new generation of "smartphones" such as Apple's iPhone. (Amend. Compl. ¶¶ 32 & 69.) They suggested that by 2008, the company would be profitable in all areas. (Amend. Compl. ¶ 114.) Then, in the company's third quarter 2007 earnings call on October 25, 2007, Zander, Brown, and Meredith affirmed that they were on schedule to meet their goals. They stated that the company had made progress in the third

quarter and that Mobile Devices "began to move in the right direction." They projected success for their RAZR 2 phone, stating that demand for the product was robust and that it was already "off to a great start, meeting the needs of the demanding feature phone users and account[ing] for over 900,000 units in the quarter." They also predicted continued improvement in the fourth quarter, with "expect[ed] fourth quarter earning per share from continuing operations to be in the range of $0.12 to $0.14." (Amend. Compl. ¶ 33.) However, Zander, Brown, and Meredith knew that sales and market share had actually continued to decline in the third quarter of 2007 as Samsung, Nokia, and Apple continued to succeed. (Amend. Compl. ¶¶ 64-66.)

The 2007 holiday season only confirmed this trend, as "Black Friday" (the Friday after Thanksgiving) marked the beginning of a decline in Motorola's handset sales. (Amend. Compl. ¶¶ 91.) A week later, and in response to increasing pressure by investors to remove Motorola's management, Motorola announced that Zander would step down from his position as CEO in January 2008 and that he would not run for re-election to the Board of Directors in May 2008. (Amend. Compl. ¶ 70.) Brown was set to replace Zander as CEO in January. (Amend. Compl. ¶ 80.)

By the beginning of December 2007, Motorola was also in negotiations with one of its parts suppliers, Freescale. The two companies had a long-term contract whereby Motorola agreed to certain minimum purchase obligations. However, due to its declining sales, Motorola would not be able to meet those obligations. Thus, following negotiations in the fourth quarter of 2007, Freescale agreed to relieve Motorola of some of their obligations in return for a $276 million payment. (Amend. Compl. ¶¶ 48-51.)

Despite these signs that Motorola would be unable to live up to the predictions given in September and October, Meredith reiterated the message he, Zander, and Brown had previously

4

delivered at the December 6, 2007 Lehman Brothers conference in San Francisco. He emphasized his desire to "dispel any sort of inadvertent message" that the company may have sent by announcing Zander's replacement without reaffirming the fact that the company was still making progress. He then repeated his predictions that the company would "show earnings from continuing operations in the $0.12 to $0.14 range" and "have sequential improvement in top- and bottom-line in mobile devices." (Amend. Compl. ¶ 84.)

In January 2008, the company's failures were revealed when they announced their fourth quarter earnings. The company posted only $0.04 per share earnings, rather than the $0.12 to $0.14 Zander, Brown, and Meredith predicted. Moreover, rather than achieving "bottom-line improvement" in Mobile Devices, Motorola reported its worst quarter in two fiscal years. (Amend. Compl. ¶ 47.) This was especially shocking considering that Motorola had historically performed best in the fourth quarter. At the same time, the company revealed some of the terms of its agreement with Freescale, including its $276 million payment.

Waber alleges that Defendants Zander and Meredith were motivated to misrepresent the company's financial situation because so much of their compensation was tied to directly to the company's stock price. Thus, by sending false signals to the public about the company's progress, they aimed to inflate the value of the company's stock, causing their stock options and restricted stock units to vest. (Amend. Compl. ¶¶ 197-202.)

Waber alleges that the remaining defendants were interested in inflating the public perception of the company's value in the fall of 2007 in order to permit the company to complete a $1.4 billion bond offering on October 29, 2007 to repay debt that was coming due on November 17, 2007. (Amend. Compl. ¶ 203.) For this reason, Waber alleges that the remaining defendants "participated in, approved and/or permitted the wrongs alleged…and participated in

efforts to conceal or disguise those wrongs from Motorola's stockholders or recklessly and/or negligently disregarded the wrongs." (Amend. Compl. ¶ 204.) More specifically, he alleges that Defendants who are on the Audit and Legal Committee must have become aware of the company's actual financial situation and allowed the aforementioned statements. (Amend. Compl. ¶ 195.) He bases this allegation on the fact that, according to its charter, the committee is responsible for discussing the company's financial condition with senior executives, overseeing the company's financial statements and reports, and reviewing the company's quarterly earnings releases and guidance provided to analysts and rating agencies. (Amend. Compl. ¶¶ 19, 183, 195.)

Finally, Waber alleges that Motorola has given money to the Massachusetts Institute of Technology (MIT) and the MIT Media Laboratory and the United Football League (UFL) for various commercial and charitable purposes. He believes that these relationships create conflicts of interest for purposes of this motion for Defendant Lewent, who is a member of the MIT Corporation, and Defendant Hambrecht, who is a founder of, and has a controlling interest in, the UFL. (Amend. Compl. ¶ 196.)

## II. Standard of review

This action is before this court pursuant to the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. Thus, while Rule 23.1 places certain pleading requirements on any plaintiff in a shareholder derivative action that is required to make a demand on the nominal defendant's board prior to filing suit, any actual demand requirement comes from the applicable state law. *Starrels v. First Nat. Bank of Chicago*, 870 F.2d 1168, 1170 (7th Cir. 1989). In this case, because Motorola is a Delaware corporation, the Court applies Delaware law to any substantive issues, but federal law to any procedural issues, such as pleading requirements. *Id.* In Delaware,

a shareholder is required to make a demand on the board prior to filing suit, unless such a demand would be futile. *Id.* at 1171 (citing *Aronson v Lewis*, 473 A.2d 805, 809 (Del. 1984)). The rule is not just a pleading requirement, but the corporation's substantive right. *Id.* Rule 23.1 requires the plaintiff to plead satisfaction of this requirement with particularity. Fed. R. Civ. P. 23.1(b)(3). But, the Court still takes all the plaintiff's well-pleaded allegations as true, *In re Nuveen Fund Litig.*, No. 94 C 360, 1996 WL 328001, at *2 (N.D. Ill. June 11, 1996), and makes all reasonable inferences in the plaintiff's favor, *Abbott Labs*, 325 F.3d at 804 & 807.

**III. Analysis**

Waber did not make a demand on Motorola's board to bring this suit. However, under Delaware law, a plaintiff is excused from making a demand if a demand upon the board would be futile. *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992). A demand is futile when the directors are incapable of making an impartial decision regarding the litigation. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). Thus, the Court can only allow Waber to proceed if he pleads with particularity the reasons why Motorola's board could not make an impartial decision about whether to bring this suit. The first question for the Court is what test for futility applies in this case. The second question is whether Waber meets the requirements of the applicable test.

    **A. *Aronson* and *Rales***

The Delaware courts have developed more than one test for analyzing the question of demand futility. The usual test is the one set forth in *Aronson*, which applies when the plaintiff challenges actions or decisions made by the board that would be the subject of the demand. *Rales*, 634 A.2d at 933 (citing *Aronson*). Under *Aronson*, courts must determine "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are

disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).

However, the focus of each part of the *Aronson* test is on the challenged transaction. *Rales*, 634 A.2d at 933 (quoting *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984). In other words, under *Aronson*, courts must ask whether the directors were allegedly interested in the challenged transaction, whether they are independent from those who were interested in that transaction, and whether the challenged transaction represented a valid exercise of business judgment. *Id.* Thus, "[t]he essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors [considering the demand] is being challenged in the derivative suit." *Id.* (emphasis in original).

For this reason, in *Rales*, the Delaware Supreme Court crafted a different test for situations "where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit." *Id.* at 933-34. The *Rales* Court suggested three "principal scenarios" where this test would apply:

> (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where...the decision being challenged was made by the board of a different corporation.

*Id.* at 934.[1] The Court noted that in each of these scenarios, courts should not focus on the business judgment involved in the challenged transaction or the directors' interest in that transaction, but rather on the directors' interest in the decision about whether to sue. *Id.* at 934.

---

[1] *Rales* was a "double derivative" suit where the nominal defendant corporation merged with another corporation and became its wholly-owned subsidiary. Thus, the case was an example of the third scenario, as the demand would be considered by the board of the parent corporation.

8

Thus, courts applying the *Rales* test must determine whether the plaintiff has alleged particularized facts that create a reasonable doubt that the board of directors, as it was composed at the time of the complaint's filing, "could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.*

Defendants argue that the Court should apply the *Rales* test here because Waber is not challenging an actual decision by the board of directors in this case. They point out that, for the most part, Waber's allegations focus on the conduct of Motorola's officers, including Zander, Meredith, and Brown, in the fall of 2007. They suggest that Waber has not alleged any more than a possible failure by the board to oversee the officers' actions.

Waber suggests that he has alleged more. He points to three sets of allegations in support of his claim that the defendant board members actually "turned a willful blind eye" to the conduct of Motorola's officers, thus bringing this case within the reach of *Aronson*. First, he notes that a number of the defendants are members of the Audit and Legal Committee, which is responsible for discussing and overseeing financial statements and reporting by the officers. Second, he notes that Zander stepped down prior to the December 6th statement at the Lehman Brothers conference and that the board obviously would have been aware of the circumstances surrounding and reasons behind Zander's resignation. Finally, he notes that the company was in negotiations with Freescale during the fourth quarter, and that the company could not enter into a settlement with Freescale without the board's knowledge and approval, so the board must have been aware of the impact of those negotiations. Waber believes that the court can reasonably infer from these allegations that the board willfully ignored the fact that Zander, Meredith, and Brown were making misleading statements.

The Seventh Circuit has applied the *Aronson* test in at least one case involving "conscious inaction" by a board. *See Abbott Labs*, 325 F.3d 795, 806. Although technically the *Abbott Labs* court was applying Illinois law, the distinction is immaterial because Illinois law on demand futility simply mimics Delaware law. *Id.* at 803; *but see Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005) (rejecting *Abbott* in part because it is actually an interpretation of Illinois law). However, the facts set forth by Waber fall short of those in *Abbott Labs* in their tendency to suggest the board's willful, rather than passive, ignorance of the officers' actions. The plaintiffs in *Abbott Labs* did rely in part on the fact that some members of the board were on the company's audit committee, but they relied on much more than that. 325 F.3d at 806. They alleged that the chairman of the board of the nominal defendant pharmaceutical company was copied on multiple warning letters from the FDA. *Id.* The FDA eventually entered into a Voluntary Compliance Plan with the company, but cancelled it three years later after finding continuing violations. *Id.* A final warning letter was sent to another member of the board. *Id.* The plaintiffs did not just assume Audit Committee Members had knowledge of the violations because of their role, but because they signed SEC disclosure forms acknowledging noncompliance. *Id.* On top of all of this, the FDA's problems with the company were public knowledge back when the Voluntary Compliance Plan first began. *Id.* Given these detailed and extensive allegations, the court had a substantial factual basis for assuming that members of the board knew about the company's repeated violations for years. *Id.*; *see also In re Pfizer Inc. Shareholder Derivative Litig.*, 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010) (finding *Aronson* applicable because "the Complaint details at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of [the nominal defendant corporation's] continued misconduct and chose to disregard it").

On the other hand, however, the facts detailed above do provide some basis from which the Court might reasonably infer that the board was more than "blamelessly unaware" of the officers' conduct. *Abbott Labs*, 325 F.3d at 805 (distinguishing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 969 (Del. Ch. 1996) and *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125 (Del. 1963)). Defendants appear to take the position that Waber is required to plead these facts with particularity in order for the *Aronson* test to apply. If that were the case, then Defendants would surely be correct that the *Rales* test applies because Waber's allegations regarding the board's knowledge are not particularized and require too much speculation. The closest Waber gets to pleading specifics about what knowledge board members' had and when is to allege that the Audit Committee must have known about the facts that belied the officers' statements beforehand because they were required by their charter to discuss those facts and statements. But, as Defendants note, the Audit Committee charter states that such discussions "need not occur in advance of each release or each provision of guidance."[2]

However, Defendants misinterpret Rule 23.1. The rule requires Waber to plead particularized facts that meet the *Aronson* test in order to have demand excused, but says nothing about the facts that give rise to the application of the test in the first place (the facts that form the basis of his claim). Fed. R. Civ. P 23.1. Hence, the Court must simply determine whether the allegations in the complaint plausibly suggest that the board affirmatively ignored the misleading nature of the comments that Motorola's officers made in the fall of 2007. And while the

---

[2] While Waber does not attach the Audit and Legal Committee charter to his complaint, and does not quote this provision, he does refer to the charter multiple times in support of his claim that the committee's members were responsible. Defendants do attach the charter to their motion and "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). While it is debatable that the charter is central to Waber's claim, it is central to any argument regarding particularized allegations under Rule 23.1, as detailed further below. Thus, the Court considers the charter to be part of the pleadings for purposes of ruling on this motion.

11

allegations may fall far short of those outlined in *Abbott Labs* and *Pfizer*, they do provide a basis from which the Court can infer that the 2007 board knew the officers' comments were misleading and failed to stop them or correct them. Thus, the Court applies the *Aronson* test.

**B. *Aronson* test**

**1. Interested**

The first step in the *Aronson* test is to determine whether a majority of the board members are so interested in the challenged transaction (in this case, in ignoring the officers' misleading statements), or so dependent on those who are interested, that the business judgment rule does not apply to the transaction. 473 A.2d at 814.

Waber alleges that only Zander and Meredith had a direct financial interest in making the misleading statements because of the effects the statements could have on their stock options. He does attempt to allege that other board members were interested because of their desire to complete a bond offering in order to pay off the company's debt obligations. However, a director is only interested if "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and stockholders." *Rales*, 634 A.2d at 936. Because the board members' interests in paying off the company's debts were no different than those of the corporation or the stockholders, Waber's allegations regarding the bond offering do not show that the remaining board members were sufficiently interested.

Apparently recognizing this, Waber relies more heavily on the theory that there is a "substantial likelihood" that a majority of the board members will be liable in this case. Under *Aronson*, this is another way to show that a director is interested. 473 A.2d at 815. However, this theory is only viable in those "rare cases" where "a transaction [is] so egregious on its face

12

that board approval cannot meet test of business judgment," not in every case were a "mere threat of personal liability" exists. *Id.* And while Waber's failure to plead much about the board members with particularity does not determine which test applies, it does hamper his ability to show that members of the board face a substantial likelihood of liability.

As noted above, Waber fails to plead with particularity that a majority of the directors knew of the misleading nature of the officers' statements. Waber's allegations regarding Brown, who allegedly made some of the misleading statements himself, may be sufficient. But allegations of certain defendants' membership on the Audit and Legal Committee, Zander's resignation, and ongoing negotiations with Freescale that started at some point during the fourth quarter simply do not provide the particulars for what the board knew, how they learned it, or when they learned it. *See Garza ex rel. Navistar Intern. Corp. v. Belton*, No. 08 C 1387, 2010 WL 3324881, *9 (N.D. Ill. Aug. 13, 2010) (holding allegations that defendant directors were members of corporation's audit committee to be insufficient to plead "conscious inaction" regarding improper accounting practices for purposes of showing substantial likelihood of liability). Without particularized allegations regarding these facts, Waber cannot show that the board was guilty of "conscious inaction" with regard to the misleading statements.

Waber's only other option would be to show a substantial likelihood that a majority of the board will be held liable for their improper oversight of the company's officers. One Delaware court described this theory of liability as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). In order to proceed on such a theory, Waber would have to allege that the directors either: (1) "utterly failed to implement any reporting or information system or controls;" or (2) "having implemented such a system or

controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Waber has not even made general allegations to this effect, let alone particularized allegations.

Finally, Waber's allegations regarding committee memberships are based on a 2009 Proxy. Thus, even if membership on the Audit Committee were enough to prove either of the above theories, Waber has not pleaded with particularity that any defendants were on that committee during the time of the misleading statements. Waber has therefore failed to show that a majority of the board faces a substantial likelihood of liability and, as a result, has failed to show that a majority of the board was interested in the decision to mislead the public.

### 2. Lacking independence

Assuming for the sake of argument that Waber has sufficiently alleged that Zander, Meredith, and Brown were interested, he must plead with particularity that at least three other members of the board were "beholden" to the interested directors "or so under their influence that their discretion would be sterilized" in order to show that a majority of the board is either interested or lacks independence. *Rales*, 634 A.2d at 936.

Waber argues first that some of the Defendants, namely Dorman and Jha, lacked independence because they were employed by Motorola. These allegations are insufficient because Waber provides no explanation for why this would make them beholden to Zander, Meredith, and Brown. None of the three arguably interested defendants were on the corporation's Compensation Committee. Moreover, while Zander and Brown, who both served as CEO, have definitely exercised significant power over other employees, neither exercised that power over Jha at any time. Jha has been the Co-CEO since joining the company after the

14

alleged misleading statements were made. Perhaps at some point Zander, Brown, or Meredith exercised some power over Dorman as an employee, but Waber has not made any such allegations.

Next, Waber alleges that Lewent and Hambrecht have interests in other organizations with which Motorola has commercial or charitable relationships. However, the mere fact that Lewent and Hambrecht have interests in businesses that have received funds from Motorola does not raise a reasonable doubt as to their independence from Meredith, Zander, and Brown. *See In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 808, 821-22 (Del. Ch. 2005). Moreover, even if Lewent and Hambrecht did lack independence, they would not make up a majority of the board when combined with the three arguably interested directors.

### 3. Exercise of business judgment

Under the second prong of the *Aronson* test, the court must determine whether Waber has pleaded facts with particularity that raise a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814. For the same reasons that Waber has failed to allege a substantial likelihood of liability for most of the directors, he fails here as well. He has simply failed to provide sufficient particularized facts regarding any actual decisions or "conscious inaction" by a majority of the board members.

For all of these reasons, Waber's allegations fail to meet the requirements of the *Aronson* test, and he has therefore failed to show demand futility.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion to dismiss. Waber requested the opportunity to amend his pleadings in the event the Court so ruled. However, Waber has already amended his complaint once since Defendants filed their original motion to

15

dismiss under Rule 23.1. Even then, despite filing a 94-page amended complaint containing 235 paragraphs, Waber failed to meet *Aronson*'s pleading requirements. Thus, the Court denies Waber's request and grants the motion to dismiss with prejudice.

IT IS SO ORDERED.

__2/23/11__
Dated

__Wm. J. Hibbler__
Hon. William J. Hibbler
United States District Court